10 Cal.Rptr.3d 205 (2004)
85 P.3d 2
32 Cal.4th 588
In re JESUSA V., a Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Heriberto C., Defendant and Appellant.
No. S106843.
Supreme Court of California.
March 1, 2004.
*209 John L. Dodd, Tustin, under appointment by the Supreme Court, and Lisa A. DiGrazia for Defendant and Appellant.
Lloyd W. Pellman, County Counsel, and Lois D. Timnick, Deputy County Counsel, for Plaintiff and Respondent.
Children's Law Center of Los Angeles, Law Offices of Kenneth P. Sherman, Marissa Coffey, Monterey Park, and Kenneth P. Sherman for Minor.
Donna Wickham Furth and Shannan Wilber for Northern California Association of Counsel for Children and Legal Services for Children, San Francisco, as Amici Curiae on behalf of Minor.
BAXTER, J.
Jesusa V. became the subject of this dependency action when her biological father, Heriberto C., was taken into police custody for beating and raping her mother, and her mother, who was pregnant at the time, was hospitalized because of her injuries. At the detention hearing, the juvenile court ordered Jesusa to be placed with Paul B., the mother's husband and the father of her five other children.
*210 Paul, who was married to the mother at the time Jesusa was born and who had received the child into his home and had held her out as his own, promptly requested a declaration that he was Jesusa's presumed father. (Fam.Code, § 7611, subds.(a), (d).) Nine days later, Heriberto also filed a request to be declared the presumed father. The juvenile court ordered the Los Angeles County Sheriff to produce Heriberto, who was incarcerated, for the hearing to identify the presumed father and to adjudicate the dependency petition. (See Pen.Code, § 2625.) In the interim, however, Heriberto had been convicted of the rape and moved from the county jail to North Kern State Prison, rendering the court's transfer order ineffective. The hearing went forward in Heriberto's absence but in the presence of his attorney. At that hearing, the juvenile court declared that Paul was Jesusa's presumed father[1] under Family Code section 7612 and found that Jesusa was a dependent of the court under Welfare and Institutions Code section 300, subdivisions (a) and (b). With the mother's consent, the court maintained Jesusa's placement with Paul.
This set of facts presents three principal issues: Did the juvenile court err in making a declaration of presumed fatherhood at a hearing conducted in Heriberto's absence but in the presence of his attorney? If not, did the juvenile court err in declaring Paul  instead of Heriberto, the biological father  to be Jesusa's presumed father? And, in any event, did the juvenile court err in adjudicating the dependency petition while Heriberto was absent but his counsel was present? We find that the juvenile court erred only in adjudicating the dependency petition in Heriberto's absence, but that the error was harmless. We therefore affirm in part and reverse in part the judgment of the Court of Appeal.

BACKGROUND
On April 1, 2001, Jesusa V., who was not yet two years old, was taken into protective custody after her biological father, Heriberto C., raped and beat her mother. The mother, who was seven months pregnant with Heriberto's child, was hospitalized. The Long Beach police officers who arrested Heriberto reported that the motorhome where the three were residing was filthy and unsuitable to live in.
The Los Angeles County Department of Children and Family Services (DCFS) thereafter filed a dependency petition that, as modified, alleged that Heriberto had a long history of violent and aggressive behavior, that Heriberto had raped and beaten Jesusa's mother, that at that time and on other occasions Jesusa had been "exposed to violent confrontations" between her mother and Heriberto, and that her mother had failed to take action to protect the child. Jurisdiction was alleged under subdivisions (a) and (b) of section 300 of the Welfare and Institutions Code.
Heriberto was in jail at the time of the detention hearing on April 4, 2001, and did not appear. Jesusa's mother appeared at the hearing with her husband, Paul B. The couple had been married for nearly 18 years, although they had lived apart for the preceding three years. They had five children together. Paul, who was a sergeant in the United States Air Force in San Diego, promptly requested presumed father status under Family Code section 7611 and asked that Jesusa be placed with him and her five half siblings. The mother supported both requests and declared in *211 writing that Paul, as well as Heriberto, had held himself out as Jesusa's father and had accepted her into his home.
Paul testified that Jesusa had lived with him from time to time when her mother came to San Diego to visit her other children and that her most recent visit had been a month earlier. The juvenile court found a prima facie basis to detain Jesusa and released her to Paul's custody. The court also made a tentative finding, subject to later rebuttal, that Paul was Jesusa's presumed father.
When Heriberto appeared in court about a week later, counsel was appointed to represent him. Heriberto denied the allegations in the petition and announced his intent to seek presumed father status. The juvenile court issued a removal order (Pen.Code, § 2625) for Heriberto to attend a hearing on April 30, 2001, on presumed fatherhood. The court also advised counsel to brief the matter and to consider having Heriberto file a supporting declaration.
On April 30, the juvenile court continued the matter to July 17, 2001, and again issued a removal order for Heriberto.
On May 21, 2001, in a separate criminal proceeding, Heriberto pleaded no contest to one count of raping Jesusa's mother on the night in question and was sentenced to three years in prison with an immigration hold. Because of an intervening transfer to North Kern State Prison, however, the juvenile court's removal order directed to the Los Angeles County Sheriff was ineffective. Heriberto therefore was not present when the parties reconvened on July 17. Counsel objected and asked for another continuance, asserting that proceeding in Heriberto's absence would violate due process. The court, after remarking that it had been under the impression the issue of paternity "would be fully decided on the briefs and argument on the briefs" without taking testimony (and observing that Heriberto had indeed filed such a brief), inquired of counsel what testimony Heriberto could provide. Counsel's response described evidence that encompassed "the extent in which [Heriberto] held out paternity, publicly acknowledged paternity for Jesusa, and formal steps he [took] to identify [her as his daughter to] ... government agencies" as well as the truth or falsity of the allegations of domestic violence in the dependency petition. The court then explained that, to resolve the issue of presumed fatherhood, it would not be making a finding as to the truth of the allegations in the petition and would consider only the mother's statements that she had on occasion sought refuge with her husband, Paul. The court also credited the representations made by counsel  i.e., that Heriberto was Jesusa's biological father, that he had held himself out as her father, and that he had received the child into his home. Accordingly, the court denied the request for a continuance.
After observing that either man  Heriberto or Paul  thus qualified as a presumed father, the juvenile court found the weightier interest favored Paul, who had been married to Jesusa's mother at the time Jesusa was conceived and born; who was still married to Jesusa's mother; who had held himself out as Jesusa's father, had received her into his home, and had treated her as his own; who was the father of Jesusa's five half siblings, all of whom still lived with him and also had developed a bond with Jesusa; and who had lived with Jesusa for a significant period in her young life. "In other words, there is so much more to being a father than merely planting the biological seed. The man who provides the stability, nurturance, family ties, permanence, is more important to a child than the man who has mere biological ties.... [¶] By finding [Paul] is the presumed *212 father, this court is protecting and preserving a family unit, the integrity of a family unit."
The juvenile court then proceeded to adjudicate the dependency petition, again over counsel's objection that Heriberto was absent. Based on several DCFS reports, the arrest report, and the police follow-up report, the court sustained the dependency petition, maintained Jesusa in Paul's custody, permitted the mother to have unmonitored visits with her child and granted her reunification services, and ordered Heriberto to have no contact with the child.
Heriberto appealed. The Court of Appeal affirmed in part and reversed in part in a published opinion. The appellate court affirmed the order identifying Paul as Jesusa's presumed father but reversed the order sustaining the dependency petition, reasoning that the lower court had lacked jurisdiction under Penal Code section 2625, subdivision (d) to adjudicate the petition in Heriberto's absence. Because this construction of section 2625 created a conflict with two other published decisions, In re Rikki D. (1991) 227 Cal.App.3d 1624, 278 Cal.Rptr. 565 (Rikki D.) and In re Axsana S. (2000) 78 Cal.App.4th 262, 92 Cal.Rptr.2d 701 (Axsana S.), and presented other important issues concerning presumed fatherhood, we granted review.

DISCUSSION

A
Although Heriberto was represented by counsel at the presumed fatherhood hearing, he claims the trial court violated Penal Code section 2625 and due process by proceeding in his absence. The Court of Appeal, relying on the fact that Heriberto was represented at the hearing by counsel, correctly rejected this claim.
Penal Code section 2625 requires a court to order a prisoner-parent's temporary removal and production before the court only "where the proceeding seeks to terminate the parental rights of [the] prisoner" under Welfare and Institutions Code section 366.26 or Family Code section 7800 et seq. or "to adjudicate the child of a prisoner a dependent child." (Pen.Code, § 2625, subds.(b), (d); see In re Barry W. (1993) 21 Cal.App.4th 358, 368-369 & fn. 7, 26 Cal.Rptr.2d 161.) A proceeding to identify the presumed father, which seeks merely to identify the man who has a legal entitlement to reunification services and/or custody (In re Zacharia D. (1993) 6 Cal.4th 435, 439, 24 Cal.Rptr.2d 751, 862 P.2d 751), is neither of these. Even after a presumed father is declared, the biological father retains "parental rights that simply differ in degree [from] the parental rights conferred on a presumed father." (Francisco G. v. Superior Court (2001) 91 Cal.App.4th 586, 596, 110 Cal.Rptr.2d 679.) Hence, Heriberto's contention that the declaration of presumed fatherhood is tantamount to a termination of his parental rights is exaggerated.
The hearing on presumed fatherhood was governed instead by Penal Code section 2625, subdivision (e): "In any other action or proceeding in which a prisoner's parental or marital rights are subject to adjudication, an order for the prisoner's temporary removal from the institution and for the prisoner's production before the court may be made by the superior court of the county in which the action or proceeding is pending...." (Italics added; see generally Payne v. Superior Court (1976) 17 Cal.3d 908, 920, 132 Cal.Rptr. 405, 553 P.2d 565.) Because the trial court has discretion whether to order the prisoner's removal in this category of cases, "it follows that such a case may proceed without attendance by the prisoner-parent." *213 (In re Barry W., supra, 21 Cal.App.4th at p. 370, 26 Cal.Rptr.2d 161.)[2]
The record demonstrates the juvenile court did not abuse its discretion in proceeding without Heriberto's personal attendance at the presumed fatherhood hearing. (In re Barry W., supra, 21 Cal.App.4th at pp. 370-371, 26 Cal.Rptr.2d 161.) When asked what testimony Heriberto could have provided, counsel's offer encompassed only evidence that established Heriberto's threshold qualifications for presumed father status  i.e., "the extent in which [Heriberto] held out paternity, publicly acknowledged paternity for Jesusa, and the formal steps he [took] to identify [her as his daughter to] ... government agencies."[3] In response, the court announced that it did not intend to determine "what [Heriberto] has done with regard to filling out documents with public agencies or government agencies or whatever he has done to confirm that he holds himself out as to the father" but would instead assume that Heriberto had held himself out as the father and did receive the child into his home. Since the court then declared that "both of these men or either of these men could be found to be presumed fathers," Heriberto's testimony became unnecessary.
The juvenile court's approach was also consistent with the California Rules of Court, which permit a determination of paternity without an evidentiary hearing. "The court may make its determination of paternity or nonpaternity based on the testimony, declarations, or statements of the mother and alleged father." (Cal. Rules of Court, rule 1413(e)(2).) In this *214 case, for example, the court advised the parties to brief the issue of presumed fatherhood  which Heriberto did  and instructed Heriberto's counsel "to consider having him file a declaration." That Heriberto failed to file a declaration  and that he still has not identified any critical testimony he could have offered (see Welf. & Inst.Code, § 388, subd. (a)) or explained why it could not have been offered by other witnesses or by documentary evidence  does not create a statutory right for him to personally attend the hearing on his presumed father status.
Heriberto's constitutional claim fares no better. Although there is no dispute that prisoners have a constitutional right of access to the courts (Payne v. Superior Court, supra, 17 Cal.3d at p. 914, 132 Cal.Rptr. 405, 553 P.2d 565) and that "absent a countervailing interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard" (Boddie v. Connecticut (1971) 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113), it does not follow that prisoners have a constitutional right to be personally present at every type of hearing. Due process guarantees" `notice and opportunity for hearing appropriate to the nature of the case.'" (Id. at p. 378, 91 S.Ct. 780, italics added.) As we have observed, due process entitles a biological father a meaningful opportunity to qualify as a presumed father. (Kelsey S., supra, 1 Cal.4th at pp. 840, 843, 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) Yet, as with other due process rights, "[h]ow that is to be achieved is to be determined by the exercise of discretion by the trial court." (Payne, supra, 17 Cal.3d at p. 927, 132 Cal.Rptr. 405, 553 P.2d 565.)
In this case, Heriberto was appointed an attorney to represent him at the presumed fatherhood hearing  an accommodation we have deemed sufficient for prisoners in other civil proceedings. (Payne v. Superior Court, supra, 17 Cal.3d at pp. 923-925, 132 Cal.Rptr. 405, 553 P.2d 565.) Through his attorney, Heriberto had the opportunity to call witnesses, to cross-examine adverse witnesses, and to present his own testimony in written form. Admittedly, he did not present any witnesses or submit such a declaration  but Heriberto must also acknowledge that his rape conviction rendered it improbable the court would have ordered reunification services (Welf. & Inst.Code, § 361.5, subds. (b)(12), (c)) and his incarceration made successful reunification all but impossible. (Id., § 361.5, subds. (a)(2), (e)(1); see In re Maria S. (1997) 60 Cal.App.4th 1309, 1313, 71 Cal.Rptr.2d 30.) In addition, Heriberto has not identified any facts that could have been presented only through his live testimony. (See, e.g., Fam.Code, § 7674, subd. (b)(1) [mother's signature is required for a voluntary declaration of paternity].)
Moreover, it appears that Heriberto was absent for only a portion of the presumed father hearing. Heriberto was present in court on April 13, when the court asked, "Do you want to be heard on any paternity issues today?" His attorney promptly responded that he "did discuss the matter" with Heriberto, who stated that he had lived with Jesusa's mother for three years, that he had held the child out as his own, and that he would be asking "for presumed [father] status." The court invited counsel to brief the issue, consider having Heriberto file a declaration, and "be prepared, then, to argue that matter on April 30th." On April 30, when Heriberto was again present, the court noted that it had recently received a brief from the minor in response to Heriberto's brief and was inclined to continue the matter. No party objected. On July 17, when the parties discovered that Heriberto's imprisonment *215 had rendered the transfer order ineffective, the court made plain its understanding, based on the foregoing, "that the issue of paternity would be fully decided on the briefs and argument on the briefs. No testimony to be taken." Under the circumstances, we cannot say that Heriberto's involuntary physical absence from that final stage deprived him of a meaningful opportunity to be heard.
Our conclusion is consistent with the case law. In Axsana S., supra, 78 Cal.App.4th 262, 92 Cal.Rptr.2d 701, for example, the incarcerated father claimed a violation of due process when the juvenile court conducted a dispositional hearing on the dependency petition and denied him reunification services while his attorney was present but he was absent. The Court of Appeal held that the father "received meaningful access to the courts through his appointed counsel. In dependency cases, as in other civil cases, personal appearance by a party is not essential; appearance by an attorney is sufficient and equally effective." (Id. at p. 269, 92 Cal.Rptr.2d 701; see also In re Dolly D. (1995) 41 Cal.App.4th 440, 445, 48 Cal.Rptr.2d 691.) Heriberto, like the father in Axsana S., "has cited no case law providing incarcerated parents a due process right to be present at dependency proceedings involving their children." (Axsana S., supra, 78 Cal.App.4th at p. 270, 92 Cal.Rptr.2d 701.) To the contrary, other state courts have "repeatedly held that that the due process rights of a prisoner who has been prohibited from participating in a custody hearing are not violated where the prisoner was represented by counsel at the hearing and was neither denied an opportunity to present testimony in some form on his behalf nor denied the opportunity to cross-examine witnesses." (Cook v. Boyd (E.D.Pa.1995) 881 F.Supp. 171, 175; see also In re T.N.T. (2002) 258 Ga.App. 396, 574 S.E.2d 444, 446-447.)
Accordingly, Heriberto was not denied any statutory or constitutional rights when the juvenile court proceeded to determine his presumed father status while his attorney was present but he was absent.

B
As the juvenile court recognized, both Paul and Heriberto satisfied the qualifications for presumed fatherhood under Family Code section 7611,[4] the relevant provision of the Uniform Parentage Act (§§ 7600-7730, hereafter UPA). Paul qualified under section 7611, subdivision (a), in that Jesusa was born during his marriage to the mother, as well as subdivision (d), in that he had received the child into his home and openly held her out as his child. Heriberto qualified under subdivision (d) in that he too had received Jesusa into his home and openly held her out as his child.
Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, "there can be only one presumed father." (In re Kiana A. (2001) 93 Cal.App.4th 1109, 1115, 113 Cal.Rptr.2d 669 (Kiana A.); Brian C. v. Ginger K. (2000) 77 Cal.App.4th 1198, 1223, 92 Cal.Rptr.2d 294.) How those competing presumptions are to be reconciled is set forth in section 7612: "(a) Except as provided in Chapter 1 (commencing with Section 7540) and Chapter 3 (commencing with Section 7570) of Part 2 or in Section 20102, a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence. [¶] (b) If two or more presumptions arise under *216 Section 7611 which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. [¶] (c) The presumption under Section 7611 is rebutted by a judgment establishing paternity of the child by another man."
Heriberto claims that his biological paternity constitutes clear and convincing evidence rebutting Paul's claim to presumed fatherhood under section 7612, subdivision (a). In the alternative, he claims that even if Paul's claim to presumed fatherhood is not rebutted, it is outweighed by Heriberto's claim under section 7612, subdivision (b).

1
In In re Nicholas H. (2002) 28 Cal.4th 56, 120 Cal.Rptr.2d 146, 46 P.3d 932 (Nicholas H.), we considered whether a presumption of fatherhood arising under section 7611 is necessarily rebutted under section 7612, subdivision (a) when, as here, the presumed father admits that he is not the biological father of the child. (Nicholas H., supra, at p. 58, 120 Cal.Rptr.2d 146, 46 P.3d 932.) We held, in accordance with several Court of Appeal cases, "that a presumption arising under section 7611(d) is not, under section 7612(a), necessarily rebutted by clear and convincing evidence that the presumed father is not the biological father of the child." (Id. at p. 64, 120 Cal.Rptr.2d 146, 46 P.3d 932.)
Our holding was based on the text of section 7612. We observed first that subdivision (a) provides merely that a presumption under section 7611 "`may be rebutted in an appropriate action only by clear and convincing evidence.'" (Nicholas H., supra, 28 Cal.4th at p. 63, 120 Cal.Rptr.2d 146, 46 P.3d 932.) Accordingly, the statute did not contemplate a reflexive rule that biological paternity would rebut the section 7611 presumption in all cases, without concern for whether rebuttal was "appropriate" in the particular circumstances. We found additional support in section 7612, subdivision (b), which directs the juvenile court confronted with conflicting presumptions to prefer the presumption which on the facts is founded on the weightier considerations of policy and logic. "As a matter of statutory construction, if the Legislature had intended that a man who is not a biological father cannot be a presumed father under section 7611, it would not have provided for such weighing, for among two competing claims for presumed father status under section 7611, there can be only one biological father." (Nicholas H., supra, 28 Cal.4th at p. 63, 120 Cal.Rptr.2d 146, 46 P.3d 932.)
As Heriberto points out, however, Nicholas H. involved an action in which no other man claimed parental rights to the child. The biological father, unlike Heriberto, had not come forward to assert his parental rights and could not be located. (Nicholas H., supra, 28 Cal.4th at p. 61, 120 Cal.Rptr.2d 146, 46 P.3d 932.) We therefore found it unnecessary to consider whether, under section 7612, "biological paternity by a competing presumptive father necessarily defeats a nonbiological father's presumption of paternity." (Nicholas H., supra, at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) Applying the analytical framework developed in Nicholas H. to this question, we now find that biological paternity by a competing presumed father does not necessarily defeat a nonbiological father's presumption of paternity.
As we observed in Nicholas H., the text of section 7612, subdivision (a) does not articulate a categorical rule detailing when the section 7611 presumption of paternity is rebutted, but instead provides only that the presumption "`may'" be rebutted "`in an appropriate action.'" (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal. *217 Rptr.2d 146, 46 P.3d 932.) This indicates that the Legislature did not envision an automatic preference for biological fathers, even if the biological father has come forward to assert his rights. Indeed, as noted above, "if the Legislature had intended that a man who is not a biological father cannot be a presumed father under section 7611, it would not have provided for such weighing, for among two competing claims for presumed father status under section 7611, there can be only one biological father." (Nicholas H., supra, 28 Cal.4th at p. 63, 120 Cal.Rptr.2d 146, 46 P.3d 932, italics added.) If, on the other hand, the Legislature had intended to restrict the weighing process under section 7612, subdivision (b) to disputes between competing nonbiological fathers, it could easily have said so.
Our analysis in Nicholas H. also was informed by section 7575, subdivision (b), which "permits but does not require" a court to rely on blood test evidence in deciding whether to set aside a voluntary declaration of paternity signed on or before December 31, 1996. (Nicholas H., supra, 28 Cal.4th at p. 63, 120 Cal.Rptr.2d 146, 46 P.3d 932.) We concluded: "It is unlikely the Legislature would  without explicitly so stating  adopt a contrary rule that blood test evidence ... must defeat the claim of a person who claims presumed father status under section 7611(d)." (Id. at p. 64, 120 Cal.Rptr.2d 146, 46 P.3d 932.) This analysis has equal application when the biological father has been identified and asserts a competing presumption of fatherhood.
Finally, Nicholas H. relied on case law from the Court of Appeal, which on balance supported the paternity presumption of the nonbiological father. (Nicholas H., supra, 28 Cal.4th at pp. 64-70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) A review of the case law reveals that the weight of authority similarly supports the nonbiological father here.
In Kiana A., supra, 93 Cal.App.4th 1109, 113 Cal.Rptr.2d 669, as is the case here, two men qualified as presumed fathers under section 7611. The biological father contended the juvenile court should have ordered genetic testing "before it commenced the weighing process of section 7612, subdivision (b), because one of the competing presumptions would have been rebutted based upon the results of the testing." (Kiana A., supra, at p. 1118, 113 Cal.Rptr.2d 669.) The Court of Appeal rejected this contention not only on the ground that the biological father had failed to seek genetic testing in the juvenile court but also on the ground that even if he had preserved the issue, "biological paternity by a competing presumptive father does not necessarily defeat a nonbiological father's presumption of paternity." (Ibid.) As support for its position (and in anticipation of our approach in Nicholas H.), the Court of Appeal focused on section 7612, subdivision (a), which "states a presumption of paternity `may be rebutted in an appropriate action only by clear and convincing evidence.' (Italics added.) Thus, although the results of genetic testing constitute clear and convincing evidence, it does not follow that such evidence will rebut the presumption in every case. Rather, the statute seeks to protect presumptions of paternity, once they have arisen, from being set aside except upon clear and convincing evidence and only in an appropriate case." (Kiana A., supra, 93 Cal.App.4th at pp. 1118-1119, 113 Cal.Rptr.2d 669.)
Kiana A. also relied on Steven W. v. Matthew S. (1995) 33 Cal.App.4th 1108, 39 Cal.Rptr.2d 535, which upheld a finding of presumed fatherhood in favor of a man who had held out the child as his own, even though the competing presumed father *218 was the child's biological father. "Thus, as between two men, both of whom qualify as presumptive fathers, biological paternity does not necessarily determine which presumption will prevail under section 7612." (Kiana A., supra, 93 Cal.App.4th at p. 1119, 113 Cal.Rptr.2d 669.)
Heriberto cites only one case to the contrary  Brian C. v. Ginger K., supra, 77 Cal.App.4th 1198, 92 Cal.Rptr.2d 294  but Brian C. does not go as far as he supposes. Brian C. involved a purported biological father who sought to challenge another man's "conclusive[ ]" presumption of paternity (§ 7540), which was based on his marital cohabitation with the mother during the child's conception. The Brian C. court found that because the purported biological father qualified as a presumed father, he had statutory standing to challenge the conclusive presumption. (Brian C., supra, 77 Cal.App.4th at pp. 1220-1221, 92 Cal.Rptr.2d 294.) In dictum (and as an aside), the court suggested that DNA tests on remand would "probably" render "moot" the need to weigh competing presumptions under section 7612, subdivision (b). (Brian C., supra, 77 Cal.App.4th at p. 1222, 92 Cal.Rptr.2d 294.) In the accompanying footnote, the court explained that "DNA tests will certainly constitute clear and convincing evidence rebutting any of the presumptions that might favor either [presumed father]. (Under subd. (a) of Fam.Code, § 7612, a presumption shown by § 7611 `may be rebutted ... only by clear and convincing evidence.')" (Brian C., supra, 77 Cal.App.4th at p. 1222, fn. 20, 92 Cal.Rptr.2d 294.) Brian C., which preceded our opinion in Nicholas H., did not quote  and thus did not consider  the critical language in section 7612, subdivision (a) that the paternity presumption may be rebutted only in an appropriate case. Moreover, its implicit suggestion that genetic tests might rebut the presumption in that particular case does not prove that biological paternity always rebuts the section 7611 presumption. (See also Kiana A., supra, 93 Cal.App.4th at p. 1120, 113 Cal.Rptr.2d 669 [distinguishing Brian C.].)[5]
For the foregoing reasons, we reject Heriberto's contention that biological paternity by a competing presumed father necessarily rebuts another man's presumption of paternity under section 7612, subdivision (a). A juvenile court confronted with such a claim must instead consider whether rebuttal of the presumption would be appropriate in the circumstances of the case. (Cf. Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) This is a matter entrusted to the juvenile court's discretion. (Id. at p. 59, 120 Cal.Rptr.2d 146, 46 P.3d 932.)
No abuse of discretion occurred here. Paul has a substantial relationship with Jesusa. Not only is Paul married to Jesusa's mother, he is the father of Jesusa's five half siblings, all of whom live with him and have themselves established a close relationship with Jesusa. Although Jesusa and her mother resided with Heriberto before his arrest and incarceration, they visited Paul at his house nearly *219 every weekend. Paul also provided shelter to Jesusa and her mother during periods of conflict between the mother and Heriberto  periods that sometimes lasted as long as a month. Inasmuch as Jesusa was less than two years old at the time Heriberto was arrested, Paul has plainly been involved in a substantial portion of the child's young life and considers Jesusa to be a part of his family. Moreover, the mother supported Paul's effort to be deemed the presumed father.
The sole facts offered to support Heriberto, on the other hand, were that he was Jesusa's biological father, that he had "received the child into his home and openly held himself out as [her] natural father," and that he had lived with Jesusa's mother prior to the conception and through her infancy. One must subtract, however, at least a three-month period in early 2000, when he was jailed in Colorado for assaulting the mother (and subsequently deported), as well as the period following his arrest and conviction for the current rape. During the remaining time, Jesusa's weekends  as well as additional periods of refuge that lasted as long as a month  were spent with Paul. Under the circumstances, the juvenile court did not abuse its discretion when it found this was not an appropriate action in which to rebut Paul's claim to presumed fatherhood.

2
Based on its finding that Heriberto and Paul each could claim a presumption of fatherhood, the juvenile court undertook to identify the presumption "which on the facts is founded on the weightier considerations of policy and logic" (§ 7612, subd. (b)) and determined that the scales favored Paul. We once again find no abuse of discretion.
At the outset, we reject the notion that the juvenile court was bound by section 7612, subdivision (b) to accord determinative weight to biology. This section, which derives from the UPA, nowhere states that biology is a conclusive consideration of policy and logic. (Doe v. Doe (2002) 99 Hawai'i 1, 52 P.3d 255, 262 ["If the genetic presumption `controlled' as a matter of law, then [the statute] would plainly say so, and there would be no point in directing the court to consider which competing presumption `on the facts is founded on the weightier considerations of policy and logic'"].) Moreover, other states that have adopted the UPA have consistently declined to make biology determinative under their analog to section 7612 when confronted by competing presumptions of paternity. In N.A.H. v. S.L.S. (Colo.2000) 9 P.3d 354, for example, the Colorado Supreme Court found that "neither the presumption of legitimacy nor the presumption based on biology is conclusive" (id. at p. 362) and held instead "that when presumptions of paternity arise in more than one potential father, trial courts must take the best interests of the child into account as part of policy and logic in resolving competing presumptions." (Id. at p. 366.) In Doe v. Doe, supra, 99 Hawai'i 1, 52 P.3d 255, the Hawai'i Supreme Court similarly found that "the genetic testing presumption is not more important than the other presumptions; it is one of several that must be considered...." (Id. at p. 262.) In Witso v. Overby (Minn.2001) 627 N.W.2d 63, the Minnesota Supreme Court declared that even if genetic tests identified one man as the biological father, the court must nonetheless "weigh the conflicting presumptions, and `the presumption which on the facts is founded on the weightier considerations of policy and logic controls.'" (Id. at p. 69; Matter of Welfare of C.M.G. (Minn.Ct.App.1994) 516 N.W.2d 555, 560 ["Where competing presumptions of paternity *220 exists, the determination of paternity is no longer solely an issue of biological fact"].) And, in Love v. Love (1998) 114 Nev. 572, 959 P.2d 523, 527, where only the husband's presumption was at issue and he sought to disclaim paternity on the ground he was not the biological father, the Nevada Supreme Court observed that "where factors conflict, as they may here, the district court must use its discretion to apply considerations of policy and logic to the relevant evidence." In short, our construction  which permits a court to consider every relevant consideration of policy and logic  is in accord with every UPA state to have addressed the issue.[6]
The juvenile court thus was obliged to weigh all relevant factors  including biology  in determining which presumption was founded on weightier considerations of policy and logic. We conclude it did so.
The juvenile court found that Paul was married to Jesusa's mother; that they have five children together; that Jesusa had spent a "considerable amount of time" in Paul's home and had lived with him "for a significant amount of time during her young life"; that Jesusa had established a bonding relationship with Paul as well as with her siblings, all of whom live with him; and that a family unit existed there to protect the child. The court also found that Jesusa's mother often went to Paul's home to seek refuge from Heriberto  a fact that tended to confirm which father "provides the safety and stability and welfare that this child is entitled to have. [¶] [Paul] has assumed the parental rights and particularly assumed the parental responsibilities of this young child. He has lived with this child. He has treated her as his own."
The facts supporting Heriberto's presumption, on the other hand, were less weighty. The juvenile court found that Heriberto lived with the mother when the child was conceived and born; that he was the biological father; and that he held himself out as Jesusa's father and received her into his home. Although the parties did not then have a copy of the judgment of conviction, the court did note the allegation of domestic violence the mother had lodged against Heriberto.
The juvenile court weighed the "competing interests" as follows: "[T]he court must look to the state interests in rendering its decision. The state interests rest on the policy to preserve and protect developing parent/child relationships which give young children social and emotional strength and stability. This is more important than establishing biological ties. [¶] In other words, there is so much more to being a father than merely planting the biological seed. The man who provides the stability, nurturance, family ties, permanence, is more important to a child than *221 the man who has mere biological ties. [¶] By finding [Paul] is the presumed father, this court is protecting and preserving a family unit, the integrity of the family unit."
Heriberto does not challenge the facts or the criteria on which the juvenile court relied. He claims instead that "because Heriberto shares a biological connection to Jesusa and has at least an equal, if not greater, relationship with Jesusa than Paul ... the conflict between the paternity presumption[s] must be resolved based upon biological paternity." As support, he relies on Kiana A., supra, 93 Cal.App.4th at page 1120, 113 Cal.Rptr.2d 669, in which the Court of Appeal stated that "where the weight of the interests of the competing presumptive fathers are in relatively equal balance, biological paternity might properly be relied upon to determine which presumption carried more weight." We find Kiana A. unhelpful to Heriberto for two reasons. First, Kiana A. stated only that biological paternity might be relied upon to determine paternity where the interests are otherwise in relatively equal balance, not (as Heriberto contends) that it must be so used. Second, the record here does not support Heriberto's characterization of his interests as equally balanced with Paul's. The juvenile court found Paul's interest to be the weightier one on the grounds that Jesusa had established a bond with Paul; that Paul was married to Jesusa's mother, who continued to visit Paul regularly and to seek refuge with him as protection from Heriberto; and that Jesusa had established a bond with her five siblings, who also lived with Paul. (Cf. Welf. & Inst.Code, §§ 366.26, subd. (c)(1)(E), 16002.) Heriberto, on the other hand, had a stormy relationship with Jesusa's mother and did not have custody of any of her other children. Moreover, it is difficult to imagine conduct more destructive of the parent-child relationship than Heriberto's violent rape of Jesusa's mother while Jesusa was present in the home. (Fam.Code, § 3020, subd. (a) ["domestic violence in a household where a child resides is detrimental to the child"].)
That Heriberto had satisfied the minimum requirements to qualify as a presumed father under section 7611 did not compel a finding that his interests and Paul's were equally balanced under section 7612. Thus, even if the juvenile court might have relied on biological paternity to select between presumptions of equal value, such a rule would not have aided Heriberto.

3
Heriberto claims next that failing to accord determinative weight to his biological relationship to Jesusa violated his due process right to parent Jesusa. We disagree.
Heriberto relies on Kelsey S., supra, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216, in which we stated that a biological father's federal constitutional right to due process "prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (Id. at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) What Heriberto fails to apprehend, though, is that the identification of another man as Jesusa's presumed father does not terminate Heriberto's parental relationship with the child. Indeed, neither Heriberto nor our dissenting colleagues cite anything to support their assertion that a declaration of Paul's presumed fatherhood has rendered Heriberto a legal stranger to the child. A declaration of presumed fatherhood entitles the presumed father to reunification services and custody of the child (In re Zacharia D., supra, 6 Cal.4th at p. 439, 24 Cal.Rptr.2d 751, 862 P.2d 751) but does not itself terminate the biological *222 father's parental relationship with the child. (Francisco G. v. Superior Court, supra, 91 Cal.App.4th 586, 596, 110 Cal.Rptr.2d 679.) Termination of parental rights requires further proceedings. (See Fam.Code, §§ 7664, 7800 et seq.; Welf. & Inst.Code, § 366.26; see generally In re Malinda S. (1990) 51 Cal.3d 368, 383-384, 272 Cal.Rptr. 787, 795 P.2d 1244.) Hence, no showing of Heriberto's unfitness was required before Paul could be declared Jesusa's presumed father.
Moreover, it appears that Heriberto, who never executed a voluntary declaration of paternity or described any other steps to formalize his role before the dependency petition was filed, has not "`sufficiently and timely demonstrated a full commitment to his parental responsibilities'" to merit constitutional protection. (Adoption of Michael H. (1995) 10 Cal.4th 1043, 1055, 43 Cal.Rptr.2d 445, 898 P.2d 891.) Unlike the unwed biological father in Kelsey S., supra, 1 Cal.4th at page 822, 4 Cal.Rptr.2d 615, 823 P.2d 1216, who filed an action two days after the child's birth to establish his parental relationship with the child and was thwarted only because the court's order granting him custody was disobeyed, Heriberto was living with the child's mother and presumably could have obtained her cooperation with any legal steps to formalize his relationship to the child. (See § 7574, subd. (b)(1).) Yet the record does not reveal any steps he took to shoulder legal responsibility for the child until after had he raped the mother and the dependency petition was filed. (Kelsey S., supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216 ["A court should also consider the father's ... prompt legal action to seek custody of the child"].) On this record, Heriberto has not demonstrated that he "promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted." (Michael H., supra, 10 Cal.4th at p. 1060, 43 Cal.Rptr.2d 445, 898 P.2d 891, italics added; see also Kelsey S., supra, 1 Cal.4th at p. 838, 4 Cal.Rptr.2d 615, 823 P.2d 1216.)
To resolve Heriberto's alternate claim that denying him presumed father status unconstitutionally interfered with his right to parent Jesusa, we will first assume that Heriberto has a constitutionally protected liberty interest in maintaining his parent-child relationship with Jesusa. (Cf. Dawn D. v. Superior Court (1998) 17 Cal.4th 932, 942, 72 Cal.Rptr.2d 871, 952 P.2d 1139 [distinguishing between "an unwed father's interest in maintaining and preserving an existing parent-child relationship" and "an unwed father's biological connection alone to a child born to a married woman"].) Then, applying traditional substantive due process principles, we must balance the competing private and state interests  i.e., Heriberto's largely abstract interest in being an absent presumed father while he remains in prison for raping Jesusa's mother, subject to deportation upon his release,[7] against the substantial state interests in familial stability and the welfare of the child. (Michelle W. v. Ronald W. (1985) 39 Cal.3d 354, 360-363, 216 Cal.Rptr. 748, 703 P.2d 88; Kiana A., supra, 93 Cal.App.4th at pp. 1114-1115, 113 Cal.Rptr.2d 669; see generally In re Sade C., *223 supra, 13 Cal.4th at p. 989, 55 Cal.Rptr.2d 771, 920 P.2d 716 ["The state has a `parens patriae interest in preserving and promoting the welfare of the child'"]; Welf. & Inst.Code, § 202 [purpose of dependency proceedings is to promote child's best interests].)
This inquiry resembles that already undertaken by the juvenile court in determining which paternity presumption was founded on the weightier considerations of policy and logic. (Kiana A., supra, 93 Cal.App.4th at p. 1121, 113 Cal.Rptr.2d 669 [alleged father "has been accorded due process through the statutory procedure which resulted in the juvenile court's determination his presumption was entitled to less weight"]; see Steven W. v. Matthew S., supra, 33 Cal.App.4th at p. 1116, 39 Cal.Rptr.2d 535.) Yet, Heriberto offers no reason why the result here should differ from that reached by the juvenile court. Indeed, Heriberto claims only that where both presumed fathers "have an equal relationship with Jesusa," due process requires that biological paternity be determinative. We need not decide here the soundness of Heriberto's legal rule, inasmuch as we have already determined that Jesusa's relationship with him was not the equal of her relationship with Paul.

4
The dissenting opinions, which rely on arguments and authorities neither mentioned nor discussed by any of the parties, merit separate analysis.
(a) Justice Chin asserts that our holding will place at risk the father-child relationship for untold thousands of biological fathers "by a court's subjective and discretionary determination that some other man who qualifies as a presumed father would be a better father." (Dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 278, 85 P.3d at p. 63.) But our holding does not apply to biological fathers who are married to and cohabit with the mother and are therefore conclusively presumed to be the father. (§ 7540.) Nor does it apply to unwed biological fathers who, unlike Heriberto, have sought to formalize their legal status by executing a voluntary declaration of paternity. (§§ 7571, 7573.) And it does not apply to unwed biological fathers who, again unlike Heriberto, have successfully maintained a parent-child relationship such that no other man obtains the opportunity to qualify as a presumed father. (See § 7611.) In short, our holding applies only to that small subset of biological fathers who have neither married the mother of their child nor otherwise taken any steps to formalize their legal relationship with the child prior to the child's formation of a presumptive parent-child relationship with a competing man who is interested in asserting his legal rights as a father. If, in that category of cases, both men seek to be declared the presumed father, the court will have to determine, as the Legislature has provided, whether it is "appropriate" to rebut the nonbiological father's presumption and which of the two presumptions "on the facts is founded on the weightier considerations of policy and logic." (§ 7612, subds.(a), (b).)
(b) Justice Chin also asserts that the Legislature has "clearly" expressed its intent to make biology determinative as between competing presumed fathers. (Dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at pp. 243, 246, 85 P.3d at pp. 33, 36.) Yet he concedes, as he must, that California's UPA "does not expressly provide that one presumed father's established biological paternity necessarily rebuts the presumption of another presumed father under subdivision (a) of section 7611." (Dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 244, 85 P.3d at p. 34.) Indeed, the legislative history on which he relies notes merely *224 that the UPA presumptions "`may be rebutted ... by clear and convincing evidence'" (id. at p. 254, 85 P.3d at p. 43, italics added), not that they must be rebutted whenever such evidence is presented.
Unlike our dissenting colleague, we find this omission significant. It is plain the Legislature knows how to craft a categorical rule for rebuttal of a presumption of fatherhood when it wants to. (Cf. People v. Trevino (2001) 26 Cal.4th 237, 241, 109 Cal.Rptr.2d 567, 27 P.3d 283.) In Family Code section 7612, subdivision (c), for example, the Legislature has provided that a statutory presumption "is rebutted by a judgment establishing paternity of the child by another man." But the Legislature did not use such unequivocal language in subdivision (a), which states instead that the statutory presumption "may be rebutted in an appropriate action only by clear and convincing evidence." (Italics added.) The significance of biology under this provision is far from clear  especially when compared with statutes from other states, which have appended language to govern situations like the one here. In New Jersey, for example, the analog to section 7612, subdivision (c) provides: "`The presumption is rebutted by a court order terminating the presumed father's paternal rights or by establishing that another man is the child's natural or adoptive father.'" (N.M. v. J.G. (N.J.Super.Ct.App.Div.1992) 255 N.J.Super. 423, 605 A.2d 709, 714, quoting N.J.S.A. 9:17-43b, italics added.) Justice Chin in essence asks us to interpret our statute as though it included this explicit directive.
The omission of any mention of biological fatherhood in section 7612, subdivision (a) becomes even more significant when we consider the exceptions set forth in that provision: "Except as provided in Chapter 1 (commencing with Section 7540) and Chapter 3 (commencing with Section 7570) of Part 2 or in Section 20102, a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (Italics added.) In section 7541, the Legislature provided that the conclusive presumption under section 7540 is rebutted by evidence of biological fatherhood. (§ 7541, subd. (a).) Similarly, in section 7576, the Legislature provided that voluntary declarations of paternity signed on or before December 31, 1996, under section 7570 et seq. or former section 20102 would not override a presumption of paternity arising under section 7555, the genetic testing provision. (§ 7576, subd. (e).) Had it wanted to specify the precise weight to be accorded biology for the remaining section 7611 presumptions, the Legislature could have crafted an analogous provision, or it could have referenced the testing provisions at section 7550 et seq. in the opening "excepting" clause to section 7612, subdivision (a). Indeed, by expressly excepting the marital presumption and the voluntary declaration of paternity presumption from the operation of section 7612, subdivision (a) and making separate provision for the legal effect of biology in those circumstances, the Legislature plainly believed that section 7612, subdivision (a) did not necessarily accord primacy to biology. Justice Chin's proffered interpretation would render the "excepting" clause meaningless.
Justice Chin's analysis also proceeds from a faulty premise. According to the dissent, if a husband's otherwise conclusive presumption under section 7540 "is necessarily rebutted by proof he is not the biological father, the rebuttable UPA presumptions [in subdivisions (a)-(e) of section 7611] must also be necessarily rebutted by such proof; in establishing the *225 limited exception to the conclusive presumption, the Legislature did not intend to make that presumption more rebuttable than the already rebuttable UPA presumptions." (Dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at pp. 249-250, 85 P.3d at pp. 39-40.) But the dissent is comparing apples and oranges. Unlike the presumptions enumerated in section 7611, the conclusive marital presumption in section 7540 is not really a presumption at all but is instead a "a rule of substantive law." (Estate of Cornelious (1984) 35 Cal.3d 461, 464, 198 Cal.Rptr. 543, 674 P.2d 245; Kusior v. Silver (1960) 54 Cal.2d 603, 619, 7 Cal.Rptr. 129, 354 P.2d 657.) The remaining section 7611 presumptions, on the other hand, are presumptions. In fact, they are presumptions "affecting the burden of proof" (§ 7612, subd. (a)) and thus were "`established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied....'" (Fisher v. City of Berkeley (1984) 37 Cal.3d 644, 695, 209 Cal.Rptr. 682, 693 P.2d 261, italics added.)[8] We note as well that the enumerated presumptions in section 7611  unlike the section 7540 presumption  may be rebutted "only by clear and convincing evidence." (§ 7612, subd. (a).) We therefore do not agree that the fact biology rebuts the section 7540 presumption necessarily dictates the role for biology in this case.
It therefore is not surprising that our dissenting colleague has been unable to cite a single case in support of his view. Indeed, although Justice Chin deems the implication "unmistakable" (dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 243, 85 P.3d at p. 34), it has thus far eluded the justices in Kiana A., supra, 93 Cal.App.4th 1109, 113 Cal.Rptr.2d 669, and Steven W. v. Matthew S., supra, 33 Cal.App.4th 1108, 39 Cal.Rptr.2d 535, both of which support our holding, both of which Justice Chin would disapprove, and neither of which has provoked a corrective response by the Legislature.
The drafters of the revised UPA, who recently deleted provisions equivalent to subdivisions (a) and (b) of section 7612, also fail to support the dissent. According to the drafters, deletion of these provisions was appropriate because "[n]owadays the existence of modern genetic testing obviates this old approach to the problem of conflicting presumptions when a court is to determine paternity. Nowadays, genetic testing makes it possible in most cases to resolve competing claims to paternity." (Amendments to the Uniform Parentage Act as Last Amended in 2002 with Prefatory Note and Comments (2003) 37 Fam. L.Q. 5, 17.) This commentary implies that the "old" approach  which is still the law in California  may have relied on something other than genetic testing to resolve competing presumptions. (See N.A.H. v. S.L.S., supra, 9 P.3d at p. 361, fn. 5 ["Other jurisdictions that have adopted the UPA have interpreted the presumption based on biology in the Act as rebuttable, rather than conclusive"].)
(c) Our dissenting colleagues' proposed interpretation cannot be reconciled with Nicholas H., either. According to Justice Chin, the Legislature 50 years ago "directed courts to give controlling weight to evidence conclusively disproving the biological paternity of a particular man" (dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 246, 85 P.3d at p. 36), and "[n]othing" in *226 the interim "suggests that ... the Legislature intended to alter the determinative effect of biological paternity under California law." (Id. at p. 255, 85 P.3d at p. 44.) Thus, "where tests conclusively show that a man is not a child's biological father, `it seems intolerable for a court to permit an opposite result to be reached. For a court to permit the establishment of paternity in cases where it is scientifically impossible to arrive at that result would seem to be a great travesty on justice.'" (Id. at p. 246, 85 P.3d at p. 36.)
Yet, we recently  and unanimously affirmed a declaration of presumed fatherhood in favor of a man who could not possibly have been the biological father in Nicholas H., relying on section 7612, subdivision (a), which did not exist 50 years ago. (See Nicholas H., supra, 28 Cal.4th at pp. 64-70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) In accordance with that provision  the same provision on which we rely today  we found that "an action in which no other man claims parental rights to the child, an action in which rebuttal of the section 7611(d) presumption will render the child fatherless" was not an appropriate action in which to rebut the presumption. (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.)[9] In other words, we relied on the best interests of the child and public policy in declining to rebut the willing candidate's presumption. (See In re Salvador M. (2003) 111 Cal.App.4th 1353, 1357-1358, 4 Cal.Rptr.3d 705 ["The paternity presumptions are driven, not by biological paternity, but by the state's interest in the welfare of the child and the integrity of the family"]; cf. In re Marriage of Wendy M. (1998) 92 Wash.App. 430, 962 P.2d 130, 133 [the "best interests of the child," including the fact that the child would be left fatherless, are an appropriate consideration in a proceeding to disestablish paternity].) Justice Chin fails to explain why the same provision  i.e., section 7612, subdivision (a)  allows us to consider the child's best interest and public policy in determining whether the presumption is rebutted in Nicholas H. but not in this case. Or why courts must ignore the child's best interests in a dependency proceeding, the very purpose of which is to protect the child. (Welf. & Inst.Code, § 202.)
(d) Justice Chin  and, to a lesser extent, Justice Kennard  rely on the provisions of the Uniform Act on Blood Tests to Determine Paternity (§ 7550 et seq.), a statutory scheme that the parties and amici curiae nowhere discuss or even cite. In this case, such reliance is inappropriate and unwise.
First of all, no blood or genetic tests of any kind were requested, performed, or offered in these proceedings. These provisions therefore have no application here.
Our dissenting colleagues suggest that the failure to obtain genetic tests can be excused because the parties stipulated to Heriberto's paternity, but they offer no authority for this proposition. To the contrary, case law has strictly construed these testing requirements. (Rodney F. v. Karen M. (1998) 61 Cal.App.4th 233, 240, 71 Cal.Rptr.2d 399 ["it is irrelevant that the biological father can prove his paternity or even that all parties to the proceedings may concede that plaintiff is the biological father"].) Moreover, given the extraordinary significance each would accord to *227 biology, it seems unwise to allow a judgment that is demonstrably false to be entered solely because of an honest mistake as to a child's biological paternity. (See, e.g., State, Div. of Child Support ex rel. NDB v. EKB (Wyo.2001) 35 P.3d 1224, 1226 [all parties were mistaken as to the identity of the biological father for nearly six years]; State v. Santos (1985) 104 Wash.2d 142, 702 P.2d 1179, 1183 ["one study has estimated that 18 percent of a group of men who voluntarily admitted to paternity were not in fact the fathers of the children in question"].)
Second, the precise interplay between this statutory scheme and the UPA is not immediately apparent. As one commentator in this area has cautioned, "[a]n outmoded and confusing system of presumptions plays a central role in the California statutory scheme." (Miller, Baseline, Bright Line, Best Interests: A Pragmatic Approach for California to Provide Certainty in Determining Parentage (2003) 34 McGeorge L.Rev. 637, 638-639 (Miller).) "[T]he law in this area is exceedingly complex.... It is not always clear how these provisions are to be reconciled." (Anderlik, Disestablishment Suits: What Hath Science Wrought? (2003) 4 J. Center for Fam., Children & Cts. 3, 5, 6.) One thus has sound reason to doubt that the legislative intent is as clear as our dissenting colleagues insist it is  or, whatever the level of clarity, that the Legislature intended biology to be conclusive. (See id. at p. 10 ["The `biological imperative' position seems to show up most frequently in concurring or dissenting opinions, suggesting that it is somewhat idiosyncratic among judges"]; id. at p. 11 [California appears to have embraced "a position of biological relevance: biology is not the whole story or even the most important part of the story"]; Miller, supra, 34 McGeorge L.Rev. at p. 640 ["While the California statutory scheme has gradually expanded the role of genetic testing, the legislative process has stopped short of making the genetic-biological relationship the baseline test for parentage"].) In any event, we hesitate to definitively construe the scheme where, as here, its provisions are inapplicable and the parties have not invoked it or analyzed it. We therefore do not do so.
With that caveat in mind, however, we can point out certain logical flaws that appear in Justice Chin's analysis. For example, he asserts that biology is necessarily determinative within the first two years of life. Yet he admits that section 7541, the provision that provides for a two-year time limit, "do [es] not apply to the other section 7611 presumptions" (such as Paul's) and that sections 7554 and 7555, the implications of which the dissent deems unmistakable, nowhere refer to the age of the child.[10] (Dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 251, 85 P.3d at p. 40.) Neither can his construction of section 7554, under which biology necessarily rebuts an enumerated section 7611 presumption, be reconciled with Nicholas H.
*228 The legislative history also fails to support Justice Chin's interpretation. According to his dissent, the purpose of section 7555, which creates a rebuttable presumption of paternity if the paternity index is 100 or greater, was to standardize the weight accorded to genetic tests in determining biological paternity. The problem, one legislative analysis explained, was that jurors were failing to accord due weight to the tests and were instead relying on less probative markers of biological paternity, such as "`the appearance of the natural mother.'" (Dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 246, 85 P.3d at p. 36; see Miller, supra, 34 McGeorge L.Rev. at p. 693.) Nothing in this snippet of legislative history suggests how a juvenile court should proceed when faced with a conflict between the rebuttable presumption of biological paternity (correctly determined under section 7555) and a rebuttable presumption of paternity under section 7611  although the available case law once again rejects the approach endorsed in the dissents. (See Steven W. v. Matthew S., supra, 33 Cal.App.4th 1108, 1116-1117 & fn. 4, 39 Cal.Rptr.2d 535.)
The legislative history of section 7541 likewise fails to support either dissenting opinion. According to these materials, the 1990 amendment to section 7541 was intended to provide unwed biological fathers, who were previously foreclosed from challenging the husband's conclusive presumption of paternity," `the opportunity to establish paternity'" when they have demonstrated an interest in raising and providing for their children. (Dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 250, 85 P.3d at p. 39, italics added.) A mere opportunity for the unwed biological father to establish paternity hardly supports the claim that biology is necessarily determinative. Indeed, in construing a statute similar to section 7541, the Colorado Supreme Court observed that the provision "does not state that blood evidence is conclusive of fatherhood in all circumstances, or that it automatically eliminates other presumptions of fatherhood." (N.A.H. v. S.L.S., supra, 9 P.3d at p. 361, italics added.)
(e) Justice Chin accuses the court of repudiating the policy set forth in Johnson v. Calvert (1993) 5 Cal.4th 84, 93, footnote 10, 19 Cal.Rptr.2d 494, 851 P.2d 776, where we declined to "`decide parentage based on the best interests of the child,' because doing so `raises the repugnant specter of governmental interference in matters implicating our most fundamental notions of privacy, and confuses concepts of parentage and custody.'" (Dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 240, 85 P.3d at p. 31.) The dissent has once again confused apples and oranges. In this case, we are not selecting a policy to resolve competing claims when the statutory law is silent on the issue, but are instead giving effect to the language of the applicable statute. Because that statute directs us to consider whether rebuttal is appropriate and whether policy and logic favor one presumption over another, Johnson is not pertinent here.
In Johnson v. Calvert, we were charged with deciding which woman  the egg donor or the birth mother  was the child's "natural mother" under California law. (Johnson v. Calvert, supra, 5 Cal.4th at p. 87, 19 Cal.Rptr.2d 494, 851 P.2d 776.) We discovered that the presumptions set forth now in section 7611  the statute at issue here  "have no application to this case" but that both women had nonetheless "adduced evidence of a mother and child relationship as contemplated by the [UPA]." (Johnson v. Calvert, supra, 5 Cal.4th at p. 92, 19 Cal.Rptr.2d 494, 851 P.2d 776.) Unlike the situation here, the conflict was not resolved in the UPA itself. (Johnson v. *229 Calvert, supra, at pp. 92-93 & fn. 9, 19 Cal.Rptr.2d 494, 851 P.2d 776; id. at pp. 112-113, 19 Cal.Rptr.2d 494, 851 P.2d 776 (dis. opn. of Kennard, J.).) After a careful review of materials extrinsic to the UPA, we decided that the parties' intent would be determinative. (Johnson v. Calvert, supra, at pp. 93-97, 19 Cal.Rptr.2d 494, 851 P.2d 776; see also Dunkin v. Boskey (2000) 82 Cal.App.4th 171, 190, fn. 10, 98 Cal.Rptr.2d 44 ["the court looked to the writings of several legal commentators"]; In re Marriage of Moschetta (1994) 25 Cal.App.4th 1218, 1231, 30 Cal.Rptr.2d 893 ["only when the operation of the [UPA] yielded an ambiguous result did the court resolve the matter by intent as expressed in the agreement"].) Under that standard, the woman who intended to bring about the birth of a child that she intended to raise as her own "is the natural mother." (Johnson v. Calvert, supra, 5 Cal.4th at p. 93, 19 Cal.Rptr.2d 494, 851 P.2d 776.) The passage from Johnson v. Calvert quoted by the dissent explained why, in selecting among possible criteria for decision, we did not rely on the best interests of the child.
This case is unlike Johnson v. Calvert. In this case, the section 7611 presumptions do apply. In this case, section 7612 does tell us how presumptions can be rebutted  by clear and convincing evidence and only in an appropriate case  and how conflicting presumptions are to be resolved  by weighing considerations of policy and logic. Whatever our views as to whether the child's best interests should be considered in making parentage decisions, we cannot ignore the Legislature's directive.[11]

C
In the course of affirming the juvenile court's determination that Paul qualified as Jesusa's presumed father, the Court of Appeal criticized the juvenile court for addressing the issue of presumed fatherhood prior to the jurisdictional hearing. In the appellate court's view, "the trial court proceeded backward in this case because if it found no jurisdiction over the minor the issue of presumed fatherhood would be moot." DCFS and amici curiae Northern California Association of Counsel for Children et al. ask us to disapprove this language and declare instead that a juvenile court has discretion to identify the presumed father once the dependency petition was filed  and that the juvenile court here did not abuse its discretion in doing so. We agree with DCFS and its amici curiae.
Where (as here) a child has been taken into temporary protective custody, the juvenile court is required to conduct a detention hearing as soon as possible and, in any event, no later than the next judicial day. (Welf. & Inst.Code, § 315.) "At the detention hearing, or as soon thereafter as practicable, the court shall inquire of the mother and any other appropriate person as to the identity and address of all presumed or alleged fathers." (Id., § 316.2, subd. (a), italics added.) Indeed, under the California Rules of Court, the court should conduct this inquiry at the beginning of the initial hearing on the petition. (Cal. Rules of Court, rule 1441(a), (b).) If one or more men are identified as an alleged father, each shall be provided notice of the proceeding and *230 informed that it could result in termination of his parental rights. (welf. & insT.code, § 316.2, subd. (b).)
There are two ways the juvenile court may proceed to determine the identity of a child's presumed father if no prior determination has been made. Under Welfare and Institutions Code section 316.2, subdivision (d) and Family Code section 7630, the alleged father may bring an action to be declared the presumed father. The juvenile court where the dependency petition is pending shall have exclusive jurisdiction to hear that action from the time the petition is filed until the petition is dismissed, the dependency is terminated, or parental rights are terminated. (Welf. & Inst.Code, § 316.2, subd. (e).) Alternatively, the juvenile court itself "may make such a determination" even if no action is filed under Family Code section 7630. (Cal. Rules of Court, rule 1413(e).) The court may order the parties to submit to blood tests (rule 1413(e)(1)) or "may make its determination of paternity or nonpaternity based on the testimony, declarations, or statements of the mother and alleged father" (rule 1413(e)(2)). Any determination made by the juvenile court in either scenario shall be noted in the court minutes. (Welf. & Inst.Code, § 316.2, subd. (f).)
Nothing in these provisions requires the juvenile court to suspend its identification of the presumed father until after the dependency petition has been resolved. Indeed, subdivision (e) of Welfare and Institutions Code section 316.2 endows the juvenile court with exclusive jurisdiction to hear the paternity action at any time while the petition is pending. Heriberto offers no reason for supposing a different rule applies when the juvenile court proceeds on its own to identify the presumed father. Moreover, inasmuch as a dependency action could eventually result in the termination of parental rights, a court needs first to know the identities of the parents. The legal parents must be identified so that they may receive notice of the hearing; be provided counsel, if necessary; and be accorded a meaningful opportunity to be heard. As DCFS points out, "it would not make sense  or be possible in many cases  to adjudicate a dependency petition without first identifying which man is the child's father." Thus, this seems to be a situation in which "the law cannot be judicially applied without a determination of parentage when such question is placed in issue." (In re Lisa R. (1975) 13 Cal.3d 636, 643, 119 Cal.Rptr. 475, 532 P.2d 123.)
Heriberto nonetheless contends that a juvenile court does not have jurisdiction to identify the presumed father until after the dependency petition has been sustained. Although evidence must be offered to prove the child comes within one or more subdivisions of Welfare and Institutions Code section 300 before the child may be declared a dependent of the court (e.g., In re Janet T. (2001) 93 Cal.App.4th 377, 391, 113 Cal.Rptr.2d 163), the juvenile court nonetheless has jurisdiction prior to that time "to make such determinations which are incidentally necessary to the performance of those functions demanded of it by the Legislature pursuant to the Juvenile Court Law." (In re Lisa R., supra, 13 Cal.3d at p. 643, 119 Cal.Rptr. 475, 532 P.2d 123.) This responsibility is now articulated in Welfare and Institutions Code section 316.2 and rule 1413 of the California Rules of Court. But, even before those provisions were enacted, we held that "a juvenile court is vested with jurisdiction to determine parentage of a minor when that finding is necessary to any ultimate determination with which it is charged." (Lisa R., supra, 13 Cal.3d at p. 644, 119 Cal.Rptr. 475, 532 P.2d 123.)
*231 We do agree with Heriberto on one point: the dependency scheme does not require the juvenile court to make a paternity determination prior to adjudicating the dependency petition. As in other types of cases (e.g., Rutherford v. Owens-Illinois, Inc. (1997) 16 Cal.4th 953, 967, 67 Cal.Rptr.2d 16, 941 P.2d 1203; People v. Arias (1996) 13 Cal.4th 92, 147, 51 Cal.Rptr.2d 770, 913 P.2d 980), we entrust the sequence of issues to the sound discretion of the trial court. Here, we find that the juvenile court did not abuse its discretion in identifying Jesusa's presumed father before making the ultimate determination that Jesusa should be declared a dependent of the court.

D
Having exhausted Heriberto's challenges to the juvenile court's declaration of Paul's presumed fatherhood, we may now address his objections to the juvenile court's adjudication of the dependency petition. Once again, Heriberto claims he had a statutory and constitutional right to be present at this proceeding. The Court of Appeal rejected the constitutional claim but agreed with Heriberto that Penal Code section 2625, subdivision (d) granted him an "absolute right" to be present at the jurisdictional hearing. Holding that the juvenile court had acted "in excess of its jurisdiction" by proceeding in Heriberto's absence, the Court of Appeal reversed the judgment and remanded for further proceedings.
In reversing that part of the judgment, the Court of Appeal focused on the word "or" in Penal Code section 2625, subdivision (d)'s admonition that no dependency petition may be adjudicated without the physical presence of "`the prisoner or the prisoner's attorney'" and determined that "the word `or' in the sentence under consideration must be construed in the conjunctive sense to mean `and.'" Reading the word "or" in its conjunctive sense, the Court of Appeal concluded that both the prisoner and the prisoner's attorney must be present before the juvenile court may adjudicate a dependency petition. We agree with the Court of Appeal that the statute requires both the prisoner and the prisoner's attorney be present. We disagree, however, that the violation here deprived the juvenile court of jurisdiction to adjudicate the petition. We instead apply our familiar harmless-error analysis and find that Heriberto, who had already been convicted of the rape at the time of the hearing, was not prejudiced.
We begin with the text of the statute. Penal Code section 2625, subdivision (d) states in relevant part: "Upon receipt by the court of a statement from the prisoner or his or her attorney indicating the prisoner's desire to be present during the court's proceedings, the court shall issue an order for the temporary removal of the prisoner from the institution, and for the prisoner's production before the court.... [N]o petition to adjudge the child of a prisoner a dependent child of the court pursuant to subdivision (a), (b), (c), (d), (e), (f), (i), or (j) of Section 300 of the Welfare and Institutions Code may be adjudicated without the physical presence of the prisoner or the prisoner's attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit signed by the warden, superintendent, or other person in charge of the institution, or his or her designated representative stating that the prisoner has, by express statement or action, indicated an intent not to appear at the proceeding." (Italics added.)
DCFS argues, with some force, that a conjunctive construction of the word "or" renders superfluous the words "or the prisoner's attorney" in the statute, since it *232 goes without saying that a prisoner who is represented by counsel would have a right to have counsel in attendance at any legal proceeding. On the other hand, Heriberto argues, with equal force, that a disjunctive construction of the word "or" would make meaningless the statute's directive that a court order a prisoner's production once the prisoner has indicated a desire to attend. We therefore agree that the statute is ambiguous and turn to additional indicators of the legislative intent. (Arnold v. Hopkins (1928) 203 Cal. 553, 563, 265 P. 223.)
In construing statutes, we must rely on "`"`the usual, ordinary import of the language employed in framing them.'"'" (Phelps v. Stostad (1997) 16 Cal.4th 23, 32, 65 Cal.Rptr.2d 360, 939 P.2d 760.) The "`ordinary and popular'" meaning of the word "or" is well settled. (Houge v. Ford (1955) 44 Cal.2d 706, 712, 285 P.2d 257.) It has a disjunctive meaning: "In its ordinary sense, the function of the word `or' is to mark an alternative such as `either this or that.'" (Ibid.) We have also recognized that the word may have a conjunctive meaning. But, as we have long stated, "[r]esort to such unnatural construction of the word `or' is sanctioned only when such construction is found necessary to carry out the obvious intent of the Legislature in a statute or the obvious intent of the parties in a contract, when such intent may be gleaned from the context in which the word is used." (Ibid.) That intent appears in the legislative history.
The language currently found in Penal Code section 2625, subdivision (d) was added to the Penal Code in 1976. (Stats.1976, ch. 1376, § 2, p. 6262.) According to one legislative analysis, "[t]he purpose of" subdivision (d) "is to ensure that prisoner-parents have the opportunity to be present at proceedings ... where taking away custody [and] control of their child(ren), on a temporary or permanent basis, is being considered." (Sen. Com. on Judiciary, Background Information to Assem. Bill No. 4354 (1975-1976 Reg. Sess.).) Another analysis explained that subdivision (d) "prohibit[s] ... proceedings" in dependency cases "without the presence of the prisoner-parent, a knowing waiver of appearance, or an affidavit from the superintendent or representative of the institution that the prisoner does not want to attend the hearing." (Assem. Com. on Criminal Justice, Analysis of Assem. Bill No. 4354 (1975-1976 Reg. Sess.) May 26, 1976.) Still another analysis explained that under subdivision (d), a dependency case "can not be disposed of unless the prisoner is either physically present in court, represented by counsel or unless he has waived his right to appear." (Assem. Com. on Criminal Justice, Analysis of Assem. Bill No. 4354 (1975-1976 Reg. Sess.) as amended June 2, 1976, p. 1.) This last analysis also explained that "the termination of parental rights is a matter of utmost concern to all parties and that the ... presence of all parties is desirable." (Ibid.) These materials reveal a strong legislative interest in enabling the prisoner to attend the hearing, an interest that would be undermined by interpreting the statute to make the attorney's presence sufficient in every case.
To interpret the statute to require only the presence of the attorney would also undermine the legislative goal of ensuring that prisoners actually receive notice of the proceeding. Penal Code section 2625, subdivision (b) requires the court to order notice of a qualifying dependency proceeding to be "transmitted to the prisoner." According to one legislative analysis, the Legislature added section 2625, subdivision (d)'s waiver requirement in 1976 to "[e]nsure that adequate notice is [actually] given. *233 [¶] ... [¶] [O]ccasionally the notice required ... to adjudicate a child a ward of the court is not received by the inmate in time for that person to be present at the hearing. This bill would solve the problem since the hearing could not proceed without some acknowledgement from the prisoner-parent." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 4354 (1975-1976 Reg. Sess.) as amended June 3, 1976, pp. 2-3.) Only by requiring the prisoner either to be present or to have executed a waiver of his or her appearance can the court ensure the prisoner actually received the notice. The juvenile court thus erred in proceeding without Heriberto's presence or his waiver of that right.[12]
We typically apply a harmless-error analysis when a statutory mandate is disobeyed, except in a narrow category of circumstances when we deem the error reversible per se. This practice derives from article VI, section 13 of the California Constitution, which provides: "No judgment shall be set aside, or new trial granted, in any cause ... for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." The Court of Appeal reasoned that this statutory violation was reversible per se because, by proceeding in Heriberto's absence, the juvenile court acted in excess of jurisdiction. We disagree.
A court acts in excess of jurisdiction "where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no `jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." (Abelleira v. District Court of Appeal (1941) 17 Cal.2d 280, 288, 109 P.2d 942 (Abelleira).) Whether an act is in excess of jurisdiction or is merely statutory error is defined by the Constitution, express statutory declaration, or rules developed by the courts and followed under the doctrine of stare decisis. (Abelleira, supra, at p. 291, 109 P.2d 942.) In this case, where Heriberto's presence was neither constitutionally required nor mandated by our rules, we must examine the statute to determine whether the Legislature intended it to be jurisdictional.
At the outset, we observe that we have rarely  if ever  found a statutory mandate to be jurisdictional when, as here, the mandate itself provides that it may be waived. (Cf. Abelleira, supra, 17 Cal.2d at pp. 288-289, 109 P.2d 942; Newman v. County of Sonoma (1961) 56 Cal.2d 625, 627, 15 Cal.Rptr. 914, 364 P.2d 850.) Nothing in the text of the statute indicates the Legislature intended a different result here. Rather, it appears the Legislature intended merely to grant the prisoner a statutory right to attend the proceedings.
An examination of the statutes governing a defendant's appearance at a criminal trial is therefore instructive, since Heriberto's denial of his right to be present under Penal Code section 2625 can reasonably be analogized to the denial of a criminal defendant's right to be present at trial under Penal Code sections 977 and 1043, which similarly mandate the defendant's presence at trial unless a waiver is submitted. (See People v. Gutierrez (2003) 29 Cal.4th 1196, 130 Cal.Rptr.2d 917, 63 P.3d *234 1000.) Despite the statutory mandate in sections 977 and 1043, we have regularly applied a harmless-error analysis when a defendant has been involuntarily absent from a criminal trial. (E.g., People v. Riel (2000) 22 Cal.4th 1153, 1196, 96 Cal.Rptr.2d 1, 998 P.2d 969 ["because this nonwaivable right is statutory and not constitutional, error is reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error"]; People v. Ayala (2000) 24 Cal.4th 243, 268-269, 99 Cal.Rptr.2d 532, 6 P.3d 193; People v. Bolin (1998) 18 Cal.4th 297, 325, 75 Cal.Rptr.2d 412, 956 P.2d 374.) We do not believe the Legislature intended a different result in the analogous circumstance here, when a prisoner is involuntarily absent from a dependency proceeding. (Cf. Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 120-122, 101 Cal.Rptr. 745, 496 P.2d 817.)
Our conclusion is bolstered by the strong countervailing interest, expressed by the Legislature itself, that dependency actions be resolved expeditiously. (Welf. & Inst.Code, § 352, subd. (b); In re Malinda S., supra, 51 Cal.3d at p. 384, 272 Cal.Rptr. 787, 795 P.2d 1244 [the state has a "legitimate interest in providing an expedited proceeding to resolve the child's status without further delay"].) That goal would be thwarted if the proceeding had to be redone without any showing the new proceeding would have a different outcome. Indeed, the concern is acute in this case, inasmuch as Heriberto had been convicted of the rape at the time of the hearing and has never asserted that he was actually prejudiced by appearing at the hearing only through his attorney. We therefore conclude that the Legislature did not intend the prisoner's statutory right to personally attend the adjudication of a dependency petition to be jurisdictional. Applying our familiar harmless-error test, we find that Heriberto could not have been prejudiced. (People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243; In re Melinda J. (1991) 234 Cal.App.3d 1413, 1419, 286 Cal.Rptr. 239.)
Independently of any statutory claim, Heriberto also contends that his absence from the jurisdictional and dispositional hearing denied him due process, but he offers no argument beyond that we have already rejected in part A., ante. The relevant issues involved in the dependency action had been explored in reports filed months before the hearing; the juvenile court had granted a lengthy continuance to permit Heriberto to respond to those points and conduct discovery; and the court had advised counsel to consider having Heriberto file a declaration. (Cf. Axsana S., supra, 78 Cal.App.4th at p. 270, 92 Cal.Rptr.2d 701.) Heriberto, however, chose not to submit such a declaration. His attorney made no offer of proof of the testimony Heriberto allegedly wanted to present. Nor did his attorney present the live testimony of other witnesses, such as those witnesses he had included on his witness list. In fact, Heriberto has never identifiedwhether by way of a petition for modification (Welf. & Inst.Code, § 388, subd. (a)) in the juvenile court or in this appeal  the evidence he claims he would have offered had he been present. (Cf. Ansley v. Superior Court (1986) 185 Cal.App.3d 477, 484-488, 229 Cal.Rptr. 771.) The omission is perhaps unsurprising, given the fact that he had raped the child's mother while the child was present in the motorhome and was in prison at the time the petition was adjudicated. Accordingly, one can say with confidence that "[n]o other result was possible" even if he had been present. (Rikki D., supra, 227 Cal.App.3d at p. 1632, 278 Cal.Rptr. 565.)
We observe as well that no denial of due process has been found where the prisoner-parent *235 is unable to attend because he or she is in the custody of another state or the federal government and is instead represented by counsel. (E.g., In re Maria S., supra, 60 Cal.App.4th at pp. 1312-1313, 71 Cal.Rptr.2d 30.) Heriberto offers no justification for a different result here. (State ex rel. Jeanette H. v. Pancake (2000) 207 W.Va. 154, 529 S.E.2d 865, 876 ["we conclude that the same due process analysis is applicable regardless of where a parent is confined"].)

DISPOSITION
The judgment of the Court of Appeal is reversed to the extent it reversed the order determining Jesusa V. to be a dependent child of the court. In all other respects, the judgment is affirmed.
WE CONCUR: GEORGE, C.J., BROWN and MORENO, JJ.
Dissenting Opinion by KENNARD, J.
In this case, a county agency petitioned the juvenile court to have a minor child declared a dependent of the court. Two men met the statutory definition of being the child's presumed father. One of the men, who was in jail at the time, was the child's undisputed biological father; the other was married to the child's mother when the child was born. After scheduling a paternity hearing, the court ordered the incarcerated biological father transported to court for the hearing. When that did not occur, the court nevertheless proceeded with the hearing, ruling that the mother's husband was the child's legal father and declaring the child a dependent of the court. The majority holds that the biological father had no right to be at the paternity hearing, and that legally he is not the child's father. I disagree on both points.[1]

I
Jesusa V. was born in 1999. Her mother, also named Jesusa, was married to Paul B. and had five other children by him, but they had separated before Jesusa's birth and Heriberto O. was Jesusa's biological father. An unusual living arrangement evolved after Jesusa's birth: Jesusa and her mother both lived with Heriberto during the week and with Paul and the other children on weekends. The mother and Heriberto had a tempestuous relationship.
Before Jesusa's second birthday, Heriberto was arrested for raping the mother. The Los Angeles County Department of Children and Family Services petitioned the juvenile court to declare Jesusa a dependent of the court. The court appointed counsel to represent Heriberto, who denied the allegations in the dependency petition and asserted that he, not Paul, qualified as Jesusa's legal father. The court scheduled a paternity hearing and ordered the deputies at the county jail, where Heriberto was incarcerated, to transport him to court for the hearing.
Heriberto, however, never made it to the paternity hearing. Although no evidence was presented as to the reason for his absence, it appears that Heriberto was not transported to court because he was no longer in county jail but was in state prison: This court has taken judicial notice of records showing that he had entered a plea of no contest to the rape. The juvenile court, over the objection of Heriberto's *236 attorney, held the paternity hearing in Heriberto's absence and ruled that Paul was Jesusa's legal father. A jurisdictional hearing on the dependency petition followed; Heriberto's attorney unsuccessfully asserted his incarcerated client's right to be present.
At the jurisdictional hearing, none of the parties was personally present: Jesusa's mother, distraught at the outcome of the paternity hearing, had walked out of the courtroom, followed by Paul. The court ruled that because it had decided that Heriberto was not Jesusa's legal father but a "mere biological father," he was "not even entitled to notice and an opportunity to be heard." Because the attorneys representing Paul and the mother did not challenge the allegations in the dependency petition, the court found them true. It then turned to the question of disposition. It ordered Jesusa placed with Paul, allowing the mother to have unmonitored visits, and it forbade Heriberto from having any contact with Jesusa.
Heriberto appealed. The Court of Appeal affirmed the juvenile court's order declaring Paul to be Jesusa's legal father, but it reversed the order sustaining the dependency petition, holding that the court lacked jurisdiction to adjudicate the dependency petition in Heriberto's absence.

II
The majority here upholds the juvenile court's ruling declaring Paul to be Jesusa's legal father. I disagree.
I begin by briefly summarizing the pertinent parts of California's complex statutory scheme governing paternity adjudications. Paternity disputes are governed by a conglomeration of three sets of laws: The Uniform Parentage Act (Fam.Code, §§ 7600-7730, hereafter the UPA),[2] the Uniform Act on Blood Tests to Determine Paternity (§§ 7550-7557), and other Family Code sections enacted by the Legislature (§§ 7540-7541, 7570-7577). Under the UPA, a man is "presumed to be the natural father of a child" if he meets certain conditions described in section 7611: He marries or attempts to marry the mother under circumstances specified in the statute; he and the child's mother sign a declaration stating that he is the father; he "receives the child into his home and openly holds out the child as his natural child" (§ 7611, subd. (d)); or the child is born in a country participating in an Orderly Departure Program, and the man acknowledges his paternity in a declaration filed under penalty of perjury. As to most of these conditions, the presumption is "a rebuttable presumption affecting the burden of proof" (§ 7612, subd. (a)), which may be refuted by clear and convincing evidence. This is not the case, however, as to the presumption described in section 7540. That section states that when a married woman living with her husband gives birth to a child, the husband is ordinarily conclusively presumed to be the child's father. But if blood tests taken in a paternity action before the child is two years old show "that the husband is not the father of the child, the question of the paternity of the husband shall be resolved accordingly." (§ 7541, subd. (a), italics added; see also § 7554 [when blood tests have been taken in any proceeding in which paternity is a relevant fact, and "the conclusions of all the experts ... are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly"].)[3]
*237 Here, Paul and Jesusa were married when Jesusa was born, but Paul did not qualify for the conclusive presumption of paternity (§ 7540) because he and Jesusa's mother were not living together at the time of birth. Heriberto and Paul, however, both qualified as presumed fathers. (§ 7611.) Heriberto qualified because he received Jesusa into his home and held her out as his natural child. Paul qualified because he was married to Jesusa's mother.[4]
When, at a paternity hearing, the court finds that two men are presumed fathers, the court must find paternity in favor of the father whose presumption "is founded on the weightier considerations of policy and logic." (§ 7612, subd. (b).) The juvenile court here construed that statutory phrase as permitting it to decide paternity based on the child's best interests. It explained: "The man who provides the stability, nurturance, family ties, permanence, is more important to a child than a man who has mere biological ties." Based on these considerations, the court adjudicated the question of Jesusa's paternity in favor of Paul, whom everyone agreed was not the biological father.
The juvenile court may well have been right that Paul rather than Heriberto was likely to be a better parent to Jesusa. That, however, is not dispositive under subdivision (b) of section 7612, as becomes clear when other sections of the Family Code are considered.
As noted earlier, section 7541 provides that when a child is under the age of two, and a blood test has shown that a man who, like Paul here, is married to the child's mother is not the child's biological father, the trial court must resolve the question of paternity against that man. Similarly, section 7554 says that when blood tests are used to resolve a paternity dispute, those tests are dispositive. Thus, sections 7541 and 7554 reflect the Legislature's view that when a paternity dispute between two presumptive fathers involves a child less than two years old, biology is the "weightier consideration[ ] of policy and logic" under section 7612, subdivision (b). The biological father would not prevail if he was not a presumed father (see 10 Cal.Rptr.3d p. 237, 85 P.3d p. 29, ante), because section 7612 applies only to disputes between presumed fathers. But here, because Heriberto  the biological father  was also a presumed father and Jesusa was under two years of age, the juvenile court should have resolved the question of paternity in his favor.
The majority insists that sections 7541 and 7554 "have no application here" (maj. opn., ante, 10 Cal.Rptr.3d at p. 226, 85 P.3d at p. 20) because they merely describe who prevails when a blood test shows a husband's or an alleged father's lack of paternity. True, no blood tests were ordered here. But that was because such tests were unnecessary, as the parties agreed that Heriberto, not Paul, was Jesusa's biological father.
In any event, the majority acknowledges that dispositive here is what the Legislature meant when it said, in subdivision (b) *238 of section 7612, that between two statutorily presumed fathers, paternity must be resolved in favor of the man whose presumption "is founded on the weightier considerations of policy and logic." As discussed above, sections 7541 and 7554 show that as to children under the age of two years, the Legislature views biology as the "weightier consideration." Thus, because Heriberto, one of the presumed fathers, was undisputedly Jesusa's biological father, the juvenile court should have adjudicated paternity in his favor.
In upholding the trial court's contrary ruling, the majority relies on In re Nicholas H. (2002) 28 Cal.4th 56, 120 Cal.Rptr.2d 146, 46 P.3d 932. That case is distinguishable, however. There, we held that when a presumed father admits that he is not the child's biological father, the trial court may still decide that he is the child's father under section 7612. But there, unlike here, no one stepped forward as the child's biological father. We stressed that our decision had no applicability to a case when, as here, "another man is vying for parental rights" (In re Nicholas H., supra, at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932), and adding that "we do not reach" the question "whether ... biological paternity by a competing presumptive father necessarily defeats a nonbiological father's presumption of paternity" (ibid.). Now, for the first time, this court must confront that issue.
In upholding the juvenile court's paternity ruling against Heriberto, Jesusa's biological father, the majority violates his due process rights as a biological father. In Adoption of re Kelsey S. (1992) 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (Kelsey), a unanimous opinion by the same justice who has authored today's majority opinion, this court held that when a biological father demonstrates "a full commitment to his parental responsibilities" (id. at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216), the due process clause of the federal Constitution bars the state from terminating his parental rights "on nothing more than a showing of a child's best interest" (ibid.), the test used by the juvenile court in this case.
The majority cites two grounds for rejecting Heriberto's due process claim. Neither is persuasive.
First, the majority cursorily asserts that the juvenile court did not terminate biological father Heriberto's parental rights when it resolved paternity in favor of Paul. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 221, 85 P.3d at p. 15.) To the contrary! A court's paternity decision is "determinative for all purposes" except in criminal prosecutions for failure to provide child support. (§ 7636.) Francisco G. v. Superior Court (2001) 91 Cal.App.4th 586, 596, 110 Cal.Rptr.2d 679, on which the majority relies, does not hold otherwise; it says nothing about a single parental right that a man retains after a court has resolved the question of paternity against him.
Second, the majority insists that Heriberto is not entitled to the due process protection articulated in Kelsey, supra, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216, because the record does not show that he took any "legal steps to formalize his relationship to the child." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.) As I explain below, this analysis is faulty.
Although the majority is right that Heriberto presented no evidence that he had tried to "formalize his relationship" with Jesusa, his biological daughter, that is only because the juvenile court denied him the opportunity to do so. Heriberto's lawyer asked the court to continue the paternity hearing so Heriberto could be present and testify about the "formal steps" he had *239 taken to identify Jesusa as his daughter to "government agencies." Responding that such actions by Heriberto would have no bearing on the outcome of the paternity hearing, the court went ahead with the hearing. Because the trial court prevented Heriberto from testifying that he took such steps, he cannot be faulted for failing to present evidence that he did so.
Moreover, even if Heriberto had taken no"legal steps to formalize his relationship" (maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16) with Jesusa, there is nothing in Kelsey to suggest that he forfeited his due process rights because of such inaction. What Kelsey does say is this: "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities  emotional, financial, and otherwise  his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (Kelsey, supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) Here, Heriberto publicly acknowledged Jesusa as his child; he took her into his home and raised her for almost two years; there is no evidence that he did not treat her in a loving manner.
Heriberto's rape of Jesusa's mother is powerful evidence of his unfitness as a parent. It was, therefore, entirely appropriate for the county agency to seek to remove Jesusa from his custody and to have her made a dependent of the juvenile court. But the juvenile court did not consider the rape when making its paternity determination. Nor did it base that determination on a finding that Heriberto was an unfit parent. Rather, the court decided that question based on Jesusa's best interests, a standard that violates our holding in Kelsey, supra, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216. There, as I noted above, we held that a court cannot terminate a biological father's parental rights absent a showing of the father's unfitness as a parent.

III
Did the incarcerated Heriberto have a right to be transported to the paternity hearing? Yes, he did.
In "any proceeding brought under Section 300 of the Welfare and Institutions Code, where the proceeding seeks to adjudicate the child of a prisoner a dependent child of the court ... the superior court ... shall order notice of any court proceeding regarding the proceeding transmitted to the prisoner." (Pen.Code, § 2625, subd. (b), italics added.) If the court receives "a statement from the prisoner or his or her attorney indicating the prisoner's desire to be present during the court's proceedings, the court shall issue an order ... for the prisoner's production before the court." (Pen.Code, § 2625, subd. (d).) Also, "no petition to adjudge the child of a prisoner a dependent child of the court ... may be adjudicated without the physical presence of the prisoner or the prisoner's attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit [from the institution where the prisoner is incarcerated] stating that the prisoner has ... indicated an intent not to appear...." (Ibid.)
Here, the Los Angeles County Department of Children and Family Services petitioned the juvenile court to declare Heriberto's biological daughter Jesusa a dependent child of the court. The paternity hearing was a crucial part of the dependency proceedings, and Heriberto told the court that he wanted to be present at the hearing. By holding the hearing in Heriberto's absence, the court violated Penal Code section 2625, an error that the majority upholds.
*240 According to the majority, Penal Code section 2625 entitles a prisoner to be present only when the juvenile court decides the issues of jurisdiction and disposition, but not when it decides other matters that are part of the dependency proceedings, such as the paternity dispute here. Not so. Subdivision (b) of section 2625 says that a prisoner must be notified of "any court proceeding regarding the [dependency] proceeding" (italics added); and subdivision (d) of the same section says that when, as here, the prisoner asks to attend any such proceeding, the court must order the prisoner's transportation.
Insisting that Heriberto did not have that right, the majority asserts that "section 2625 requires a court to order a prisoner-parent's temporary removal and production before the court only `where the proceeding seeks ... to adjudicate the child of a prisoner a dependent child.'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 212, 85 P.3d at p. 29.) This adjudication was not made, the majority asserts, at the paternity hearing in this case. But the paternity hearing here was a crucial part of the entire dependency proceeding, a proceeding that did"seek[ ] to adjudicate the child of a prisoner a dependent child." (Pen.Code, § 2625, subd. (b).) As a result, Heriberto had a statutory right to be present.

IV
As explained above, the juvenile court erred when it ruled that Heriberto, Jesusa's undisputed biological father, had no right to be personally present at the paternity hearing, and when it decided at that hearing that Paul, who was married to Jesusa's mother when Jesusa was born, rather than Heriberto, was Jesusa's legal father. The court's erroneous paternity determination also had the effect of wrongly denying Heriberto his right to appear, either in person or through counsel, at the jurisdictional and dispositional hearings that immediately followed the paternity determination: Ruling that Heriberto was not Jesusa's legal father, the court stated he was "not even entitled to notice and an opportunity to be heard" at those proceedings. I would reverse the judgment of the Court of Appeal and remand the matter to that court, with directions to reverse the juvenile court's judgment in its entirety.
I CONCUR: WERDEGAR, J.
Dissenting Opinion by CHIN, J.
Only 10 years ago, in a nearly unanimous decision construing the same enactment at issue here  California's Uniform Parentage Act (UPA) (Fam.Code, § 7600 et seq.)[1]  we held that where biological parentage is established, courts faced with competing claims should not"decide parentage based on the best interests of the child." (Johnson v. Calvert (1993) 5 Cal.4th 84, 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776 (Johnson).) We also cautioned that, under these circumstances, basing parentage decisions on a child's best interests "raises the repugnant specter of governmental interference in matters implicating our most fundamental notions of privacy, and confuses concepts of parentage and custody." (Ibid.) Today, a majority of this court reverses course and makes the very approach we rejected 10 years ago the rule in California.
I dissent from the majority's decision to abandon our prior construction of the UPA. No statute compels the majority's conclusion. On the contrary, the majority's *241 conclusion is inconsistent with California's statutory scheme, which requires courts to determine paternity in accordance with biological fact even where a man enjoys a so-called conclusive presumption of paternity. It is also inconsistent with compelling legislative history that clearly shows our Legislature's intent to have parentage determined by biology where possible. Through the statutory scheme and its legislative history, the Legislature has directed us to determine parentage in this case  as opposed to custody  in accordance with what everyone concedes is the biological truth: that Heriberto C. is the father of Jesusa V. Finally, the majority's conclusion raises serious constitutional questions regarding the rights of biological fathers. For all of these reasons, I dissent from the majority's holding that Heriberto's status as a presumed father and his unquestioned biological paternity do not necessarily rebut or outweigh the presumption under section 7611 that Paul B. is Jesusa's "natural father," and that the determination of paternity depends instead on a trial court's subjective and discretionary assessment of the child's best interests.
I also dissent from the majority's conclusion that when the juvenile court determined paternity in Heriberto's absence, it did not violate Heriberto's statutory right under Penal Code section 2625 to be personally present. The majority's cramped interpretation of this provision is inconsistent with the statute's plain language.
On the particular facts of this case, the result of the majority's conclusion is unobjectionable: Jesusa will remain in Paul's care and Heriberto will have no legal access to her. However, as we have held, questions of parentage are legally separate from questions of custody. (Johnson, supra, 5 Cal.4th at p. 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) Concerns that Heriberto is not an appropriate father for Jesusa can, and should, be addressed through our laws on custody and termination of parental rights, not through an initial paternity determination. Applying those laws, my construction will ultimately produce the same result in this case without distorting the statutes governing paternity determinations and rendering them unconstitutional.
Moreover, the majority's rule applies not just in this case, but in all cases involving competing paternity claims of men who qualify under section 7611 as presumed "natural father[s]" of a child. Given the prevalence in today's world of fractured families and the relative ease of qualifying as a presumed "natural father"  especially under the majority's analysis in this case  thousands of biological fathers in California may now be at risk that, although they have a loving, healthy, and well-developed relationship with their children, some court may terminate their parental rights based on the conclusion that another man who qualifies as a presumed father would be a better father. Thus, the majority's conclusion has serious implications extending well beyond this case; it permits judges making paternity decisions to ignore biological fact because they believe someone else would make a better father, and it permits them to do so in the biological father's absence if the biological father is a prisoner. Because these results are not authorized by statute and were not intended by the Legislature, I dissent.

I. HERIBERTO's BIOLOGICAL PATERNITY CONTROLS.
As the majority explains, this case involves a clash of competing presumptions under section 7611 that a particular man is Jesusa's "natural father." The juvenile court found that, in addition to being Jesusa's "biological father," Heriberto qualified *242 as a presumed father because he "holds himself out as the father and has received [Jesusa] into his home." The latter finding qualified Heriberto for the presumption under subdivision (d) of section 7611, which applies where a man "receives the child into his home and openly holds out the child as his natural child." The juvenile court found that Paul qualified as a presumed father because he "was married to [Jesusa's mother] at the time [Jesusa] was conceived and born," even though Jesusa's mother "was living with" Heriberto when Jesusa "was conceived and apparently when [she] was born." These findings qualified Paul for the presumption under subdivision (a) of section 7611, which applies where a child is born "during the marriage" of a man "and the child's natural mother."[2]
The UPA provides that the presumptions for which Heriberto and Paul qualified are "rebuttable presumption[s]" that "may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).) The UPA also provides that "[i]f two or more presumptions arise under Section 7611 which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (§ 7612, subd. (b).) These provisions give rise to two separate questions here: (1) whether Heriberto's unquestioned biological paternity constitutes clear and convincing evidence that necessarily rebuts the presumption that Paul is Jesusa's "natural father" (§ 7611); and (2) if Heriberto's biological paternity does not necessarily rebut Paul's presumption, whether it nevertheless requires a finding that, "on the facts" of this case (§ 7612, subd. (b)), the presumption that Heriberto is Jesusa's "natural father" (§ 7611) is "founded on the weightier considerations of policy and logic." (§ 7612, subd. (b).)
In answering these questions, we must construe the statutes not "in isolation," but "`with reference to the entire scheme of law of which [they are] part so that the whole may be harmonized and retain effectiveness.' [Citation.]" (People v. Pieters (1991) 52 Cal.3d 894, 899, 276 Cal.Rptr. 918, 802 P.2d 420 (Pieters).) Moreover, if *243 the statutory language permits, then we must adopt a construction that does not render the statutes "unconstitutional in whole or in part, or raise serious and doubtful constitutional questions." (Miller v. Municipal Court (1943) 22 Cal.2d 818, 828, 142 P.2d 297 (Miller).) Applying these principles, I conclude that Heriberto's undisputed biological paternity is controlling in this case.

A. The Statutory Scheme and Legislative Intent.
The relevant statutes and legislative history, most of which the majority disregards, clearly demonstrate the Legislature's intent to make established biological paternity determinative as between competing presumed fathers. Under California's Uniform Act on Blood Tests to Determine Paternity (§ 7550 et seq.), "[i]n a civil action or proceeding in which paternity is a relevant fact, the court may upon its own initiative or upon suggestion made by or on behalf of any person who is involved, and shall upon motion of any party to the action or proceeding made at a time so as not to delay the proceedings unduly, order the mother, child, and alleged father to submit to genetic tests." (§ 7551.) "If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly." (§ 7554, subd. (a), italics added.) "[I]f the court finds that the paternity index, as calculated by the [qualified] experts ..., is 100 or greater," then "[t]here is a rebuttable presumption ... of paternity," which "affect[s] the burden of proof" and "may be rebutted by a preponderance of the evidence." (§ 7555, subd. (a).)
The implications of these provisions for the case now before us are unmistakable. Given the undisputed fact that Heriberto is Jesusa's biological father, genetic tests done pursuant to section 7551 would surely have shown that Paul "is not the father of" Jesusa (§ 7554, subd. (a)) and that Heriberto is Jesusa's father. Based on such results, section 7554, subdivision (a) would have required that "the question of [Paul's] paternity ... be resolved accordingly" (italics added), that is, with a judicial determination that he is not Jesusa's father. Such a judicial determination would necessarily and conclusively have rebutted the presumption under section 7611 that Paul is Jesusa's "natural father."[3] At that point, only Heriberto would have still been a presumed father under section 7611. Moreover, based on the test results, Heriberto would also have enjoyed "a rebuttable presumption ... of paternity" under section 7555, subdivision (a), and there is no evidence in the record to rebut this presumption.
The paternity determination should be no different in this case simply because testing was not actually performed. At the very first hearing, Jesusa's mother stated that Heriberto is the biological father, and no one has ever contended otherwise. The juvenile court expressly "made a finding that [Heriberto] is the biological father." Where, as here, the parties all agree as to who the biological father is, we should not insist that they go through pointless and invasive test procedures that would involve considerable expense and would significantly delay resolution of dependency actions. As the majority notes, such delays would be contrary to the Legislature's "goal" that dependency actions "be resolved expeditiously." (Maj. opn., *244 ante, 10 Cal.Rptr.3d at p. 234, 85 P.3d at p. 26; see In re Malinda S. (1990) 51 Cal.3d 368, 384, 272 Cal.Rptr. 787, 795 P.2d 1244 [noting state's "interest" in resolving child's status without unnecessary delay]; Marlene M. v. Superior Court (2000) 80 Cal.App.4th 1139, 1151, 96 Cal.Rptr.2d 104 ["intent of the Legislature, especially with regard to young children, is that the dependency process proceed with deliberate speed and without undue delay"].) Moreover, where, as here, one of the presumed fathers is also the biological father, the legislative policy decision these statutes reflect  that biological paternity is determinative  should be of controlling weight in determining which presumption is, "on the facts ... founded on the weightier considerations of policy and logic...."[4] (§ 7612, subd. (b).)
Although the UPA does not expressly provide that one presumed father's established biological paternity necessarily rebuts the presumption of another presumed father under subdivision (a) of section 7611, that conclusion is evident from the statutory framework as a whole. In addition to defining specific presumptions in subdivisions (a) through (d), section 7611 of the UPA incorporates by reference the presumptions set forth in sections 7540 and 7576. Section 7540 establishes a presumption that "the child of a wife cohabiting with her husband ... is ... a child of the marriage." Although the presumption purports to be "conclusive[ ]" (§ 7540), it is not; "[n]otwithstanding" the presumption, "if the court finds that the conclusions of all the experts, as disclosed by the evidence, based on blood tests performed pursuant to [section 7551], are that the husband is not the father of the child, the question of paternity of the husband shall be resolved accordingly." (§ 7541, subd. (a), italics added.) Parties with standing to request such testing must do so within "two years from the child's date of birth." (§ 7541, subds.(b), (c).) Section 7576, subdivision (a), establishes a "presumption," with "the same force and effect as the presumption under Section 7540," that the child of a man and woman executing a voluntary declaration of paternity before January 1, 1997, "is ... the man's child." Although this presumption also purports to be "conclusive[ ]" (§ 7576, subd. (a)), it *245 is not; "any person" may rebut it "by requesting blood or genetic tests pursuant to" section 7551 within three years from the date of the declaration's execution. (§ 7576, subd. (d).) Thus, the Legislature has expressly provided that, as to young children, biological proof necessarily rebuts even the "conclusive[ ]" presumptions under sections 7540 and section 7576, subdivision (a). Logically, if the Legislature provided that proof of biological paternity necessarily rebuts these so-called conclusive presumptions, both of which are UPA presumptions, then surely the Legislature intended that such proof would rebut the nonconclusive UPA presumption under section 7611, subdivision (a).[5]
These same provisions alternatively show that, in addition to rebutting paternity presumptions, biological paternity should be given controlling weight in determining which unrebutted presumption is, "on the facts ... founded on the weightier considerations of policy and logic...." (§ 7612, subd. (b).) Section 7576, subdivision (e), provides that if the presumption based on a voluntary paternity declaration is not rebutted, it "override[s] all statutory presumptions of paternity except a presumption arising under Section 7540 or [Section] 7555." (Italics added.) By implication, the hierarchy of presumptions established by this section affirmatively demonstrates the Legislature's intent that the presumption under section 7555 based on biological paternity would outweigh the presumptions under subdivisions (a) through (e) of section 7611. Logically, if the presumption based on a voluntary declaration necessarily overrides the 7611 presumptions (except the conclusive presumption under section 7540), but does not necessarily override section 7555's biologically-based presumption, then section 7555's biologically-based presumption must also necessarily override those section 7611 presumptions. Thus, the Legislature has expressed its policy decision that the presumption of a presumed father who is also the biological father is, "on the facts ... founded on the weightier considerations of policy and logic...."[6] (§ 7612, subd. (b).)
*246 The legislative history of these provisions clearly supports my conclusion. The legislative command that paternity questions "shall be resolved" in accordance with tests conclusively showing that "the alleged father is not the father of the child" (§ 7554, subd. (a)) first appeared in 1953 as part of the Code of Civil Procedure (Stats.1953, ch. 1426, § 1, p. 3013). It derives from the identically-worded section 4 of the 1952 Uniform Act on Blood Tests to Determine Paternity (1952 Act). In a prefatory note, the drafters of the 1952 Act explained that where tests conclusively show that a man is not a child's biological father, "it seems intolerable for a court to permit an opposite result to be reached.... For a court to permit the establishment of paternity in cases where it is scientifically impossible to arrive at that result would seem to be a great travesty on justice." (9 West's U. Laws Ann. (1957) Miscellaneous Acts, 1952 Act, comrs. note No. 1, p. 103.) Thus, 50 years ago, our Legislature directed courts to give controlling weight to evidence conclusively disproving the biological paternity of a particular man. My conclusion that Heriberto's undisputed biological paternity necessarily rebuts Paul's presumption is consistent with the Legislature's command. The majority holding's that Heriberto's biological paternity is simply a "factor[ ]" that a juvenile court is "obliged" to consider in weighing the competing presumptions under section 7611 (maj. opn., ante, 10 Cal.Rptr.3d at p. 220, 85 P.3d at p. 15) overrides that command.
The majority's conclusion also defeats the Legislature's intent in establishing the "rebuttable presumption ... of paternity" based on biology that is currently found in section 7555, subdivision (a). In 1986, when it first enacted this presumption, the Legislature expressly declared in an uncodified section of the enacting legislation: "It is the intent of the Legislature to standardize the process by which paternity is established in order to achieve a greater degree of equity and consistency in paternity determinations. The Legislature finds that the science of genetic testing has advanced to the degree that paternity determinations resulting from such testing are so reliable that the burden of proof can be shifted to the putative father." (Stats.1986, ch. 629, § 1, pp. 2136-2137 [enacting Evid.Code, former § 895.5].) A legislative analysis explained that the section was necessary because," `under existing law, juries, regardless of the biological facts, tend to arrive at their decisions because of very subjective factors such as the appearance of the natural mother, and the ability of the expert witnesses to explain complex matters. The results of trials on these issues do not always correspond to the biological realities, regardless of how overwhelming such evidence may be. In fact, under [one appellate decision], the court is free to ignore blood test evidence. This bill should standardize paternity determinations and insure that blood test findings are given appropriate consideration.'" (Sen. Com. on Judiciary, analysis of Assem. Bill No. 3326 (1985-1986 Reg. Sess.) May 28, 1986, pp. 2-3.) My conclusion that Heriberto's conceded biological paternity necessarily rebuts Paul's presumption is consistent with and implements the Legislature's stated desire to "standardize paternity determinations and insure that" such determinations "correspond to the biological realities." (Id. at p. 3.) The majority's conclusion that a court need only consider biological paternity as one of several "relevant factors" in weighing competing presumptions (maj. opn., ante, 10 Cal.Rptr.3d at p. 220, 85 P.3d at p. *247 15) is directly contrary to and defeats the Legislature's clearly stated intent.
In rejecting my conclusion, the majority misstates the legislative history. The Legislature's expressly declared "purpose" in enacting section 7555 was not, as the majority states, to standardize "the weight accorded to genetic tests in determining biological paternity" (maj. opn., ante, 10 Cal.Rptr.3d at p. 228, 85 P.3d at p. 21), but was to standardize "the process by which paternity is established in order to achieve a greater degree of equity and consistency in paternity determinations." (Stats.1986, ch. 629, § 1, pp. 2136-2137, italics added.) "The problem" the statute addressed was not, as the majority asserts, that jurors were "relying on less probative markers of biological paternity" (maj. opn., ante, 10 Cal.Rptr.3d at p. 228, 85 P.3d at p. 21), but that they were making decisions "regardless of the biological facts" and "regardless of how overwhelming" evidence of "the biological realities ... may be." (Sen. Com. on Judiciary, analysis of Assem. Bill No. 3326 (1985-1986 Reg. Sess.) May 28, 1986, pp. 2-3.) Thus, contrary to the majority's assertion, this legislative history says a great deal about what a court should do "when faced with a conflict between" a presumption under section 7555 based on biology and a presumption under section 7611 that is not based on biology (maj. opn., ante, 10 Cal.Rptr.3d at p. 228, 85 P.3d at p. 21); it tells us that, in order to implement the Legislature's expressly stated intent "to standardize the process by which paternity is established" and "to achieve a greater degree of equity and consistency in paternity determinations" (Stats.1986, ch. 629, § 1, pp. 2136-2137), the presumption under section 7555 controls.[7]
This conclusion is consistent with a critical fact that the majority's analysis ignores: whereas the section 7611 presumptions, none of which is based on biology, are all subject to the UPA weighing process under section 7612, the presumption based on biology under section 7555 is expressly not subject to that weighing process. By its terms, section 7612 requires the weighing of conflicting presumptions that "arise under Section 7611." As explained above, the presumptions that arise under section 7611 are those specified in *248 subdivisions (a) through (e) of that section and those incorporated by reference from "Chapter 1 (commencing with Section 7540) and Chapter 3 (commencing with Section 7570) of Part 2." All of these presumptions are based on factors other than biology: marriage (§§ 7540, 7611, subd. (a)), attempted marriage (§ 7611, subds.(b), (c)), a voluntary declaration of paternity (§§ 7576, 7611, subd. (e)), or conduct towards the child (§ 7611, subd. (d)). The presumption based on biology under section 7555 appears in chapter 2 of part 2, not in chapter 1 or chapter 3. Because the presumption under section 7555 based on biology does not "arise under Section 7611," it is not subject to weighing under section 7612, subdivision (b); it "may be rebutted" only "by a preponderance of the evidence" disproving the biological facts (§ 7555) and it necessarily rebuts the presumptions that arise under subdivisions (a) through (d) of section 7611. Moreover, the Legislature's exclusion of the presumption based on biology was clearly intentional, not simply an oversight. Until 1994, the only presumption incorporated by reference into the UPA was the presumption in chapter 1 of part 2 based on marriage. (§ 7540; see Stats.1993, ch. 219, § 176, p. 1670.) In 1994, the Legislature amended section 7611 to incorporate the presumption in chapter 3 of part 2 based on a voluntary declaration of paternity. (§ 7576; see Stats.1994, ch. 1269, § 53, p. 8058.) Clearly, the Legislature made a conscious decision to exclude the presumption in chapter 2 based on biology (§ 7554) from the UPA's balancing process under section 7612. This choice reflects the Legislature's intent that biological paternity would control paternity determinations, not that it would be, as the majority asserts, simply a factor that a court must weigh.
Nor does the majority explain how, under its analysis, a juvenile court that is "obliged" to consider biological paternity even can take this "factor [ ]" into account (maj. opn., ante, 10 Cal.Rptr.3d at p. 220, 85 P.3d at p. 15) in cases where biological paternity is not admitted. Under the majority's view, how does the juvenile court determine biological paternity where it is not admitted? If through genetic tests performed pursuant to section 7551, then, as explained above, section 7554 expressly tells us the effect of results showing that the tested man "is not the father of the child"; we must "resolve [ ]" "the question of [his] paternity ... accordingly." If not through such testing, then how? The majority does not tell us.
Also supporting my conclusion is the evolution and legislative history of the "conclusive[ ]" presumption under section 7540 that "the child of a wife cohabiting with her husband ... is ... a child of the marriage." This presumption originally appeared as Evidence Code former section 621. In 1980, when the Legislature first made the presumption rebuttable with tests showing that "the husband is not the father of the child," only "the husband" was given standing to move for testing and only within "two years from the date of birth of the child." (Stats.1980, ch. 1310, § 1, p. 4433 [amending Evid.Code, former § 621, now Fam.Code, § 7541, subd. (b)].) In 1981, the Legislature extended standing to "the mother of the child," subject to the same time limit and only "if the child's biological father has filed an affidavit with the court acknowledging paternity of the child." (Stats.1981, ch. 1180, § 1, p. 4761 [amending Evid.Code, former § 621, now Fam.Code, § 7541, subd. (c)].) In 1990, the Legislature extended standing to a "presumed father" under section 7611 and to "the child," subject to the same time limit and only "for purposes of establishing [the presumed father's] paternity." (Stats.1990, ch. 543, § 2, p. 2855 [amending Evid. *249 Code, former § 621, now Fam.Code, § 7541, subd. (b)].)
The legislative history regarding these amendments is revealing. Regarding the 1980 legislation that first made the conclusive presumption rebuttable by the husband, one legislative analysis explained: "Under the Uniform Parentage Act [citation], a man is presumed to be the natural father of a child if he comes within the purview of Evidence Code [former] Section 621 or meets any of the other conditions specified in Civil Code [former] Section 7004 [now, Family Code section 7611]. Except for [Evidence Code former] Section 621, all these presumptions are rebuttable and may be met by clear and convincing evidence." (Assem. Com. on Judiciary, analysis of Assem. Bill No. 1981 (1979-1980 Reg. Sess.) June 11, 1980, p. 2.) Thus, "[i]f the conclusive presumption is ... eliminated by proof that the parties did not live together as husband and wife, the disputable presumption [that arises under the UPA] can then be met by any kind of competent evidence." (Id. at p. 3.) The analysis also explained that "an exception to the conclusive presumption ... is needed to prevent in some cases an injustice...." (Id. at p. 2.) Similar statements appear in the legislative history of the 1981 amendment that extended standing to mothers if the biological father acknowledges paternity by affidavit. After stating that "all" of the presumptions "[u]nder the Uniform Parentage Act ... are rebuttable" except the conclusive presumption under Evidence Code former section 621 (ibid.), one analysis explained that the 1981 amendment "would give the child's mother equal standing with the husband" to request testing and to "prevent the [husband's] conclusive presumption of paternity from operating especially where the biological father wishes to establish paternity. ..." (Assem. Com. on Judiciary, analysis of Assem. Bill No. 207 (1981-1982 Reg. Sess.) Feb. 11, 1981, p. 2, italics added.)
These statements demonstrate several important things. First, they show the Legislature's express recognition that the conclusive presumption now found in section 7540 is a UPA presumption and the Legislature's intent to make that UPA presumption necessarily rebutted by proof that the presumed father is not the biological father; the amended statute commands that "the question of paternity of the husband shall be resolved accordingly," that is, in accordance with the proof that "the husband is not the father of the child." (§ 7541, subd. (a), italics added.) Second, they demonstrate that, in making the conclusive presumption rebuttable by the husband, the Legislature intended to make that presumption more like the other presumptions under the UPA, all of which were already rebuttable. Thus, if a husband's otherwise conclusive UPA presumption of paternity is necessarily rebutted by proof he is not the biological father, then the nonconclusive UPA presumptions must also be necessarily rebutted by such proof; in establishing the limited exception to the conclusive presumption, the Legislature did not intend to make that presumption more rebuttable than the already rebuttable UPA presumptions. Finally, as especially relevant here, they demonstrate the Legislature's intent that biological paternity would necessarily rebut even an otherwise conclusive UPA presumption "where the biological father wishes to establish paternity. ..." (Assem. Com. on Judiciary, analysis of Assem. Bill No. 207 (1981-1982 Reg. Sess.) Feb. 11, 1981, p. 2, italics added.) That is precisely the situation here; Heriberto, the biological father, formally "request[ed] that the court enter a judgment of [his] paternity."[8]
*250 The legislative history of the 1990 amendment extending standing to presumed fathers is perhaps even more significant. Regarding the "[n]eed for" this change, one legislative analysis explained: "[T]his measure would rectify those situations where unwed biological fathers are foreclosed from establishing paternity and precluded from continuing a supportive relationship with a child who was born while the mother was married and cohabiting with another man. [It] ... allow[s] a father who has demonstrated an interest in raising and providing for his child in a familial relationship the opportunity to establish paternity under the above factual circumstances. [¶] ... With more children born out of wedlock, to women who may be technically married, but no longer living with their husbands, ... legislation must be adopted which addresses the problems of unwed fathers who want to become involved and be responsible for the welfare of their children." (Sen. Com. on Judiciary, analysis of Sen. Bill No.2015 (1989-1990 Reg. Sess.) Mar. 27, 1990, p. 3.) Another analysis explained that the amendment specifically targeted "those situations wherein a mother, a biological father, and child have lived together as a family, and thereupon, the mother departs to return to a husband or to live elsewhere and the biological father does not have access to the procedures that are otherwise available to a divorced father for determination of' custody or visitation." (Assem. Com. on Judiciary, analysis of Sen. Bill No.2015 (1989-1990 Reg. Sess.) Apr. 4, 1990, p. 3.) The amendment was meant to change the fact that, under then-existing law, where a mother's husband qualified for the conclusive presumption under Evidence Code former section 621, a biological father who also qualified as "a presumed father [could] be refused visitation rights regardless of his established relationship with the child." (Assem. Com. on Judiciary, Report on Sen. Bill No. 2015 (Apr. 4, 1990) p. 3.) The Legislature passed the amendment despite the contention of opponents that it would "seriously erode[ ]" the "public policy of promoting the integrity of an intact family unit, and providing certainty to the relationship of a child in such a family." (Id. at p. 4.) These statements, and the 1990 amendment itself, demonstrate the Legislature's intent that where a man who is a presumed father under section 7611 seeks to establish his paternity within a child's first two years of life, proof of his biological paternity conclusively and necessarily rebuts any other man's UPA presumption, even the otherwise conclusive presumption of the mother's husband.
The facts here closely match the factual scenario the Legislature specifically had in mind when it gave presumed fathers standing to rebut the otherwise conclusive UPA presumption of a husband's paternity under section 7540. Jesusa's mother left Paul, whom she said she "sees ... as a brother" rather than a husband, and moved in with Heriberto three years before the dependency proceeding began on April 4, 2001. She lived with Heriberto when Jesusa was conceived and when she was born (May 1999), and the three of them lived together until the dependency proceeding began, when Jesusa was less than 23 months old. Thus, during the relevant events, although Jesusa's mother *251 was still technically married to Paul, she was living with Heriberto. Moreover, Jesusa's mother reported that Heriberto had "always been very loving and gentle to" Jesusa. Finally, on April 13, 2001, when Heriberto filed a formal request in the dependency action for a judgment declaring his paternity, Jesusa was still less than two years old. Thus, this is precisely the type of case where the Legislature intended that a UPA presumption  which, by definition, is not based on biology  would necessarily be rebutted by proof that another presumed father is the biological father.
The majority's response on this point is erroneous. Isolating a single phrase from the legislative reports  "`the opportunity to establish paternity'"  the majority asserts that "[a] mere opportunity for the unwed biological father to establish paternity hardly supports" the conclusion "that biology is necessarily determinative." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 228, 85 P.3d at p. 21.) However, as I have shown, a review of the entire legislative history, rather than a single phrase taken out of context, demonstrates the Legislature's intent to make biology determinative where a biological father who also is a presumed father under section 7611 seeks to rebut another man's presumption. Moreover, the majority's response ignores the fact that section 7541, subdivision (a), expressly makes biology determinative, by providing that "the question of paternity" of the tested presumed father "shall be resolved according[ ]" to results showing that he "is not the father." In this regard, and contrary to the majority's assertion, section 7541 is not at all "similar to" the statute the Colorado Supreme Court construed in N.A.H. v. S.L.S. (Colo.2000) 9 P.3d 354. (See maj. opn., ante, 10 Cal.Rptr.3d at p. 228, 85 P.3d at p. 21.) The Colorado statute merely provided that a "presumption of legitimacy" that is not based on biology "is overcome" by testing showing that the presumed father "is not the parent of the child." (N.A.H., supra, at pp. 360-361.) Section 7541, subdivision (a), does not provide that such testing merely overcomes a presumption; it provides that "paternity ... shall be resolved according [ ]" to test results showing that the tested presumed father "is not the father of the child."
The majority is incorrect that my construction of these statutes renders part of section 7612, subdivision (a), "meaningless." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.) As the majority observes, section 7541 specifies that the section 7540 presumption "is rebutted by evidence of biological fatherhood," and section 7576, subdivision (e), specifies that a presumption based on a voluntary paternity declaration "would not override a presumption of paternity arising under section 7555, the genetic testing provision." (Maj. opn., ante, 10 Cal.Rptr.3d at pp. 224-225, 85 P.3d at pp. 18-19.) The majority next correctly observes that subdivision (a) of section 7612 provides: "Except as provided in Chapter 1 (commencing with Section 7540) and Chapter 3 (commencing with Section 7570) of Part 2 ..., a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (See maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.) However, the conclusion the majority reaches based on these provisions is incorrect. That the Legislature "expressly except[ed]" the presumptions under section 7540 and section 7576 "from the operation of section 7612, subdivision (a) and [made] separate provision for the legal effect of biology in those circumstances" does not, as the majority asserts, show the Legislature's "belie[f] that section 7612, subdivision (a) *252 [does] not necessarily accord primacy to biology." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.) Rather, it shows that the Legislature wanted to impose limits with respect to these presumptions that do not exist with respect to the other section 7611 presumptions. Specifically, as the majority recognizes (maj. opn., ante, 10 Cal.Rptr.3d at p. 220, fn. 6, 85 P.3d at p. 14, fn. 6), through the "excepting" clause of section 7612, subdivision (a), the Legislature imposed time limits for rebutting the presumptions under sections 7540 and 7576 that do not apply to the other section 7611 presumptions. (See § 7541, subds. (c), (d) [two-year time limit]; § 7576, subd. (d) [three year time limit]). That is, the "excepting" clause takes the section 7540 and 7576 presumptions out of the general rule that otherwise applies. Thus, contrary to the majority's assertion, my construction does not render "meaningless" the "`excepting' clause" in subdivision (a) of section 7612.[9] (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.)
On the other hand, the majority's construction renders meaningless all of subdivision (b) of section 7612. As I have explained, section 7612 gives rise to two separate questions: (1) under subdivision (a), whether a presumed father's presumption is rebutted; and (2) under subdivision (b), where there are competing unrebutted presumptions, which one "on the facts is founded on the weightier considerations of policy and logic." Under the majority's construction, these questions are exactly the same, and a court looks to the exact same factors to answer each. The majority holds that courts must "consider the child's best interest and public policy in determining" under subdivision (a) of section 7612 "whether [a] presumption is rebutted." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 226, 85 P.3d at p. 20.) Similarly, the majority holds that a court "`must take the best interests of the child into account as part of policy and logic in resolving competing presumptions' "under subdivision (b) of section 7612. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 219, 85 P.3d at p. 14.) Thus, although the term "best interests" does not appear in either subdivision (a) or subdivision (b) of section 7612, the majority reads that term into both. In affirming the juvenile court's finding that Paul's presumption was not rebutted, the majority weighs Paul's "relationship" to Jesusa, her half siblings, and her mother against the fact that Heriberto is Jesusa's biological father and he lived with her through her infancy. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 219, 85 P.3d at p. 14.) Likewise, in affirming the juvenile court's finding that Paul's presumption is weightier, the majority weighs the exact same factors, restated almost verbatim. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.) Under the majority's analysis and construction, subdivision (b) of section 7612 is entirely useless; it adds nothing that is not already contained in subdivision (a) of the same section. Thus, it is the majority's construction, not mine, that renders part of section 7612 meaningless. My construction gives effect to all parts of the statute.
The majority's construction also produces absurd results. As noted, the "conclusive" presumption under section 7540 is *253 also a section 7611 UPA presumption, and the majority concedes that, under section 7541, subdivision (a), this "conclusive presumption ... is rebutted by evidence of biological fatherhood." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 19.) However, under the majority's view, the nonconclusive presumptions under section 7611 are not necessarily rebutted by evidence of biological fatherhood. Thus, according to the majority, evidence of biological fatherhood necessarily rebuts the "conclusive[ ]" UPA presumption of a husband who is cohabiting with his wife at the time of conception (§ 7540), but not the non conclusive UPA presumption of a husband who is not cohabiting with his wife (§ 7611, subd. (a)), or of a man who marries the mother after the child's birth (§ 7611, subd. (c)), or of a man who incorrectly believed he had validly married the mother (§ 7611, subd. (b)). Moreover, test results showing that a husband is "not the father" does not merely rebut the presumption under section 7540, it requires that the husband's "paternity be resolved accordingly," that is, with a judgment that he is not the father. (§ 7541, subd. (a).) Such a judgment necessarily precludes the husband from establishing his paternity claim under some other provision. Thus, under the majority's view, a husband is actually better off if he is not cohabiting with his wife at the time of conception and therefore does not qualify for the "conclusive" presumption under section 7540. Under these circumstances, he would qualify for only a nonconclusive presumption under section 7611 and, because section 7541 does not apply, he could still be declared the father despite another presumed father's established biological paternity. It is highly doubtful that the Legislature intended these absurd results.[10]
The majority's attempt to explain these results simply demonstrates the absurdity of its construction. The majority asserts that it is incorrect to "compar[e]" the "presumption in section 7540" to the other section 7611 presumptions because the former, "[u]nlike" the latter, is "not really a presumption at all but is instead `a rule of substantive law.'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 225, 85 P.3d at p. 19.) However, the characterization of the section 7540 presumption as a "substantive rule of law" is ours, not the Legislature's. (Kusior, supra, 54 Cal.2d at p. 619, 7 Cal.Rptr. 129, 354 P.2d 657.) Section 7540 provides that the child of a wife cohabiting with her husband is "presumed" to be the child of the marriage. Similarly, section 7611 expressly provides that a man "is presumed" to be a child's natural father "if he meets the conditions provided in" section 7540 "or in" subdivisions (a) through (e) of section 7611. Thus, contrary to the majority's assertion, section 7540, like subdivisions (a) through (e) of section 7611, creates a paternity presumption.[11] In any event, even if, as the majority asserts, *254 section 7540 alone states a substantive rule of law, then the presumption it establishes should be harder to rebut than the other section 7611 presumptions, not easier; yet, under the majority's construction, evidence that necessarily rebuts the section 7540 presumption does not necessarily rebut the other section 7611 presumptions. The majority also errs in suggesting that the other section 7611 presumptions are unlike the section 7540 presumption in that they "were `"established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied."'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 225, 85 P.3d at p. 19.) As we have explained, the section 7540 presumption and the other section 7611 presumptions all serve the same public policy. (In re Nicholas H. (2002) 28 Cal.4th 56, 65, 120 Cal.Rptr.2d 146, 46 P.3d 932 Nicholas H.; Estate of Cornelious (1984) 35 Cal.3d 461, 465, 198 Cal.Rptr. 543, 674 P.2d 245 (Cornelious).) Finally, the majority's analysis is not aided by its observation that, "unlike the section 7540 presumption," the other section 7611 presumptions "may be rebutted `only by clear and convincing evidence.'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 225, 85 P.3d at p. 19.) The standard of proof for rebutting the section 7540 presumption is actually higher; that presumption is overcome only if "all the experts" agree that "the husband is not the father." (§ 7541, subd. (a), italics added.) Thus, contrary to the majority's suggestion, the difference in the applicable standard of proof again demonstrates that the Legislature intended to make the section 7611 presumption harder to rebut than the other section 7611 presumptions, and that proof rebutting the section 7540 presumption therefore necessarily rebuts the other section 7611 presumptions.
My conclusion that, under our current statutory scheme, one presumed father's biological paternity necessarily rebuts another man's presumption is consistent with the law as it existed before the Legislature adopted the UPA in 1975. In Kusior, we considered the rebuttable presumption under Civil Code former sections 194 and 195 in favor a mother's husband where the child was born within 10 months of the dissolution of marriage. (Kusior, supra, 54 Cal.2d at p. 607, 7 Cal.Rptr. 129, 354 P.2d 657.) Blood tests taken "pursuant to" the California Uniform Act on Blood Tests to Determine Paternity  specifically, Code of Civil Procedure former section 1980.3, which was substantively identical to the first sentence of Family Code section 7551 (see Stats.1953, ch. 1426, § 1, p. 3013)  showed that the mother's husband "could not have been the father of the child...." (Kusior, supra, 54 Cal.2d at p. 607, 7 Cal.Rptr. 129, 354 P.2d 657.) We held that, in adopting California's Uniform Act on Blood Tests to Determine Paternity, the Legislature made "a legislative determination ... that blood test evidence is conclusive." (Kusior, at p. 619, 7 Cal.Rptr. 129, 354 P.2d 657.) We relied for this conclusion on Code of Civil Procedure former section 1980.6, which, in language identical to Family Code section 7554, provided that "if `the conclusions of all the experts ... are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly.'" (Kusior, supra, 54 Cal.2d at p. 620, 7 Cal.Rptr. 129, 354 P.2d 657, fn. omitted.) "[U]nder th[is] language," we explained, "where the tests so taken establish that *255 the mother's husband could not be the father of the child the rebuttable presumptions of paternity are conclusively rebutted." (Ibid., italics added.)
Indeed, under California law before the UPA's passage, evidence other than tests  including an admission of biological paternity  showing that a presumed father was not the biological father conclusively rebutted a presumption. In Baker v. Baker (1859) 13 Cal. 87, 96, 1859 WL 960 (Baker), the evidence showed that a woman had admitted to her brother that her husband was not her child's biological father. We first held that, absent evidence of collusion, the admission was admissible because "the public can have no interest in suppressing the truth." (Id. at p. 94.) We then held that the woman's admission "placed" her child's paternity "upon a stranger beyond a doubt" and, thus, necessarily "overc[a]me" the husband's rebuttable presumption. (Id. at p. 101.) Here, of course, not only does Jesusa's mother concede Heriberto's biological paternity, both Heriberto and Paul do so as well. Moreover, there is not even a hint of collusion in this case. Thus, under California law before passage of the UPA, Heriberto's conceded biological paternity would have conclusively and necessarily rebutted Paul's presumption. (See also Anderson v. Anderson (1931) 214 Cal. 414, 417, 5 P.2d 881 [because evidence established biological paternity by "a stranger ... beyond question," husband's presumption "no longer obtains"]; Hughes v. Hughes (1954) 125 Cal.App.2d 781, 784-787, 271 P.2d 172.)
Nothing suggests that, in adopting the UPA, the Legislature intended to alter the determinative effect of biological paternity under California law in cases involving competing paternity claims. The UPA's purpose was not to enact fundamental changes regarding the role of biology in the law of paternity, but was simply to replace the concept of legitimacy with the concept of the parent and child relationship and to specify a procedure for establishing that relationship. (Legis. Counsel's Dig., Sen. Bill No. 347 (1975-1976 Reg. Sess.) 2 Stats.1975, Summary Dig., p. 344; Johnson, supra, 5 Cal.4th at pp. 88-89, 19 Cal.Rptr.2d 494, 851 P.2d 776.) According to one legislative analysis, "[a]ll of the presumptions established by [the UPA] correspond[ed] to current law." (Sen. Com. on Judiciary, analysis of Sen. Bill No. 347 (1975-1976 Reg. Sess.) May 8, 1975, pp. 15-16, italics added.) For example, the rebuttable presumption at issue in Kusior, which we held was conclusively rebutted by tests showing that the presumed father was not the biological father, was the same rebuttable presumption now contained in section 7611, subdivision (a). The legislative history of the UPA also explained that the UPA presumptions "may be rebutted ... by clear and convincing evidence." (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 347 (1975-1976 Reg. Sess.) Aug. 7, 1975, p. 2.) Similarly, the National Conference of Commissioners on Uniform State Laws, which drafted the 1973 Uniform Parentage Act (1973 Act) from which California's UPA was derived (Adoption of Michael H., supra, 10 Cal.4th at p. 1050, 43 Cal.Rptr.2d 445, 898 P.2d 891), explained that the 1973 Act's presumptions are rebuttable "[i] n accordance with current law in most states relating to the rebuttal of a presumption of `legitimacy.'" (9B West's U. Laws Ann. (2001) U. Parentage Act (1973) com. to § 4, p. 394, italics added.) As explained above, when this comment was written, the law in California provided that rebuttable presumptions were conclusively rebutted by proof  such as lack of intercourse, blood tests, the husband's sterility or impotency, or admissions by the mother  that the presumed father was not the biological *256 father.[12] The law in other states was the same. (See generally, Annot., Proof of Husband's Impotency or Sterility as Rebutting Presumption of Legitimacy (1978) 84 A.L.R.3d 495; Annot., Presumption of Legitimacy, or of Paternity, of Child Conceived or Born Before Marriage (1958) 57 A.L.R.2d 729.) The majority's conclusion that, despite one presumed father's conceded biological paternity, a court may decline to find another man's presumption rebutted based on a weighing of policy considerations, constitutes a revolutionary change in terms of the law as it existed when California's UPA and the 1973 Act were drafted and approved. Nothing in the legislative history of the UPA indicates that our Legislature even considered, much less intended to make, this revolutionary change. On the contrary, as explained, the legislative history shows that the UPA was intended to preserve existing law regarding the determinative effect of biological paternity in cases involving competing paternity claims.[13]
Indeed, the very language of the UPA demonstrates that the majority's construction is inconsistent with the Legislature's intent. As noted above, the UPA specifies a procedure for establishing "[t]he parent and child relationship" (§ 7610), which the UPA defines as "the legal relationship existing between a child and the child's natural or adoptive parents...." (§ 7601, italics added.) The particular UPA procedure at issue here is that for establishing "[t]he parent and child relationship ... [b]etween a child and the natural father." (§ 7610, subd. (b), italics added.) Under well established principles of statutory construction, in construing these provisions, "[w]e look first to the plain meaning of the statutory language, giving the words their usual and ordinary meaning. [Citation.]" (People v. Garcia (2002) 28 Cal.4th 1166, 1172, 124 Cal.Rptr.2d 464, 52 P.3d 648.) The usual and ordinary meaning of *257 the terms "natural parent" and "natural father" is, respectively, the biological parent and the biological father. (See Lehr v. Robertson (1983) 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 ["the biological connection ... offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring"].) As Black's Law Dictionary explains, the term "natural father" is "[a]lso termed biological father" and means "[t]he man who impregnated the child's natural mother." (Black's Law Dict. (7th ed.1999) p. 623, col. 1.) For years, we have construed the term "natural" parent, both in interpreting the UPA and in other contexts, in accordance with its common and ordinary meaning, that is, as meaning" biological" parent.[14] Based on the common and ordinary meaning of the terms "natural parent" (§ 7601) and "natural father" (§ 7610, subd. (b)), the UPA's purpose is to specify a procedure for identifying a child's biological father and legally establishing his relationship to his child. Thus, under the statute's plain meaning, although Paul's marriage to Jesusa's "natural mother" initially qualified him under section 7611, subdivision (a), for a presumption that he is Jesusa's "natural father," Heriberto's conceded biological paternity constitutes "clear and convincing evidence" that necessarily rebuts the presumption. (§ 7612, subd. (a); see In re Zacharia D., supra, 6 Cal.4th at p. 450, fn. 18, 24 Cal.Rptr.2d 751, 862 P.2d 751 [UPA presumption of one man "was rebutted by blood tests establishing that [another man] was the biological father"].)
Relevant legislative history confirms that the Legislature understood and used the term "natural father" in the UPA in accordance with its ordinary meaning, that is, "biological father." As explained above, in 1980, the Legislature first made the "conclusive[ ]" presumption under section 7540 rebuttable by giving "the husband" standing to obtain testing that would necessarily rebut the presumption. (Stats.1980, ch. 1310, § 1, p. 4433 [amending Evid.Code, former § 621, now § 7541, subd. (b)].) One legislative analysis of this amendment explained that a "consequence" of the "irrebutable presumption [wa]s that the child's natural father, when he is not the husband, [could not] establish paternity. Thus, the presumption prevent[ed] the natural father from establishing a legal father-child relationship which is the basis for familial rights...." (Sen. Com. on Judiciary, analysis of Assem. Bill No.1981 (1979-1980 Reg. Sess.) June 23, 1980, pp. 3-4, italics added.) In these comments, the term "natural father" was clearly being used to mean "biological father." Legislative analyses of the 1990 amendment that extended standing to "presumed father[s]" under the UPA (§ 7541, subd. (b)), similarly used the term "natural father" to mean "biological father." Several of those analyses explained that, under then-existing law, standing to rebut the otherwise conclusive presumption under section 7540 *258 was limited to the mother's husband and the mother "if the natural father has filed an affidavit acknowledging paternity." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 2015 (1989-1990 Reg. Sess.) as amended July 6, 1990, p. 2, italics added.) The statute these reports described actually provides standing to the mother "if the child's biological father has filed an affidavit with the court acknowledging paternity...." (§ 7541, subd. (c), italics added.) Another analysis explained that the amendment enables "a presumed father" under the UPA to obtain blood tests "to establish himself to be the biological father." (Assem. Com. on Judiciary, Republican Analysis of Sen. Bill No. 2015 (1989-1990 Reg. Sess.) July 7, 1990, italics added.) As already explained, the UPA sets forth a procedure for establishing a parent-child relationship "[b]etween a child and the natural father...." (§ 7610, subd. (b), italics added.) Still another analysis explained that the amendment addressed problems arising under the high court's decision in Michael H. v. Gerald D. (1989) 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91, where "[t]he dissenting opinions argued that a natural father's biological link to his child combined with a substantial parent-child relationship maintained between them, guarantees the natural father a liberty interest in his relationship with child." (Assem. Com. on Judiciary, analysis of Sen. Bill No. 2015 (1989-1990 Reg. Sess.) Apr. 4, 1990, p. 4, italics added.) By interchangeably using the terms "biological" and "natural" in discussing one of the presumptions under the UPA (§ 7611), these analyses clearly demonstrate the Legislature's understanding and intent that the term "natural father" in the UPA (§ 7610, subd. (b)) would be interpreted in accordance with its ordinary meaning, that is, "biological father." The logical conclusion based on this ordinary meaning is that a presumed father's conceded biological paternity necessarily rebuts the presumption that another man is "the natural father" of a child.[15] (§ 7611.)
This conclusion is consistent with our analysis in Johnson. There, we had to resolve the competing maternity claims of two women: one who gave birth to the child and another who had provided the egg that was implanted into the first. (Johnson, supra, 5 Cal.4th at p. 87, 19 Cal.Rptr.2d 494, 851 P.2d 776.) We first reasoned that the UPA, which "applies to any parentage determination," governed the issue. (Id. at p. 89, 19 Cal.Rptr.2d 494, 851 P.2d 776.) We then reasoned that, because both women had a biological claim to maternity, "the [UPA] presumptions contained in [section 7611] do not apply." (Johnson, supra, 5 Cal.4th at p. 91, 19 Cal.Rptr.2d 494, 851 P.2d 776.) These presumptions, we explained, "describe situations in which substantial evidence points to a particular man as the natural father of the child. [Citation.]" (Ibid., italics added.) We then held that, because both women had established a biological basis for their claim, "there [was] no need to resort to an evidentiary presumption to ascertain the identity of the *259 natural mother." (Id. at p. 91, 19 Cal.Rptr.2d 494, 851 P.2d 776, italics added.) We next expressly rejected the very approach the majority adopts here: that courts applying the UPA should "decide parentage based on the best interests of the child." (Johnson, supra, 5 Cal.4th at p. 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) We explained that under our statutory framework, "the determination of parentage must precede, and should not be dictated by, eventual custody decisions." (Ibid.) We also explained that concerns about the child's "best interests" should be addressed, not through parentage determinations, but through our "dependency laws, which are designed to protect all children irrespective of the manner of birth or conception." (Ibid.) We ultimately held that, in resolving the competing maternity claims "under the [UPA]," "the parties' intentions" controlled, rather than the child's best interests. (Id. at p. 95, 19 Cal.Rptr.2d 494, 851 P.2d 776.)
Our analysis in Johnson confirms that, under the UPA, in resolving competing claims of parentage  as opposed to custody  biological parentage controls over a mere presumption that is not based on biology, notwithstanding the child's best interests. Under that analysis, Paul's UPA presumption does not apply in this case because Heriberto is Jesusa's undisputed biological father; if, as we held in Johnson, the UPA presumptions do not apply when both claimants establish biological parentage, then certainly the undisputed biological paternity of one presumed father necessarily rebuts the presumption of another presumed father. Concerns that Heriberto is not an appropriate father for Jesusa should be addressed, not through this paternity determination, but through our laws on custody and termination of parental rights. (See In re Marriage of Moschetta, supra, 25 Cal.App.4th at p. 1226, 30 Cal.Rptr.2d 893 [§ 7611 presumptions, which "serve the function of settling questions of biological parenthood," are inapplicable where there is "no question of biological parenthood" because "[a]ll parties know ... who is genetically related to whom"].)
The majority's discussion of Johnson is erroneous. The majority asserts that Johnson is not pertinent here because section 7612 contains a "directive" that "the child's best interests should be considered in making parentage decisions." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 229, 85 P.3d at p. 22.) The majority is incorrect; section 7612 does not even mention the child's best interests. That gloss on section 7612 is solely a creation of the majority's; as explained above, the majority reads the phrase "best interests" into both subdivision (a) and subdivision (b) of that section.[16] Moreover, contrary to the majority's suggestion, in Johnson, when we held that parentage claims should not be based on the child's best interests, we were not merely "selecting a policy"; we were, as we are here, "giving effect to" the UPA. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 228, 85 P.3d at p. 22.) The majority's holding "repudiate[s]" that statutory construction. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 228, 85 P.3d at p. 21.) Finally, the majority's discussion ignores Johnson's conclusion that because the purpose of the UPA's presumptions is to identify "a particular man as the natural father of the child," where the biological evidence establishes "the identity of the natural [parent]," the presumptions "do not apply." (Johnson, supra, 5 Cal.4th at p. 91, 19 *260 Cal.Rptr.2d 494, 851 P.2d 776.) Under that conclusion, because Heriberto is Jesusa's biological father, Paul's presumption does not apply.[17]
In rejecting my construction of section 7612, subdivision (a), the majority, contrary to governing principles, expressly declines to "construe the [statutory] scheme" of which section 7612 is a part. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 227, 85 P.3d at p. 20.) The majority also fails to consider most of the legislative history I have discussed, and offers no legislative history supporting its own construction. Nor does the majority consider the common and ordinary meaning of the term "natural father" or offer any alternative meaning of that phrase. Finally, the majority disregards Johnson, which specifically construed the UPA in the context of competing parentage claims. Instead, in construing section 7612, subdivision (a), the majority relies principally on a decision that did not involve competing parentage claims: Nicholas H., supra, 28 Cal.4th 56, 120 Cal.Rptr.2d 146, 46 P.3d 932. Purportedly "[a]pplying" Nicholas H., the majority concludes that one presumed father's conceded biological paternity "does not necessarily defeat" the competing presumption of another man who is not the biological father. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 216, 85 P.3d at p. 11.)
For several reasons, the majority's reliance on Nicholas H. is misplaced. First and foremost, Nicholas H. actually supports my conclusion that, in this case of competing paternity claims, Heriberto's conceded biological paternity necessarily rebuts Paul's presumption. The "question" we faced in Nicholas H. was "whether a presumption arising under section 7611[ ] is, under section 7612[, subdivision (a),] necessarily rebutted when the presumed father ... admits that he is not the biological father of the child." (Nicholas H., supra, 28 Cal.4th at p. 58, 120 Cal.Rptr.2d 146, 46 P.3d 932, italics added.) We held that such an admission does not necessarily rebut a presumption where the "presumed father is providing a loving home for" the child and the child's "biological father ... has shown no interest in" establishing his paternity or accepting "the privilege and responsibility of fathering" the child. (Id. at pp. 58-59, 120 Cal.Rptr.2d 146, 46 P.3d 932.) "Rather," we explained, the kind of action "the Legislature had in mind" where a section 7611 would be rebutted is one "in which another candidate is vying for parental rights and seeks to rebut a section 7611[ ] presumption in order to perfect his claim...." (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) Of course, the case now before us is precisely the kind of case that, according to Nicholas H.,"the Legislature had in mind" as one in which a section 7611 presumption would be rebutted by another man's biological paternity; Heriberto, who is both the biological father and a presumed father in his own right, "is vying for parental rights and seeks to rebut" Paul's section 7611 presumption "in order to perfect his *261 claim." (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) Thus, contrary to the majority's analysis, Nicholas H. supports the conclusion that Heriberto's conceded biological paternity necessarily rebuts Paul's presumption.[18]
Relevant legislative history confirms that the distinction we drew in Nicholas H.  between cases where the biological father seeks to establish his paternity claim and cases where he does not  correctly reflects the Legislature's intent. As explained above, when the Legislature extended standing to contest section 7540's conclusive presumption to a "presumed father" under section 7611 and to "the child," it did so only "for purposes of establishing [the presumed father's] paternity." (Stats.1990, ch. 543, § 2, p. 2855 [amending Evid.Code, former § 621, now Fam.Code, § 7541, subd. (b)].) According to the amendment's legislative history, the Legislature specifically included this limitation to "clarify that the purpose for" giving presumed fathers and the child standing was "to establish the paternity of the presumed father" and to prevent "a presumed father (who may not be the biologic father) or the child [from] fil[ing] a motion to have the husband determined as not the biologic father, with no intent of obtaining a legal determination to establish paternity in someone else." (Assem. Com. on Judiciary, analysis of Sen. Bill No. 2015 (1989-1990 Reg. Sess.) Apr. 4, 1990, p. 6.) At the same time the Legislature added this limitation, it rejected a proposed amendment that would have deleted the restriction barring a mother from contesting the husband's conclusive presumption unless "the child's biological father has filed an affidavit with the court acknowledging paternity of the child." (§ 7541, subd. (c).) One legislative analysis explained that this proposed amendment could, "if the mother establishes her husband's lack of paternity," leave the child "legally without a father," which "would be contrary to public policy." (Assem. Com. on Judiciary, analysis of Sen. Bill No. 2015 (1989-1990 Reg. Sess.) Apr. 4, 1990, p. 6.) This legislative history supports our statement in Nicholas H. that the case now before us  in which a biological father who is also a presumed father seeks "to perfect his claim" and to rebut the presumption of another man  is precisely the kind of case "the Legislature had in mind" as an "`appropriate action'" where the presumption would be rebutted. (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.)
Nicholas H. supports my conclusion in another important respect. The child in Nicholas H. was more than four years old when the dependency petition was filed (Nicholas H., supra, 28 Cal.4th at pp. 59-60, 120 Cal.Rptr.2d 146, 46 P.3d 932), and, in reaching our conclusion, we quoted the following statement from Cornelious, supra, 35 Cal.3d at pages 465-466, 198 Cal.Rptr. 543, 674 P.2d 245: "`[I]n the case of an older child [over two years of age] the familial relationship between the child and the man purporting to be the child's father is considerably more palpable than the biological relationship of actual paternity.'" (See Nicholas H., supra, 28 Cal.4th at p. 65, 120 Cal.Rptr.2d 146, 46 P.3d 932.) This quotation from Cornelious was taken *262 from a discussion explaining why the Legislature, when it gave mothers and their husbands the right to contest the conclusive presumption under section 7540, required that the right be exercised within two years of the child's birth. (Cornelious, supra, 35 Cal.3d at pp. 465-466, 198 Cal.Rptr. 543, 674 P.2d 245.) Significantly, that discussion also explained that the Legislature's "probable rationale" for this limitation was that, "`[i]n the case of a young child'"  that is, a child under two years of age  "`the most palpable relation that anyone has to the child is a biological relationship.'" (Id. at p. 465, 198 Cal.Rptr. 543, 674 P.2d 245.) This discussion supports my conclusion that, at least when the child is less than two years old, the Legislature intended that biological paternity would be controlling. In the case now before us, Jesusa was less than two years old when the dependency petition was filed and when Heriberto formally asked the court to enter a judgment declaring his paternity. Thus, by quoting and relying on the discussion in Cornelious, Nicholas H. supports my conclusion that Heriberto's biological paternity necessarily rebuts Paul's presumption.[19]
Beyond summarizing Nicholas H., the majority's actual analysis under that decision is as unconvincing and conclusory as it is brief. After repeating Nicholas H.'s observation that section 7612, subdivision (a), provides that a presumption "may be rebutted in an appropriate action," the majority asserts: "This indicates that the Legislature did not envision an automatic preference for biological fathers, even if the biological father has come forward to assert his rights." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12.) The majority's logic is faulty; the mere fact that section 7612, subdivision (a), makes the presumptions rebuttable "in an appropriate action" does not indicate a legislative intent not to make biology determinative where "the biological father has come forward to assert his rights." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12.) On the contrary, as I have explained, in Nicholas H., we stated that this is precisely the factual scenario that the Legislature envisioned as "`an appropriate action'" for rebutting the presumption. (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) Moreover, as I have also explained, the overall statutory scheme and the relevant legislative history demonstrate the Legislature's intent to make biology controlling in paternity disputes between competing presumed fathers, at least with respect to young children like Jesusa.
The majority next asserts that, "`if the Legislature had intended that a man who is not a biological father cannot be a presumed father under section 7611, it would not have provided for such weighing, for among two competing claims for presumed father status under section 7611, there can *263 be only one biological father.' [Citation.]" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12, italics added.) Again, the majority's logic is faulty. The majority incorrectly assumes that in every case involving competing presumptions, one of the presumed fathers will be the biological father. However, because biological paternity is not a requirement of any of the UPA presumptions, in some cases, neither of the presumed fathers will be the biological father. In this circumstance, neither presumed father will be able to rebut the other's presumption (assuming the facts underlying the presumptions are otherwise established). The majority's logic also overlooks the fact that, under specified circumstances, two of the UPA presumptions  a husband's presumption under section 7540 and the presumption under section 7576 based on a voluntary paternity declaration  are, by statute, not rebuttable. (§ 7541, subds.(b), (c), (e); § 7576, subd. (d).) Thus, in some cases, a presumed father who is also the biological father may be precluded from rebutting another man's UPA presumption. Finally, the majority's logic overlooks the fact that it is possible  for example, in the case of men who are identical twins  for genetic tests to show that more than one man could be the biological father. In all of these scenarios, weighing will be necessary to determine which unrebutted presumption "controls." (§ 7612, subd. (b).) These possibilities demonstrate that a weighing provision is necessary even under my conclusion that one presumed father's biological paternity necessarily rebuts a rebuttable presumption of another man.
For the same reason, the majority errs in asserting that if the Legislature "had intended to restrict the weighing process under section 7612, subdivision (b) to disputes between competing nonbiological fathers, it could easily have said so." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12.) As I have just explained, under my conclusion, the weighing process under section 7612, subdivision (b), is not applicable only to disputes between nonbiological fathers. Moreover, even were the weighing process so limited, because, as I have demonstrated, the Legislature understood and intended that one presumed father's proven biological paternity would, under section 7612, subdivision (a), necessarily rebut the rebuttable presumption of another man, the Legislature had no need to specify that the weighing process under subdivision (b) of that section applies only to competing nonbiological fathers; that conclusion logically follows from the statutory scheme the Legislature put in place.
Nor is the majority correct that section 7575 supports its conclusion. According to the majority, section 7575, subdivision (b) "`permits but does not require' a court to rely on blood test evidence in deciding whether to set aside a voluntary declaration of paternity signed on or before December 31, 1996." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12.) "`It is unlikely,'" the majority asserts, that "`the Legislature would  without explicitly so stating  adopt a contrary rule that blood test evidence ... must defeat the claim of a person who claims presumed father status under section 7611(d).' [Citation.]" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12.)
The majority's analysis is both unpersuasive and incorrect. It is unpersuasive because it ignores the fact that blood test evidence showing that the tested man is not the father does necessarily rebut the presumption of a husband who is "conclusively presumed" to be the father under section 7540. (§ 7541, subd. (a).) To paraphrase the majority," `[i]t is unlikely the Legislature would  without explicitly so stating  adopt a contrary rule'" that *264 test results do not necessarily rebut the nonconclusive UPA presumptions. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12.) The majority's analysis is incorrect because it does not focus on the correct statute. In determining whether Heriberto's biological paternity necessarily rebuts Paul's presumption under section 7611, we should consider the Legislature's treatment of presumptions based on voluntary paternity declarations. That issue is governed by section 7576, not, as the majority asserts, by section 7575. As explained above, section 7576, subdivision (a), provides that a voluntary declaration of paternity completed before January 1, 1997, raises a "presumption" that the child of the man executing the voluntary declaration "is ... the man's child." As also explained above, section 7576, subdivision (d), provides that "any person" may rebut the "presumption" raised by such a declaration by obtaining genetic tests pursuant to section 7551. This provision makes a presumption based on a voluntary declaration expressly subject to California's Uniform Act on Blood Tests to Determine Paternity (§ 7550 et seq.), including the direction in section 7554 that the "question of paternity shall be resolved" in accordance with tests showing that the "alleged father is not the father." Thus, a presumption based on a voluntary declaration, like a section 7540 presumption, is necessarily rebutted by test results showing that the presumed father is not the father. That test results necessarily rebut the presumptions under both sections 7540 and 7576 follows not just from subdivision (d) of section 7576, but also from subdivision (a), which expressly declares that the "presumption" based on a voluntary paternity declaration "has the same force and effect as the presumption under Section 7540." (§ 7575, subd. (a).) This fact supports my construction because, again to quote the majority, "`[i]t is unlikely the Legislature would'" provide that the so-called conclusive UPA presumptions under both sections 7540 and 7576 are necessarily rebutted by such evidence and, "without explicitly so stating," "`adopt a contrary rule'" with respect to the nonconclusive UPA presumptions.[20] (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12.)
The majority is also incorrect in asserting that not "a single case" supports *265 my construction of section 7612, subdivision (a) (maj. opn., ante, 10 Cal.Rptr.3d at p. 225, 85 P.3d at p. 19), whereas its construction of that subdivision is consistent with the "weight of authority" in our Courts of Appeal. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 217, 85 P.3d at p. 12.) Brian C. v. Ginger K. (2000) 77 Cal.App.4th 1198, 92 Cal.Rptr.2d 294, supports my conclusion. There, in discussing resolution of competing claims of presumed fathers under the UPA, the court observed: (1) under section 7551, a court "may order blood tests at any time"; (2) under section 7612, subdivision (a), a section 7611 presumption "`may be rebutted ... only by clear and convincing evidence'"; and (3) "DNA tests ... certainly constitute clear and convincing evidence rebutting any of the presumptions that might favor either" of the competing fathers. (Brian C. v. Ginger K., supra, 77 Cal.App.4th at p. 1222, fn. 20, 92 Cal.Rptr.2d 294.) The majority offers no persuasive reason for discounting this decision.
On the other hand, upon examination, the Court of Appeal decisions on which the majority relies turn out not to be "weight[y]" at all. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 216, 85 P.3d at p. 11.) In Steven W., the court discussed only subdivision (b) of what it is now section 7612 in concluding that one man's presumption was controlling; it did not even consider whether, under subdivision (a) of section 7612, one presumed father's biological paternity necessarily rebuts the other man's presumption. (Steven W., supra, 33 Cal.App.4th at pp. 1115-1117, 39 Cal.Rptr.2d 535.) Thus, it provides no support for the majority's construction of the latter subdivision. In In re Kiana A. (2001) 93 Cal.App.4th 1109, 113 Cal.Rptr.2d 669, the entire discussion of the significance of biological paternity was dicta; before opining on this issue, the court held that biological paternity had not been established in the juvenile court and that the man asserting his biological paternity could not raise his "untimely claim" for the first time on appeal. (Id. at p. 1118, 113 Cal.Rptr.2d 669.) Moreover, the court's dicta on this issue contained no analysis other than citing Steven W. and citing the language of section 7612, subdivision (a). (Kiana, supra, 93 Cal.App.4th at p. 1118-1119, 113 Cal.Rptr.2d 669.) Finally, like Nicholas H. and unlike the case now before us, both Steven W. and Kiana involved a child who was more than two years old when the paternity issue arose. (Kiana, supra, 93 Cal.App.4th at p. 1109, 113 Cal.Rptr.2d 669 [child over 12 years of age]; Steven W., supra, 33 Cal.App.4th at p. 1108, 39 Cal.Rptr.2d 535 [almost 3-year-old child].) In both cases, the courts relied heavily on this fact in reaching their conclusion. (Kiana, supra, 93 Cal.App.4th at pp. 1119-1120, 113 Cal.Rptr.2d 669; Steven W., supra, 33 Cal.App.4th at pp. 1117-1118, 39 Cal.Rptr.2d 535.) Thus, these cases provide no substantial support for the majority's construction.[21]
The majority's analysis is equally faulty with respect to its conclusion that a court need not give "determinative weight" to biology in determining under subdivision *266 (b) of section 7612 which presumption "`on the facts is founded on the weightier considerations of policy and logic.'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 219, 85 P.3d at p. 14.) The sum total of the majority's statutory analysis under California law is the following: Section 7612, subdivision (b) "nowhere states that biology is a conclusive consideration of policy and logic." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 219, 85 P.3d at p. 14.) Thus, the majority completely ignores the overall statutory scheme, which, as I have shown, demonstrates the Legislature's intent, at least with respect to children less than two years of age, to make biological paternity the controlling consideration of policy and logic in resolving the competing paternity claims of presumed fathers. In this regard, the majority's analysis again violates the principle that we construe statutes not "in isolation," but "`with reference to the entire scheme of law of which [they are] part.'" (Pieters, supra, 52 Cal.3d at p. 899, 276 Cal.Rptr. 918, 802 P.2d 420.)
Instead of analyzing California's statutory scheme, the majority relies on decisions from other states. Specifically, the majority cites decisions from Colorado, Hawai'i, Minnesota, and Nevada in which courts purportedly "declined to make biology determinative under their analog to section 7612 when confronted by competing presumptions of paternity." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 219, 85 P.3d at p. 14.)
The non-California decisions on which the majority relies do not support the majority's conclusion because the statutes they construed are significantly different from California's UPA. As explained above, when our Legislature established a presumption based on test results, it excluded that presumption from the UPA's weighing process under section 7612 and specifically declared its "intent ... to standardize the process by which paternity is established in order to achieve a greater degree of equity and consistency in paternity determinations." (Stats.1986 ch. 629, § 1, pp. 2136-2137.) It thus provided clear evidence of its intent to make established biological paternity determinative as to which competing UPA presumption is, "on the facts ... founded on the weightier considerations of policy and logic...." (§ 7612, subd. (b), italics added.) By contrast, in Colorado, Hawai'i, Minnesota, and Nevada, the presumption based on scientific tests is just one of several presumptions stated in their version of section 7611, that is, their version of section 4 of the 1973 Act. (Colo. Rev. Stats. § 19-4-105; Hawaii Rev. Stats. § 584-4(a); Minn.Stat. § 257.55, subd. (1); Nev. Rev. Stats. § 126.051(1).) Notably, in the decisions the majority cites, the courts relied on this fact, and the fact that the same statute provided for the weighing of conflicting presumptions, in concluding that their state's presumption based on biology does not necessarily overcome the presumptions based on other factors.[22] For example, as one of the cited cases explained, "the original lodestar of [Minnesota's] parentage act" was "biological "paternity; thus, "[w]hen the parentage act was first adopted in [Minnesota], ... the effort was to find the biological father and then to adjudicate that person the legal father." (Matter of Welfare of C.M.G. (Minn.Ct.App.1994) 516 N.W.2d 555, 560, fn. 8, italics added.) However, "when the [Minnesota] legislature added the presumption established under the genetic *267 test presumption, [citation], it ... treated [that presumption] simply as the sixth presumption [under the parentage act]." (Ibid.) This fact "demonstrate[s]" that, in Minnesota, "other considerations ha[ve] since made the search something more than a search for a biological father." (Ibid.) This decision, and the others the majority cites, do not support the majority's conclusion precisely because their analyses depended on the fact that, unlike our Legislature, the legislatures in Colorado, Hawai`i, Minnesota, and Nevada expressly made their presumption based on biology subject to weighing by placing it in the weighing provision of their version of the 1973 Act.[23] Indeed, by recognizing that, absent this fact, the "lodestar of the parentage act" is "biological" paternity (C.M.G., supra, 516 N.W.2d at p. 560, fn. 8), these decisions actually support my conclusion that biological paternity is determinative under California's statutory scheme, at least as to children no more than two years of age.[24]

B. Constitutional Considerations
In addition to being inconsistent with the overall statutory scheme and the Legislature's intent, the majority's conclusion violates the principle that, in interpreting statutes, we should avoid constructions that "raise serious and doubtful constitutional questions." (Miller, supra, 22 Cal.2d at p. 828, 142 P.2d 297.) Under this principle, "[i]f a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, [we] will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality.... [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers." (Ibid.)
Contrary to this principle, the majority's conclusion renders our statutory scheme unconstitutional. In Kelsey, we held that, "if an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities  emotional, financial, and otherwise  his federal constitutional right to due process prohibits *268 the termination of his parental relationship absent a showing of his unfitness as a parent"; a showing that termination is in the child's best interests, which is a lower standard, is simply not constitutionally sufficient. (Kelsey, supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) In violation of this constitutional principle, the majority sanctions the termination of Heriberto's parental rights without a finding of unfitness, based on the juvenile court's finding that Jesusa's best interests are served by having Paul declared to be her legal father.
The majority's attempt to refute this conclusion fails. Initially, the majority confuses and avoids the issue by insisting that the proceedings here merely determined who "the presumed father" is, not who the father is. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 212, 85 P.3d at p. 8.) The majority states that a juvenile court may determine "the identity of a child's presumed father" through an action brought under Family Code section 7630 and Welfare and Institutions Code section 316.2, subdivision (d). (Maj. opn., ante, 10 Cal.Rptr.3d at p. 230, 85 P.3d at p. 23, italics added.) However, as we have explained, section 7630 of the UPA sets forth "the means" by which "[a] man can establish a father and child relationship," not merely his status as a presumed father. (Johnson, supra, 5 Cal.4th at p. 90, 19 Cal.Rptr.2d 494, 851 P.2d 776, italics added.) The plain language of section 7630 confirms this fact. It authorizes "a man presumed to be the child's father" under section 7611 to bring an action to "declar[e]" the actual "existence of the father and child relationship" that is merely "presumed under ... Section 7611." (§ 7630, subd. (a)(1).) It also authorizes "[a]n action to determine the existence of the father and child relationship with respect to a child who has no presumed father under Section 7611." (§ 7630, subd. (c), italics added.) The UPA'S legislative history also confirms this fact; it explains that the UPA "sets forth a procedure whereby a man can be judicially determined to be the father of the child," and that "[a]ll rights of ... the parents with regard to th[e] child ... are based on the parent and child relationship" established under the UPA's procedure. (Sen. Com. on Judiciary, analysis of Sen. Bill No. 347 (1975-1976 Reg. Sess.) as amended May 8, 1975, p. 14, italics added.) Finally, the other statute the majority cites  Welfare and Institutions Code section 316.2, subdivision (d)  also confirms this fact; it says nothing about identifying the presumed father, but provides that "[i]f a man appears in the dependency action and files an action under Section 7630 or 7631 of the Family Code, the court shall determine if he is the father." (Italics added.) Thus, contrary to the majority's statement, nothing in either Family Code section 7630 or Welfare and Institutions Code section 316.2, subdivision (d), authorizes a determination of the identity of the presumed father.
Nor is the majority correct in stating that a court may determine the identity of "a child's presumed father"  as opposed to the child's father  under California Rules of Court, rule 1413. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 230, 85 P.3d at p. 23, italics added.) Rule 1413, which is entitled "Paternity," establishes a juvenile court's "duty" in a dependency proceeding "to determine the parentage of" a child  not the child's presumed father  if "parentage" has "not otherwise [been] determined." (Cal. Rules of Court, rule 1413(a), italics added.) It states that if "there has been no prior determination of paternity of the child, the juvenile court may make such a determination." (Cal. Rules of Court, rule 1413(e), italics added.) As commonly understood, the terms "parentage" and "paternity" *269 refer to the identity of a child's actual father.[25] Thus, like Family Code section 7630 and Welfare and Institutions Code section 316.2, subdivision (d), rule 1413, by its terms, establishes a court's duty to determine who the father is, not who the presumed father is. Under these statutes, the juvenile court's finding necessarily denied Heriberto's formal "request that the court enter a judgment of [his] paternity" and necessarily established Paul's paternity, that is, it established Paul as Jesusa's father, not merely her presumed father. In so doing, it also necessarily terminated Heriberto's rights as a parent. Under section 7636, a "judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes except" certain criminal prosecutions.[26]
The record fully supports this conclusion. At the hearing where Heriberto first appeared, the court advised that there would "be an issue on April 30th as to determining the paternity." On April 30, the court announced that it was continuing "the issue as to paternity" to July 17. On July 17, when counsel objected to proceeding in Heriberto's absence, the court relayed its understanding "that the issue of paternity would be fully decided on the briefs and argument." DCFS then argued that the court should "make a finding of paternity or nonfinding of paternity" based on what had already been submitted, and it "urge[d] the court to go ahead and make its finding as to paternity." Jesusa's counsel then set forth her understanding of the court's tentative ruling: that both Paul and Heriberto were "eligible for presumed status, but that issues of public policy and logic would determine that [Paul] should be the father that's chosen." (Italics added.) After the court's ruling, Jesusa's counsel argued: "[I]n the court making a finding that [Paul] is the presumed father, that effectively states that [Heriberto] is not the father. [¶] ... It's a finding that he is not the father of this child period, and that [Paul] ... enjoys all the legal rights and responsibilities as a parent to [Jesusa] and not [Heriberto]." The court immediately responded that, as a result of its finding, Heriberto "does not have any legal rights to this child other than being noticed for" a hearing under Welfare and Institutions Code section 366.26, "should this court ever get to the stage where" it sets such a hearing. Thus, despite the language the court used in stating its finding  that Paul is "the presumed father"  the juvenile court and the parties fully understood and intended the court's decision to be a paternity determination that stripped Heriberto of his parental rights.[27]
*270 Indeed, although the majority states that the statutes and rules on which it relies authorize actions to determine the identity of a child's presumed father, its actual discussion recognizes that the cited provisions pertain to determinations of "paternity" and "legal" parenthood. (Maj. opn., ante, 10 Cal.Rptr.3d at pp. 213, 230, 85 P.3d at pp. 9, 23.) Based on these statutes, the majority concludes that the juvenile court had discretion "to hear [a] paternity action at any time" after the dependency petition was filed. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 230, 85 P.3d at p. 23, first italics added.) More importantly, the majority justifies its conclusion on the ground that, in a dependency proceeding, "[t]he legal parents must be identified" if certain procedural requirements are to be observed, and that dependency petitions often cannot be adjudicated "`without first identifying which man is the child's father.'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 230, 85 P.3d at p. 23, italics added.) "Thus," the majority concludes, "`the law cannot be judicially applied [here] without a determination of parentage. ...'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 230, 85 P.3d at p. 23, italics added.) This discussion demonstrates that even the majority recognizes the juvenile court here made a paternity determination identifying Paul as Jesusa's legal father. Also demonstrating this fact is the majority's failure to explain what additional proceedings are necessary to determine the identity of Jesusa's father  as opposed to her presumed father  what statute authorizes such proceedings, or how, in light of the juvenile court's ruling, Heriberto can still maintain a paternity claim.
Despite Paul's status as the legal father under the juvenile court's order, the majority insists that Heriberto "retains `parental rights that simply differ in degree [from]'" Paul's rights. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 212, 85 P.3d at p. 212.) According to the majority, actual termination of Heriberto's "parental rights requires further proceedings." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.)
The majority is incorrect. Although claiming that Heriberto retains parental rights, the majority identifies not a single right that he retains. Instead, to support its assertion, the majority simply cites Francisco G. v. Superior Court (2001) 91 Cal.App.4th 586, 596, 110 Cal.Rptr.2d 679. (Maj. opn., ante, 10 Cal.Rptr.3d at pp. 212, 221, 85 P.3d at pp. 8, 16.) However, like the majority, although the court in Francisco made a general statement regarding the rights of a biological father, it did not identify a single right that a biological parent has. (Francisco, supra, 91 Cal.App.4th at pp. 590-595, 110 Cal.Rptr.2d 679.) Moreover, Francisco is completely inapposite; it did not consider whether a biological father retains parental rights after a juvenile courts makes a paternity finding in favor of another presumed father. In Francisco, the court considered the statutory reunification rights in a dependency proceeding of a biological father who was never a presumed father; there was no paternity determination and no presumed father. (Ibid.) It was in this context that the court stated, by way of background, that a biological father has "parental rights that simply differ in degree [from] the parental rights conferred on a presumed father." (Id. at p. 596, 110 Cal.Rptr.2d 679.) In short, nothing supports *271 the majority's assertion that, notwithstanding the juvenile court's decision, Heriberto "retains `parental rights.'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 212, 85 P.3d at p. 8.) Nor does the majority explain how, in light of the juvenile court's ruling  which "is determinative for all purposes" (§ 7636)  it is possible that Heriberto can retain any parental rights after Paul has been declared to be Jesusa's legal father.
The majority's assertion that actual termination of Heriberto's "parental rights requires further proceedings" (maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16) is also suspect. Again, as to this issue, the juvenile court's paternity finding here is, by statute, "determinative." (§ 7636.) Moreover, section 7800 et seq., which the majority cites (maj. opn., ante, 10 Cal.Rptr.3d at p. 221, 85 P.3d at p. 16), does not support the majority's claim. Section 7803 authorizes courts to declare children free "from parental custody and control." However, in light of the juvenile court's order, this provision does not apply to Heriberto. Section 7802 provides that "[a] proceeding may be brought under this part for the purpose of having a minor child declared free from the custody and control of either or both parents." (Italics added.) The language of this statute  "either or both parents" (§ 7802)  obviously contemplates that a child has only two parents. In this case, under the juvenile court's ruling, which is "determinative for all purposes" (§ 7636), those two parents are Jesusa's mother and Paul. Because Heriberto no longer qualifies as a "parent[ ]" under section 7802, no declaration is either necessary or obtainable as to him.
Welfare and Institutions Code section 366.26, which the majority also cites, (maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16), is also inapplicable. It applies only "to children who are adjudged dependent children of the juvenile court pursuant to subdivision (c) of Section 360." (Welf. & Inst.Code, § 366.26, subd. (a).) Here, Jesusa was not adjudged a dependent under Welfare and Institutions Code section 360, subdivision (c). Moreover, Welfare and Institutions Code section 366.26, subdivision (b), provides for terminating "the rights of the parent or parents...." Given the juvenile court's paternity finding, Heriberto no longer appears to qualify as a parent. Finally, Welfare and Institutions Code section 366.26, subdivision (b), provides for terminating parental rights only in connection with adoption. The majority fails to explain how, in light of the finding in favor of Paul and Family Code section 7636, adoption proceedings will ever come about in this case. Like Family Code section 7800 et. seq., Welfare and Institutions Code section 366.26 simply has no relevance to this case and does not support the majority's conclusion that Heriberto's parental rights have not been terminated.
Finally, section 7664, which the majority also cites, is also inapplicable for two reasons. First, like Welfare and Institutions Code section 366.26, Family Code section 7664 applies only in the context of adoption proceedings, which will never come about in light of the juvenile court's ruling. Second, Family Code section 7664 applies only to a "natural father." However, under the juvenile court's ruling, Heriberto cannot qualify as Jesusa's natural father. As explained above, a UPA proceeding establishes the "parent and child relationship" between "a child and the natural father" (§ 7610, subd. (b)), and the juvenile court's ruling here, which "is determinative for all [relevant] purposes" (§ 7636), establishes that Paul, not Heriberto, is Jesusa's "natural father." (§ 7610, subd. (b).) Thus, the majority is incorrect in stating *272 that actual termination of Heriberto's "parental rights requires further proceedings."[28]
Nor is the majority justified or correct in rejecting Heriberto's due process claim based on his purported failure to "execute[] a voluntary declaration of paternity or describe[ ]" on the record "any other steps" he took "to formalize his relationship to" Jesusa. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.) In the juvenile court, counsel for Jesusa asserted in her brief that Heriberto had "signed" a "voluntary declaration of paternity." Regarding other steps that Heriberto may have taken to formalize his relationship, ironically, the lack of evidence in the record the majority cites stems directly from a ruling the majority now affirms: the juvenile court's refusal to continue the matter until Heriberto was present. Heriberto's counsel requested the continuance specifically so Heriberto could appear to present precisely the kind of evidence the majority says is lacking. As the majority notes (maj. opn., ante, 10 Cal.Rptr.3d at p. 213, 85 P.3d at p. 9), when the juvenile court asked what testimony Heriberto wanted to provide, counsel responded: "the extent in which [he] held out paternity, publicly acknowledged paternity for Jesusa, and the formal steps he went to [to] identify" Jesusa as "his daughter" to "government agencies." The juvenile court denied the continuance because it found it did "not need" to know "what [Heriberto] ha[d] done with regard to filling out documents with public agencies or government agencies." The majority affirms that ruling, reasoning that Heriberto's proposed testimony was "unnecessary" in light of the juvenile court's decision to assume that Heriberto qualified as a presumed father. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, 85 P.3d at p. 9.) Having affirmed the denial of the continuance Heriberto sought so he could present this evidence, the majority errs in now rejecting his constitutional claim based on the absence of that very evidence in the record.[29]
In any event, the majority errs in holding that Heriberto has no constitutional protection absent such a showing. Contrary to the majority's analysis, neither Kelsey nor Michael H. supports this conclusion or even suggests that the taking of steps to formalize the paternal role is an absolute prerequisite to constitutional protection. On the contrary, in Kelsey, we identified "prompt legal action to seek custody" as only one of many factors "[a] court should consider." (Kelsey, supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) We more broadly held that, in determining whether a biological father has made the showing necessary to trigger due process protections, a court should not look to any one factor, but "should consider all factors," including the biological father's "conduct both before and after the child's birth." (Ibid.) The majority asserts that Heriberto did less than the father in *273 Kelsey, who filed an action to establish his parental role only two days after the child's birth. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.) However, in terms of demonstrating a timely and full commitment to parental responsibilities, Heriberto did far more than the father in Kelsey. The father in Kelsey never lived with or even visited his child. (Kelsey, supra, 1 Cal.4th at pp. 822, 825, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) By contrast, Heriberto lived with Jesusa's mother for a year before Jesusa's birth, lived with Jesusa and her mother as a family until his arrest almost two years after Jesusa's birth, and acted as Jesusa's father during those two years. Given these circumstances, and the fact that Paul has always conceded that Heriberto is Jesusa's father, Heriberto had no reason to take "legal steps to formalize his relationship" with Jesusa or "`seek custody of'" her. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.) Moreover, during this dependency proceeding, Heriberto continues to assert his paternity and acknowledges that, if a judgment is entered establishing his paternity, he "will have the obligation to support" Jesusa until she is at least 18. Based on his conduct over the entire relevant period, Heriberto clearly qualifies for constitutional protection, even assuming, as the majority does, he did not take steps to formalize his paternal relationship. The majority errs in concluding otherwise.[30]
After rejecting Heriberto's claim that the juvenile's court's decision unconstitutionally terminated his parental rights, the majority addresses his claim that the juvenile court's decision "unconstitutionally interfered with" those rights. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.) Based on a purported "balance" of the competing interests, the majority rejects Heriberto's "substantive due process" claim. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.)
The majority's analysis is incorrect, because it mischaracterizes and incorrectly weights the relevant interests to be balanced. On one side of the scale, the majority places Heriberto's "largely abstract interest in being an absent presumed father while he remains in prison." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.) However, Heriberto's interest is hardly abstract; it arises from the period he lived with Jesusa's mother during her pregnancy and from the actual parental relationship he developed with Jesusa during the almost two years he lived with her as her father. As previously noted, according to Jesusa's mother, Heriberto was "always ... very loving and gentle to" Jesusa during this time. Moreover, the majority takes the short-term, myopic view in focusing only on Heriberto's "interest in being an absent presumed father while he remains in prison." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16, italics added.) Heriberto will not be in prison forever; as the majority notes, he received "three years in prison" for his rape conviction. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 211, 85 P.3d at p. 7.) This three-year period will end in May 2004, only a few months from now (assuming Heriberto is not released even earlier based on custody credits). We must consider not only Heriberto's interest while he remains in prison, but also his interest in being a father after his impending release. The juvenile court's paternity determination will seriously interfere with  indeed, *274 it will terminate  Heriberto's rights long after his release. On the other side of the scale, the majority places the "substantial state interests in familial stability and the welfare of the child." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, 85 P.3d at p. 16.) In this case, the state's interest in familial stability is "relatively weak [ ]," given that Jesusa lived with Heriberto and her mother as a family until Heriberto's arrest almost two years after Jesusa's birth, and that Paul has never claimed he is actually Jesusa's father. (Brian C. v. Ginger K., supra, 77 Cal.App.4th at p. 1217, 92 Cal.Rptr.2d 294; see also Michael H. v. Gerald D., supra, 491 U.S. at p. 120, fn. 1, 109 S.Ct. 2333 (plur. opn. of Scalia, J.) ["where the husband and wife have not been cohabiting" and husband "already knows the child is not his, [it is] less likely that the paternity hearing will disrupt an otherwise harmonious and apparently exclusive marital relationship"].) Moreover, the state's interest in the child's welfare is amply protected by the separate statutory scheme relating to custody issues and termination of parental rights. For all of these reasons, the majority's rejection of Heriberto's due process claim is erroneous.[31]
The majority's conclusion also raises serious and doubtful constitutional questions with respect to the equal protection clause. In Kelsey, we explained that when a biological father "has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (Kelsey, supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216, fn. omitted.) Contrary to this principle, under the majority's conclusion, the parental rights of a biological father who has made the necessary commitment to his parental responsibilities do not receive the same protection as the parental rights of a biological mother. As explained above, we held in Johnson that, under the UPA, the parentage claim of a woman who has established her biological maternity and who "from the outset intended to be the child's mother" cannot be defeated based on the child's best interests, even by another woman who also establishes a biological basis for parentage. (Johnson, supra, 5 Cal.4th at p. 93, 19 Cal.Rptr.2d 494, 851 P.2d 776.) Here, the majority holds that a man in the same position  who has established his biological paternity, who moved in with the mother a year before the child's birth and intended from the outset to be the child's father, and who lived with the child and acted as her father for almost two years after her birth  does not enjoy the same protection; his parentage claim may be defeated if a court concludes that the child's best interests are served by recognizing the paternity claim of someone with no biological basis for his claim. Thus, in interpreting the UPA as establishing lesser protection for the rights of a biological father, the majority's holding renders our statutory scheme violative of the equal protection clause. As we explained in Kelsey:"We simply do not in our society take children away from their mothers  married or otherwise"  merely because a *275 "best interest" inquiry suggests that "a `better' ... parent can be found.... [N]o valid reason [exists] why we should be less solicitous of a father's" rights. (Kelsey, supra, 1 Cal.4th at p. 846, 4 Cal.Rptr.2d 615, 823 P.2d 1216.)

C. Policy Considerations
Finally, the majority can offer no persuasive policy basis for adopting a construction that fails to implement the Legislature's intent and renders our statutory scheme unconstitutional. As we explained in Johnson, the determination of who a child's father is under the UPA  that is, "the determination of parentage"  is separate from the "eventual custody decision [ ]"; "[l]ogically, the determination of parentage must precede, and should not be dictated by, eventual custody decisions." (Johnson, supra, 5 Cal.4th at p. 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) As we also explained, basing the parentage determination on "the best interests of the child," as the majority does, improperly "confuses concepts of parentage and custody." (Ibid.) If we properly keep these concepts separate, then Heriberto should be found to be Jesusa's father under the statutes governing parentage determinations and questions of custody and termination of parental rights should be decided under the "dependency laws" that govern such matters. (Ibid.) If those dependency laws are applied on the facts here, then a juvenile court would surely deny Heriberto custody of Jesusa and terminate his parental rights. (See Welf. & Inst.Code, § 366.26, subd. (c)(1) ["convict [ion] of a felony indicating parental unfitness ... constitute[s] a sufficient basis for termination of parental rights" unless "termination would be detrimental to the child"].) Thus, in this case, the majority's construction and my construction will produce the same outcome.
As this discussion demonstrates, the majority errs in asserting that, under my construction, "courts must ignore the child's best interests in a dependency proceeding." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 226, 85 P.3d at p. 20.) Under my construction, and as we held in Johnson, courts must consider the child's best interests in a dependency proceeding in determining termination and custody issues, not in determining parentage under the UPA. Moreover, as the majority observes, paternity determinations occur in contexts other than dependency proceedings. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2.) To paraphrase the majority, our construction of the paternity statutes should not be driven by "the fortuity that a dependency petition is pending." (Ibid.)
The majority is also incorrect regarding the effect of my construction where a child is "the product of rape." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 229, fn. 11, 85 P.3d at p. 22, fn. 11.) The majority asserts that, under these circumstances, my construction requires a court "to favor the biological father over any other presumed father." (Ibid.) However, this assertion overlooks the fact that, under my construction, even though a biological father qualifies as a presumed father, his parental rights would surely be terminated where the child is the product of rape, and another presumed father would be able to obtain custody and parental rights through adoption. The majority's assertion also overlooks the fact that my approach is precisely the approach the Legislature, through its statutes, has dictated where a child is the product of rape and the rapist qualifies under section 7611 as a presumed father. (§§ 7611.5 [prohibiting rapists from becoming presumed fathers only if they do not qualify under § 7611]), 7825, subd. (b) [in action for order declaring child free from father's custody and control, that *276 child is product of rape raises "conclusive presumption" that "father is unfit to have custody or control"]; Welf. & Inst.Code, § 366.26, subd. (c)(1) (["convict[ion] of a felony indicating parental unfitness ... constitute[s] a sufficient basis for termination of parental rights" unless "termination would be detrimental to the child"].) The majority also errs in asserting that my construction gives a rapist "`"a right of reunification services ... simply because [he] is the biological father of the child."'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 229, fn. 11, 85 P.3d at p. 22, fn. 11.) The majority's assertion overlooks the fact that, consistent with the Legislature's express intent, my construction applies not to all biological fathers, but only to those who otherwise qualify as presumed fathers under section 7611. (See § 7611.5.) More importantly, the majority's assertion overlooks the fact that, even where a rapist qualifies as a presumed father, our statutes expressly deprive him of any right to reunification services. (Welf. & Inst.Code, §§ 361.5, subds. (b)(12), (c), (e)(1).) My construction has no effect on operation of these statutes.
So, one may ask, if my construction and the majority's would produce the same result here, then does any of this matter? Yes; because, as we held only 10 years ago, courts applying the UPA should not"decide parentage based on the best interests of the child," and should keep parentage and custody decisions separate (Johnson, supra, 5 Cal.4th 84 at p. 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776); because, as we also cautioned 10 years ago, deciding parentage on the basis of the child's best interests "raises the repugnant specter of governmental interference in matters implicating our most fundamental notions of privacy" (ibid.); because we held in Kelsey that the "federal constitutional right[s]" of biological fathers like Heriberto "prohibit[ ]" termination of their parental relationship absent a showing of their "unfitness" as parents (Kelsey, supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216); and because the majority is announcing a rule that applies not only on the tragic facts of this case, but in every case where a biological father is confronted by a man who also qualifies as a presumed father.
The majority's claim that only a "small subset" of biological fathers is at risk under its holding (maj. opn., ante, 10 Cal.Rptr.3d at p. 223, 85 P.3d at p. 17) is neither accurate nor reassuring. The majority errs in asserting that an unwed biological father can necessarily escape the effect of its conclusion simply "by executing a voluntary declaration of paternity." (Ibid.) A voluntary paternity declaration is not effective without the mother's signature. (§ 7574, subd. (b)(1).) Even if the mother signs, she can rescind the voluntary declaration within 60 days of executing it. (§ 7575, subd. (a).) Thus, contrary to the majority's statement, an unwed biological father cannot protect himself by unilaterally executing a paternity declaration. Moreover, many biological fathers will, no doubt, fail to recognize the need to formalize their legal status by filing a paternity declaration until it is too late. Here, for example, given that Jesusa lived with Heriberto throughout her life and Paul never claimed to be her father, Heriberto had no reason to know he needed to file a paternity declaration (even assuming, as the majority does, he did not actually do so). Thus, for a variety of reasons, in many cases, the protection a voluntary paternity declaration affords will be unavailable.
The majority also errs in asserting that unwed biological fathers can necessarily escape the effect of its conclusion by "successfully maintain[ing] a parent-child relationship such that no other man obtains the opportunity to qualify as a presumed *277 father." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 223, 85 P.3d at p. 17.) Depending solely on the mother's actions, another man can qualify for a presumption regardless of how successfully the unwed biological father maintains the parent-child relationship. For example, another man may become a presumed father if the mother either marries him or allows him to take the child into his home. (§ 7611, subd. (c), (d).) Thus, contrary to the majority's statement, its conclusion may apply to an unwed biological father notwithstanding his successful efforts to maintain a parent-child relationship.
Indeed, the majority's application of section 7611, subdivision (d), in this case amply demonstrates this fact. The majority finds that, although Paul has never claimed to be Jesusa's natural father, he qualifies as a presumed father under section 7611, subdivision (d), because Jesusa's mother took Jesusa to Paul's on weekends to be with Jesusa's half siblings. (Maj. opn., ante, 10 Cal.Rptr.3d at pp. 210, 215, 85 P.3d at pp. 6, 10.) Thus, under the majority's analysis, Heriberto could have prevented Paul from qualifying as a presumed father under section 7611, subdivision (d), only by limiting Jesusa's time with her mother and half siblings. Such behavior, which the majority's conclusion encourages, would have been contrary to Jesusa's best interests.
Given today's world, the substantial risk the majority's conclusion poses for unwed biological fathers is no small matter. According to the Centers for Disease Control and Prevention, in 2002, there were 1,365,966 births to unmarried women in the United States  more than one out of every three (34 percent)  and these numbers are similar to those reported "since 1995."[32] Recent statistics also show that 39 percent of children in the United States under the age of 18 live apart from their biological fathers. (Sparling, All in the Family: Recognizing the Unifying Potential of Same-Sex Marriage (2001) 10 Law & Sexuality 187, 202, fn. 86.) Thus, literally thousands of unwed biological fathers are potentially at risk under the majority's conclusion.
Indeed, contrary to the majority's claim, even biological fathers who "married the mother of their child" (maj. opn., ante, 10 Cal.Rptr.3d at p. 223, 85 P.3d at p. 17) are at risk under the majority's conclusion if they were not cohabiting with the mother at the time of conception or did not marry the mother until after the child's birth. (§§ 7540, 7611, subd. (a), (c); see also Dawn D., supra, 17 Cal.4th at p. 935, 72 Cal.Rptr.2d 871, 952 P.2d 1139.) Also at risk are biological fathers who thought they were validly married to the mother, but were not. (§ 7611, subd. (b).) These biological fathers, like the unwed biological fathers discussed above, are subject to the majority's conclusion unless they both recognize the need to take formal action and get the mother's cooperation before a dispute arises.[33]
*278 Thus, the number of biological fathers  both married and unmarried  at risk under the majority's holding is far greater than the majority suggests. Under the majority's holding, all of these biological fathers  no matter how law-abiding, loving and competent and no matter how well developed their relationship with their children  are at risk of having their parental rights terminated by a court's subjective and discretionary determination that some other man who qualifies as a presumed father would be a better father. Because the majority's conclusion is not consistent with our statutes, the Legislature's intent, or constitutional requirements, I dissent.

II. HERIBERTO HAD A STATUTORY RIGHT TO BE PERSONALLY PRESENT.
Heriberto claims that under Penal Code section 2625, which sets forth certain statutory rights of prisoners with respect to actions involving their parental rights, the juvenile court erred in adjudicating the paternity issue and the dependency petition in his absence. Regarding adjudication of the petition, the majority agrees and holds that the court erred. I agree with that holding.[34] However, I disagree with the majority's holding that the juvenile court did not err with respect to the paternity determination.
Regarding the paternity determination, the majority asserts that Penal Code section 2625 requires a court to order a prisoner's production "only `where the proceeding seeks to terminate the parental rights of [the] prisoner' under Welfare and Institutions Code section 366.26 or Family Code section 7800 et seq. or `to adjudicate the child of a prisoner a dependent child.'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 212, 85 P.3d at p. 8.) Because a paternity determination "is neither of these," the majority asserts, the statute did not require the juvenile court to order Heriberto's production. Instead, the majority claims, the court had "discretion" to order his production under subdivision (e) of Penal Code section 2625, which provides that "[i]n any other action or proceeding in which a prisoner's parental or marital rights are subject to adjudication," the superior court "may" order the prisoner's production in court. (See maj. opn., ante, 10 Cal.Rptr.3d at p. 212, 85 P.3d at p. 8.)
The majority is incorrect, because it misconstrues the statutory language. As relevant here, section 2625 does not, as the majority states, require the court to issue a production order only when the actual adjudication of dependency occurs. Rather, it provides that a juvenile court must: (1) "[i]n ... any proceeding brought under Section 300 of the Welfare and Institutions Code ... to adjudicate the child of a prisoner a dependent child of the court, ... order notice of any court proceeding regarding the proceeding transmitted to the prisoner" (Pen.Code, § 2625, subd. (b), italics added); and (2) issue a production order "[u]pon receipt ... of a statement from the prisoner or his or her attorney indicating the prisoner's desire to be present during the court's proceedings" (Pen.Code, § 2625, subd. (d)). The juvenile court's paternity determination here was unquestionably a "proceeding regarding the [Welfare and Institutions Code section 300] proceeding" involving Jesusa. (Pen.Code, § 2625, subd. (b).) As explained above, our statutes and court rules *279 confirm this conclusion. (Welf. & Inst.Code, § 316.2; Cal. Rules of Court, rule 1413.) Indeed, the majority acknowledges that the dependency petition here could not be adjudicated "`without first identifying which man is the child's father.'" (Maj. opn., ante, 10 Cal.Rptr.3d at p. 230, 85 P.3d at p. 23.) Thus, under the statute's plain language, because the paternity determination was a "proceeding regarding the [section 300] proceeding" involving Jesusa (Pen.Code, § 2625, subd. (b)), and because Heriberto asked to be present, the court was required to order Heriberto's production. (Pen.Code, § 2625, subd. (d).)[35]
As this discussion demonstrates, my analysis does not, as the majority asserts, "fail[ ] to recognize" (maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2) that, as here relevant, Penal Code section 2625, subdivision (a) applies "[i]n ... any proceeding brought under Section 300 of the Welfare and Institutions Code ... to adjudicate the child of a prisoner a dependent child of the court." On the contrary, my analysis expressly acknowledges this fact but, unlike the majority's, it does not focus only on this isolated phrase. My construction gives effect to the entire provision, including the requirement that the court "order notice of any court proceeding regarding the proceeding transmitted to the prisoner." (Pen.Code, § 2625, subd. (b), italics added.) Thus, the statutory language itself expressly provides the "indication" the majority demands that the Legislature intended the right to appear under Penal Code section 2625 to apply to a paternity hearing where "a dependency petition is pending." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2.)
Indeed, despite its analysis, in a footnote the majority concedes that a prisoner's right to be present under Penal Code section 2625 is not confined only to the proceeding where the actual dependency adjudication occurs. In this regard, the majority states its "view" that, under subdivision (b) of Penal Code section 2625, the right also applies to any "jurisdictional hearing" that "precede[s]" the formal adjudication of the petition. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2.) I agree.
However, the majority fails to justify its conclusion that, under subdivision (b) of Penal Code section 2625, the right applies to such jurisdictional hearings, but "not to" paternity determinations. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2.) In stating that the right also applies to jurisdictional hearings, the majority expressly concedes that the phrase "any court proceeding regarding the [Welfare and Institutions Code section 300] proceeding" (Pen.Code, § 2625, subd. (b)) "encompass[es]" more than just the adjudication hearing. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2.) However, the majority does not explain why a jurisdictional hearing qualifies as "any court proceeding regarding the proceeding" (Pen.Code, § 2625, subd. (b)), but a paternity determination, which the majority concedes must be made "`in many cases'" before the petition is adjudicated (maj. opn., ante, 10 Cal.Rptr.3d at p. 230, 85 P.3d at p. 23), does not. The statutory language demonstrates that the majority is incorrect; if, as the majority asserts, the Legislature "intended" *280 the statute to" encompass" only adjudication and disposition hearings (maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2), then the Legislature would have said so and would not have broadly required notice in "any court proceeding regarding [a welfare anD institutions code section 300] proceeding." (Pen.Code, § 2625, subd. (b), italics added.) The majority cites no legislative history to support its narrow reading of this broad language. Thus, the majority's conclusory analysis is unconvincing.[36]
Nor is the majority correct that my construction would produce an "absurd result." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8.) The majority asserts that, under my conclusion, a juvenile court "must" give notice and order a prisoner's production for "every" hearing in the course of the dependency proceeding. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2.) However, by the statute's express terms, even after giving notice, a court must order the prisoner's production only"[u]pon receipt ... of a statement from the prisoner or his or her attorney indicating the prisoner's desire to be present during the court's proceedings...." (Pen.Code, § 2625, subd. (d).) We have no reason to believe that a prisoner would request to be present for mundane "housekeeping matters," such as "scheduling hearings." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 213, fn. 2, 85 P.3d at p. 8, fn. 2.) Indeed, wise counsel would advise against such a course, so as not to irritate the judge who will be deciding the substantive issues. Moreover, even after asking to be present, a prisoner may waive his right. Again, wise counsel would advise a prisoner to follow this course. Finally, contrary to the majority's assertion, my construction does not even necessarily require that notice be given  and the prisoner's option thus invoked  with respect to all such mundane matters. In applying other statutes that mandate a criminal defendant's presence at trial, we have held the presence requirement inapplicable to such matters. (E.g., People v. Ochoa (2001) 26 Cal.4th 398, 435, 110 Cal.Rptr.2d 324, 28 P.3d 78.) A similar limitation would be appropriate with respect to Penal Code section 2625. Of course, as I have explained, the paternity determination at issue here was anything but mundane; it determined Heriberto's parental rights and, as the majority concedes, had to be made before the petition could be adjudicated. Thus, contrary to the majority's assertion, my construction would not produce an anomalous result.
The majority's fallback position  that Heriberto actually "was absent for only a portion of the presumed father hearing" (maj. opn., ante, 10 Cal.Rptr.3d at p. 214, 85 P.3d at p. 9, italics added)  is simply incorrect. In support of its assertion, the majority notes that Heriberto was present at hearings on April 13 and April 30, and *281 was absent only for the July 17 hearing. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 214, 85 P.3d at p. 9.) However, the April 13 hearing was Heriberto's first appearance in the case  the date he was "arraigned"  and it was during this arraignment that he was first advised that Paul was making a paternity claim. This advisement hardly constituted adequate notice to qualify the hearing as part of the presumed father hearing. Moreover, neither Paul nor Jesusa's mother was present at the April 13 hearing; indeed, at a prior hearing, the court had directed that neither of them "should appear" at Heriberto's arraignment. Like Heriberto, they were told to appear on April 30, when the court would be "determining the paternity." Given these facts, the April 17 hearing cannot be considered to be part of the paternity hearing simply because the court asked Heriberto's counsel if he "want[ed] to be heard on any paternity issues today." The majority's reliance on the April 30 hearing is even more misplaced. At that hearing, the court, on its own initiative, "continue[d] the issue as to paternity" to July 17 without hearing any argument on the issue. Thus, contrary to the majority's assertion, the July 17 hearing was not merely "a portion of the presumed father hearing" (maj. opn., ante, 10 Cal.Rptr.3d at p. 214, 85 P.3d at p. 9); it constituted the entire paternity hearing and Heriberto was absent for all of it. For all of these reasons, I disagree with the majority's conclusion that Heriberto had no statutory right under Penal Code section 2625 to be personally present on July 17 when the juvenile court determined paternity.
Although I agree with the majority that Heriberto had such a statutory right with respect to adjudication of the petition, I have a comment about the majority's analysis; it further demonstrates the majority's attempt to obfuscate the fact that the juvenile court in this case made a paternity finding that terminates Heriberto's rights, not merely a finding as to who "the presumed father" is. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 212, 85 P.3d at p. 8.) As relevant here, Penal Code section 2625, subdivision (d), applies, by its terms, only where the dependency petition seeks "to adjudge the child of a prisoner a dependent child of the court." (Italics added.) If, as I have demonstrated, the juvenile court ruled that Paul is Jesusa's legal father, then subdivision (d) is simply inapplicable to the subsequent dependency adjudication; under the court's ruling, Jesusa is not "the child of a prisoner." (Pen.Code, § 2625, subd. (d).) Indeed, in their briefs, both DCFS and Jesusa make precisely this argument. DCFS asserts that, because "[t]he law allows for only one legal father," once the court found in Paul's favor, Heriberto no longer qualified as "an incarcerated `parent'" for purposes of applying Penal Code section 2625 and "had no standing" with respect to the dependency adjudication. Similarly, the brief filed on Jesusa's behalf asserts that, "once the court" ruled in Paul's favor, Heriberto "no longer maintained his legal status as Jesusa's parent" and "Penal Code section 2625 did not apply to him." The majority completely ignores these arguments; avoiding this threshold issue as to whether Penal Code section 2625 even applies to the dependency adjudication in light of the juvenile court's finding, the majority instead considers whether the presence of counsel satisfied the requirements of the statute and the due process clause. (Maj. opn., ante, 10 Cal.Rptr.3d at pp. 231-235, 85 P.3d at pp. 23-28.)
The majority's consideration of the due process issue while remaining silent on the threshold issue violates our longstanding rule that we "`"will not decide constitutional questions where other grounds are *282 available and dispositive of the issues of the case."' [Citations.]" (Santa Clara County Local Transportation Authority v. Guardino (1995) 11 Cal.4th 220, 230, 45 Cal.Rptr.2d 207, 902 P.2d 225.) Under that principle, "`we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us.' [Citations.]" (Ibid.) Here, we need not reach the constitutional due process issue if Penal Code section 2625 does not apply in light of the juvenile court's paternity determination. Thus, rather than ignore this potentially dispositive threshold issue that the parties have specifically raised, the majority should decide the issue before discussing Heriberto's constitutional due process claim. (Cf. Pearl v. Workers' Comp. Appeals Bd. (2001) 26 Cal.4th 189, 196, fn. 3, 109 Cal.Rptr.2d 308, 26 P.3d 1044["[b]ecause" statute "is inapplicable, we need not, and do not, decide" claim that its application is unconstitutional]; Dibb v. County of San Diego (1994) 8 Cal.4th 1200, 1208, 36 Cal.Rptr.2d 55, 884 P.2d 1003 ["before considering" constitutional issue, "we must first consider whether" statute applies].)
The majority's failure to consider this issue, in contravention of our basic framework for interpreting statutes, enables the majority to avoid answering the crucial question of whether, in light of the juvenile court's finding in favor of Paul, Heriberto is still Jesusa's father. In my view, the majority should take a stand on this question, because if, as I have explained, the juvenile court's ruling establishes that Heriberto is not Jesusa's father, then under Kelsey, the juvenile court has terminated his parental rights in violation of constitutional requirements.

III. CONCLUSION.
Like the majority, I am deeply concerned about the fate of Jesusa. However, unlike the majority, I conclude that because Heriberto is both the biological father and a presumed father under section 7611, the statutes require us to address Jesusa's fate through provisions governing custody and termination of parental rights, not through the paternity determination that occurred here. Unlike the majority, which construes section 7612 in virtual isolation as if no other statute or legislative history tells us anything about the Legislature's policy decisions regarding biological paternity, I base my conclusion on section 7612 viewed in the context of the overall statutory scheme and its legislative history. My conclusion also rests on constitutional considerations that apply in light of what actually happened here, but which the majority refuses to acknowledge: that the juvenile court's order terminated Heriberto's parental rights. Thus, although I share the majority's concern, I cannot subscribe to its methods. The result produced here under the majority's construction ultimately can, and probably would, be produced through custody and termination proceedings without distorting our statutes governing parentage determinations, ignoring the Legislature's expressed intent, and rendering our statutes unconstitutional. Finally, unlike the majority, I conclude that where a biological father who is a prisoner files a paternity claim in a dependency proceeding and asks to be present when the claim is decided, permitting a court to reject the claim  and thereby terminate his parental rights  in his involuntary absence is contrary to statute. I therefore dissent.
NOTES
[1] Although "the statutory term `presumed father' is somewhat `cumbersome,'" we must "take the statutory nomenclature as we find it." (Adoption of Kelsey S. (1992) 1 Cal.4th 816, 823, fn. 3, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (Kelsey S.).)
[2] Our dissenting colleagues rely on the language in Penal Code section 2625, subdivision (b) that the court provide notice "of any court proceeding regarding the proceeding" to the prisoner and reason that the court must therefore supply notice (and order the prisoner's production) for every hearing in the course of the dependency proceeding. This construction, however, fails to recognize that "proceeding" refers not to just any proceeding, but only "where the proceeding seeks to adjudicate the child of a prisoner a dependent child of the court." (Pen.Code, § 2625, subd. (b), italics added.) In our view, the "proceeding regarding the proceeding" language is intended to encompass the jurisdictional hearing, which may precede the formal adjudication of the petition at the dispositional hearing, as well as the dispositional hearing. However, it cannot be read so broadly as to encompass a presumed fatherhood hearing, which usually arises outside of any "proceeding ... to terminate the parental rights of any prisoner" or "to adjudicate the child of a prisoner a dependent child of the court." (Pen.Code, § 2625, subd. (b); see, e.g., Dawn D. v. Superior Court (1998) 17 Cal.4th 932, 936, 72 Cal.Rptr.2d 871, 952 P.2d 1139; Barkaloff v. Woodward (1996) 47 Cal.App.4th 393, 396, 55 Cal.Rptr.2d 167 [proceeding under the Domestic Violence Protection Act, Fam.Code, § 6200 et seq.].) A prisoner-parent's attendance at a presumed fatherhood hearing in these latter circumstances is unquestionably governed by subdivision (e) of Penal Code section 2625. We see no indication that the Legislature intended that subdivision (d) apply to an identical hearing merely because of the fortuity that a dependency petition is pending. Indeed, under the dissent's broad reading, subdivision (d) would apply even to scheduling hearings or other housekeeping matters in the course of a dependency proceeding. We decline to interpret the statute to reach such an absurd result.
[3] Counsel conceded that this evidence was intended merely to rebut assertions in the minor's brief that Heriberto had offered insufficient evidence to support a threshold finding that he was the presumed father  i.e., that he had presented "no evidence that he openly and publicly acknowledged paternity of Jesusa," had "claimed fatherhood of Jesusa to friends, relatives or neighbors," or "took formal steps to identify her to governmental agencies as his daughter." As counsel for the minor pointed out at oral argument, Heriberto made no offer of proof concerning the nature and quality of his bond with the child to supplement his biological relationship with her.
[4] All future statutory references are to the Family Code unless otherwise noted.
[5] We also said in Nicholas H. that the Legislature, by including the limiting phrase "`in an appropriate action,'" "had in mind an action in which another candidate is vying for parental rights and seeks to rebut a section 7611(d) presumption in order to perfect his claim." (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) This dictum described a common circumstance in which rebuttal might be appropriate, but did not declare that rebuttal was appropriate in all such cases. Indeed, the very next paragraph cautioned that we did not reach the question whether "biological paternity by a competing presumptive father necessarily defeats a nonbiological father's presumption of paternity." (Nicholas H., supra, at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.)
[6] Justice Kennard would rely on sections 7541 and 7554, which she concedes may be inapplicable here, as proof that the Legislature believes biology is the most weighty consideration of policy and logic. Yet, if the Legislature had wanted to make a categorical exception for biology that did not rely "on the facts" of a particular case (§ 7612, subd. (b)), it could easily have said so. (E.g., Wilson ex rel. C.M.W. v. Estate of Williams (Tex.App.2003) 99 S.W.3d 640, 647 [former section 160.110(e) of the Texas Family Code included an additional sentence providing "`that the weightier presumption of paternity is that of a presumed father who is not excluded as the biological father of the child by scientifically accepted paternity testing that shows that at least 99 percent of the male population is excluded'"].) Moreover, the Legislature's articulation of a rule of rebuttal for the section 7540 presumption that differs from that for the enumerated section 7611 presumptions (see § 7612, subd. (a)), and the imposition of a two-year limit in section 7541 without any corresponding limit on the presumptions at issue here, undermines her claim that biology must be deemed the weightier consideration in this case.
[7] Heriberto thus effectively seeks the rights of fatherhood without any of its responsibilities. But, as we have also noted, "Childhood does not wait for the parent to become adequate." (In re Marilyn H. (1993) 5 Cal.4th 295, 310, 19 Cal.Rptr.2d 544, 851 P.2d 826.) "`There is little that can be as detrimental to a child's sound development as uncertainty over whether [she] is to remain in [her] current "home," ... especially when such uncertainty is prolonged.'" (In re Sade C. (1996) 13 Cal.4th 952, 988, 55 Cal.Rptr.2d 771, 920 P.2d 716.)
[8] In Nicholas H., quoting a Court of Appeal decision, we described that policy as the "`state interest in preserving the integrity of the family and legitimate concern for the welfare of the child.'" (Nicholas H., supra, 28 Cal.4th at p. 65, 120 Cal.Rptr.2d 146, 46 P.3d 932.)
[9] We also cautioned that the Court of Appeal, in assuming that natural necessarily meant biological in sections 7611 and 7612, had "read too much into the passages it selected" from our case law. (Nicholas H., supra, 28 Cal.4th at p. 64, 120 Cal.Rptr.2d 146, 46 P.3d 932.) Our dissenting colleague appears to have made the same mistake. (See dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at pp. 256-257, 85 P.3d at pp. 44-46.)
[10] Under the dissent's construction of section 7551 et seq., in which genetic tests requested by any party or other person" `involved'" in the action would necessarily and conclusively rebut another man's presumption under section 7611, Heriberto's status as the biological father would necessarily and conclusively rebut Paul's presumption even if Heriberto were not a presumed father. (See dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 243, 85 P.3d at p. 34.) This would be inconsistent with Dawn D. v. Superior Court, supra, 17 Cal.4th 932 at pages 938-939, 72 Cal.Rptr.2d 871, 952 P.2d 1139, in which we held that a biological father who was not a presumed father under section 7611 or Kelsey S., supra, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216, had no statutory or constitutional right to challenge another man's section 7611 presumption.
[11] Under the dissenters' bright-line rule, in which biology is necessarily determinative, a juvenile court would be obliged to favor the biological father over any other presumed father, even if the child were the product of a rape. Like the Court of Appeal in In re Jerry P. (2002) 95 Cal.App.4th 793, 802, 116 Cal.Rptr.2d 123, "`we think it highly unlikely the Legislature intended to give a right of reunification services to a rapist ... simply because the man is the biological father of the child.'"
[12] In re Axsana S., supra, 78 Cal.App.4th 262, 92 Cal.Rptr.2d 701, and In re Rikki D., supra, 227 Cal.App.3d 1624, 278 Cal.Rptr. 565, which held to the contrary without examining this legislative history, are disapproved to the extent they are inconsistent with the discussion herein.
[1] The majority also holds that the biological father was entitled to be present at the jurisdictional and dispositional hearings where the juvenile court declared the child a dependent of the court, but that the court's violation of this right was harmless. Although I agree with this analysis, I also conclude, as explained in part IV, post, that the court's jurisdictional and dispositional findings should be reversed for other reasons.
[2] Unless otherwise stated, all further statutory citations are to the Family Code.
[3] Both subdivision (a) of section 7541 and section 7554 are phrased negatively; that is, they state the result when a blood test shows that a man is not the father of the child. The reason: A blood test can only rule out the possibility that a man is not a child's biological father; it cannot show with complete certainty that a man is the biological father.
[4] The majority and Justice Chin's dissenting opinion disagree as to whether Paul also qualified as a presumed father by holding Jesusa out as his natural child. (Maj. opn., ante, 10 Cal.Rptr.3d at pp. 210, 215, 85 P.3d at pp. 6, 10; dis. opn. of Chin, J., post, 10 Cal.Rptr.3d at p. 242, fn. 2, 85 P.3d at p. 33, fn. 2.) I see no need to resolve this debate because it does not affect the outcome of this case.
[1] Except as otherwise indicated, all further statutory references are to the California Family Code.
[2] The majority states that Paul also qualified for the presumption under subdivision (d) of section 7611. (Maj. opn., ante, 10 Cal.Rptr.3d at pp. 210, 215, 85 P.3d at pp. 6, 10.) However, the record shows that the juvenile court based its finding regarding Paul only on subdivision (a) of section 7611, and that no one argued in the juvenile court that he qualified for the presumption under section 7611, subdivision (d). In this regard, citing section 7611, subdivision (a), the Court of Appeal stated that Paul "qualifies as a presumed father because he and Jesusa's mother were married to each other at the time of Jesusa's birth." Nor does the record contain sufficient evidence to support the majority's independent finding that Paul met the requirements of section 7611, subdivision (d), specifically, that he "openly [held] out [Jesusa] as his natural child." (Italics added.) The record indicates that Paul has never claimed to be Jesusa's natural father. (See Adoption of Michael H. (1995) 10 Cal.4th 1043, 1051, 43 Cal.Rptr.2d 445, 898 P.2d 891 [presumption under § 7611, subd. (d) applies only if man "openly and publicly admit[s] paternity"]; In re Marriage of Moschetta (1994) 25 Cal.App.4th 1218, 1226, 30 Cal.Rptr.2d 893 [presumption under § 7611, subd. (d), found inapplicable because woman "never held [child] out as her `natural' child" and "[t]here never was any doubt that [woman] ha[d] no biological, natural or genetic connection with" child].) The majority notes that Jesusa's mother declared in writing that Paul had held himself out as Jesusa's father. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 210, 85 P.3d at p. 6.) However, this hearsay document is contrary to all of the other evidence in the case and, according to the Los Angeles County Department of Children and Family Services (DCFS), was not "given any legal weight" in the juvenile court. My disagreement with the majority on this point does not affect my analysis or conclusion.
[3] The majority concedes that similar language in section 7541, subdivision (a), establishes that a presumption "is rebutted by evidence of biological fatherhood." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.)
[4] The majority asserts that these provisions do not apply here because no testing was requested or performed and "case law has strictly construed these testing requirements." (Maj. opn., ante, 10 Cal.Rptr.3d at pp. 225-226, 85 P.3d at p. 19.) However, the case the majority cites for the latter proposition is completely inapposite; it declined to consider test results to rebut the conclusive presumption under section 7540 because the person offering the results had no statutory standing to challenge that presumption. (Rodney F. v. Karen M. (1998) 61 Cal.App.4th 233, 238-240, 71 Cal.Rptr.2d 399.) In any event, even were the majority correct, as I explain, the legislative policy reflected by these statutes and the legislative history support my conclusion that Heriberto's biological paternity is determinative despite the absence of testing. Given our duty to construe section 7612 in the context of the entire statutory scheme, rather than in isolation, the purported technical inapplicability of the testing provisions does not, as the majority asserts, justify its refusal "to definitively construe the scheme." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 227, 85 P.3d at p. 19.) Finally, the majority fails to explain why it is "unwise" (maj. opn., ante, 10 Cal.Rptr.3d at p. 226, 85 P.3d at p. 19) to apply this legislative policy given the trial court's express and uncontested finding that Heriberto is Jesusa's biological father. Indeed, the majority's assertion in this regard is inconsistent with its own conclusion that the juvenile court here was "obliged" to consider Heriberto's biological paternity in weighing competing presumptions under section 7611. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 220, 85 P.3d at p. 15.) If, as the majority holds, Heriberto's biological paternity was sufficiently established to require its consideration, then it should be considered as the Legislature has directed.
[5] The same analysis establishes that proof of biological paternity necessarily rebuts the other nonconclusive presumptions under section 7611, including the presumption under subdivision (d) of that section.
[6] These provisions show one additional thing: that the court in In re Raphael P. (2002) 97 Cal.App.4th 716, 734, 118 Cal.Rptr.2d 610, erred in stating that section 7551 "do[es] not authorize courts to order genetic testing of a man who meets the statutory test for presumed fatherhood." To support its statement, the court reasoned that section 7611 refers to testing of an "alleged father," not a "presumed father [ ]." (In re Raphael P., supra, 97 Cal.App.4th at p. 734, 118 Cal.Rptr.2d 610.) However, as explained above, sections 7541 and 7576 provide that testing of a presumed father done "pursuant to" section 7551 rebuts their respective presumptions if it shows that the presumed father is not the biological father. (§§ 7541, subd. (a); 7576, subd. (d).) Accordingly, the term "alleged father" in section 7551 must include presumed fathers; otherwise, the testing of presumed fathers to which sections 7541 and 7576 refer could not be performed "pursuant to" section 7551. (§§ 7541, subd. (a), 7576, subd. (d); see also Kusior v. Silver (1960) 54 Cal.2d 603, 620, 7 Cal.Rptr. 129, 354 P.2d 657 (Kusior) ["rebuttable presumptions" of presumed fathers were "conclusively rebutted" by "tests taken under" identical language in predecessor of § 7551 (Code Civ. Proc., former § 1980.3)].) Moreover, it is unlikely the Legislature would authorize testing of presumed fathers who qualify for the so-called conclusive presumptions, but not of presumed fathers who qualify only for a nonconclusive presumption.

In any event, when Paul and Heriberto first appeared in this action and alleged that they qualified for a paternity presumption, they were merely "alleged father[s]." (§ 7551.) They remained so at least until they actually established their claim with proof. Thus, the juvenile court had discretion to order, and the parties had a right to demand, testing pursuant to section 7551.
[7] Moreover, the statutes themselves tell courts what to do when faced with such a situation. As explained above, section 7554, subdivision (a), directs that the paternity of a man who qualifies for a presumption under section 7611 "shall be resolved according[]" to tests showing that he "is not the father." Where a presumed father under section 7611 also qualifies for a presumption under section 7555, testing will show that another presumed father under section 7611 "is not the father," and his "paternity" must be determined "accordingly." (§ 7554, subd. (a).) Moreover, as I have explained, the hierarchy of presumptions stated in section 7576, subdivision (e), establishes that a presumption under section 7555 based on biological paternity outweighs the presumptions set forth in subdivisions (a) through (e) of section 7611.

Contrary to the majority's assertion, Steven W. v. Matthew S. (1995) 33 Cal.App.4th 1108, 39 Cal.Rptr.2d 535 (Steven W.) did not "reject[ ]" my approach. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 228, 85 P.3d at p. 21.) There, the only issue the court addressed was whether the "presumed father status" of a man who qualifies for a presumption under two subdivisions of section 7611 necessarily "controls" over the "presumed father status" of a man who qualifies for a presumption under only subdivision (a)(4) of section 7611. (Steven W., supra, 33 Cal.App.4th at p. 1116, 39 Cal.Rptr.2d 535.) Although "not[ing]" as an aside in a footnote that one of the men "was also entitled to a rebuttable presumption of paternity [under section 7555] on the basis of the blood test evidence" (id. at p. 1116, fn. 4, 39 Cal.Rptr.2d 535), the court did not consider the effect of that presumption; the parties had not raised the issue on appeal or, apparently, in the trial court.
[8] Specifically, as contemplated by our statutes and court rules, Heriberto filed a form JV-505 stating: "I believe I am the child's father and request that the court enter a judgment of paternity." (See Welf. & Inst.Code, § 316.2, subd. (b); Cal. Rules of Court, rule 1413(h).) Thus, the majority errs in stating that Heriberto asked only "to be declared the presumed father." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 210, 85 P.3d at p. 15.)
[9] The Legislature's intent to have the general rule apply to the other section 7611 presumptions also explains why it did not include in section 7612 a provision "analogous" to section 7541 or section 7576, and why it did not "reference[ ] the testing provisions at section 7550 et seq. in the opening `excepting' clause to section 7612, subdivision (a)." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.)
[10] The majority's analysis is also inconsistent with the Legislature's treatment of presumptions raised by voluntary paternity declarations. By statute, such presumptions "override" all of the other section 7611 presumptions except the section 7540 presumption. (§ 7576, subd. (e).) However, as I have explained, presumptions based on voluntary paternity declarations are subject to section 7554, which, like section 7541, subdivision (a), requires a court to determine the "paternity" of a presumed father "according[ ]" to test results showing that he "is not the father." (§ 7554.) Thus, although the Legislature has declared that the section 7576 presumption should be stronger than the other section 7611 presumptions, under the majority's conclusion, it is weaker.
[11] Moreover, in 1960, when we first characterized the section 7540 presumption as "a substantive rule of law," we based that characterization on the fact that the presumption was not rebuttable. (Kusior, supra, 54 Cal.2d at p. 619, 7 Cal.Rptr. 129, 354 P.2d 657.) As explained above, the Legislature subsequently made the section 7540 rebuttable.
[12] (Jackson v. Jackson (1967) 67 Cal.2d 245, 247, 60 Cal.Rptr. 649, 430 P.2d 289 [conclusive presumption does not operate where evidence shows "it was impossible that the child was conceived during the period of cohabitation"]; Kusior, supra, 54 Cal.2d at p. 620, 7 Cal.Rptr. 129, 354 P.2d 657 [blood tests "conclusively rebut[ ]" rebuttable presumption]; Anderson v. Anderson, supra, 214 Cal. at pp. 416-417, 5 P.2d 881 [where biological paternity by "a stranger is established beyond question," husband's presumption "no longer obtains"]; Baker, supra, 13 Cal. at p. 101 [husband's presumption was "met and overcome by" mother's admission that another man was the biological father]; Hughes v. Hughes, supra, 125 Cal.App.2d at pp. 784-787, 271 P.2d 172.)
[13] According to the majority, commentary on the deletion of the 1973 Act's weighing provision "implies" that the 1973 Act "relied on something other than genetic testing to resolve competing presumptions." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 225, 85 P.3d at p. 19, italics added.) I do not contend otherwise; when the 1973 Act was drafted, "genetic testing" had not reached the point where it could definitively identify the father, although it could, in some cases, conclusively exclude certain men. As explained above, it was not until 1986 that, according to the Legislature, "the science of genetic testing ha[d] advanced to the degree that" an affirmative presumption of paternity could be based on such testing. (Stats.1986, ch. 629, § 1, pp. 2136-2137; cf. 9 West's U. Laws Ann., supra, Miscellaneous Acts, 1952 Act, comrs. note No. 1, p. 102.) Thus, in 1973, a weighing provision was necessary in light of scientific limitations on "genetic testing." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 225, 85 P.3d at p. 19.) This does not change the fact that the focus of the 1973 Act was identifying a child's biological father through whatever means were available. Indeed, by emphasizing advances in genetic testing, the recent revisions to the 1973 Act confirm this fact. As the cited commentary explains, "[n]owadays, genetic testing makes it possible in most cases to resolve competing claims to paternity." (Amendments to the Uniform Parentage Act as Last Amended in 2002 with Prefatory Note and Comments (2003) 37 Fam. L.Q. 5, 17.)
[14] (E.g., In re Zacharia D. (1993) 6 Cal.4th 435, 449, fn. 15, 24 Cal.Rptr.2d 751, 862 P.2d 751["[a] biological or natural father is one whose biological paternity has been established"]; Adoption of Kelsey S. (1992) 1 Cal.4th 816, 823, fn. 3, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (Kelsey) ["`natural father' ... mean[s] a biological father"]; Cornelious, supra, 35 Cal.3d at p. 464, 198 Cal.Rptr. 543, 674 P.2d 245 [that woman had genetic trait for sickle cell anemia "means that either her natural mother or her natural father must carry the trait"]; In re Lisa R. (1975) 13 Cal.3d 636, 649, 119 Cal.Rptr. 475, 532 P.2d 123 [appellant's interest "arose from more than the mere biological fact that he is [child's] natural father"]; id. at p. 647, 119 Cal.Rptr. 475, 532 P.2d 123; People v. Sorensen (1968) 68 Cal.2d 280, 289, 66 Cal.Rptr. 7, 437 P.2d 495 [husband's presumption may exist even though he "is not the natural father"].)
[15] As my analysis amply demonstrates, I have not, as the majority incorrectly asserts, merely "assum[ed] that natural necessarily mean[s] biological" based on a few "'selected'" passages "from our case law." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 226, fn. 9, 85 P.3d at p. 20, fn. 9.) Rather, based on the common and ordinary meaning of the term, legislative history demonstrating the Legislature's understanding of the term, the overall statutory scheme, and our historical construction of the term, I have concluded  not assumed  that the Legislature intended the term "natural" in the UPA to mean biological. By contrast, the majority simply disregards the term; it makes no attempt to determine what the Legislature intended by its use of the term "natural."
[16] Thus, it is ironic that the majority accuses me of "interpret [ing]" the statutory scheme "as though it included [a] directive" that is not there. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.)
[17] Our conclusion on this point did not, as the majority suggests, derive from "materials extrinsic to the UPA." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 229, 85 P.3d at p. 22; see Johnson, supra, 5 Cal.4th at p. 91, 19 Cal.Rptr.2d 494, 851 P.2d 776.) Nor did our rejection of the majority's "best interests" approach derive from such materials. (Johnson, supra, 5 Cal.4th at p. 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) Indeed, even as to our adoption of the "intent" approach, contrary to the majority's assertion, we considered the extrinsic materials the majority cites only after  and to "support"  the conclusion we had already reached. (Johnson, supra, 5 Cal.4th at p. 93, 19 Cal.Rptr.2d 494, 851 P.2d 776.)
[18] As this discussion demonstrates, Nicholas H. did not, as the majority asserts, merely "describe[ ] a common circumstance in which rebuttal might be appropriate." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 218, fn. 5, 85 P.3d at p. 13, fn. 5, italics added.) Rather, it stated that "an appropriate action" where the presumption would be rebutted is one "in which another candidate is vying for parental rights and seeks to rebut a section 7611[ ] presumption in order to perfect his claim...." (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) Such is the case here.
[19] As this analysis demonstrates, the majority errs in asserting that my construction "cannot be reconciled" with Nicholas H. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 225, 85 P.3d at p. 19.) Moreover, contrary to the majority's assertion, Nicholas H. did not hold that application of section 7612, subdivision (a), requires evaluation of "the best interests" of the child. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 226, 85 P.3d at p. 20.) On the contrary, Nicholas H. nowhere mentions the child's "best interests." Rather, as I have explained, we based our decision in Nicholas H. on what the Legislature "had in mind," that is, the Legislature's intent. (Nicholas H., supra, 28 Cal.4th at p. 70, 120 Cal.Rptr.2d 146, 46 P.3d 932.) As I have also explained, Nicholas H. stated that the kind of action now before us, in which competing fathers are "vying for parental rights," is precisely the kind of action the Legislature "had in mind" as "an appropriate action" where a presumption would be rebutted. (Ibid.)
[20] As already explained, also supporting my construction is the fact that the hierarchy of presumptions established in subdivision (e) of section 7576 affirmatively demonstrates the Legislature's intent that a presumption under section 7555 based on biological paternity would outweigh a presumption under subdivisions (a) through (e) of section 7611. Moreover, by statute, the requirements for a valid voluntary declaration of paternity include a signed statement "by the mother" that the identified father "is the only possible father" (§ 7574, subd. (b)(5), italics added) and a signed statement "by the father ... that he is the biological father of the child." (Id., subd. (b)(6), italics added.) Thus, contrary to the majority's analysis, the provisions relating to the presumption based on a voluntary declaration of paternity are part of an overall statutory scheme that demonstrates the Legislature's intent to make established biological paternity the controlling factor in dealing with competing presumptions.

Section 7575, subdivision (b), which the majority incorrectly cites instead of section 7576, addresses the rescission or setting aside of voluntary declarations, not the rebuttal of presumptions based on such declarations. Voluntary declarations signed after 1996, which are subject to section 7575, do not merely raise a presumption of paternity, they "establish the paternity of a child" and "have the same force and effect as a judgment for paternity issued by a court." (§ 7573.) By focusing on section 7575 and ignoring the statute that expressly governs the rebuttal of presumptions based on a voluntary paternity declaration  section 7576  the majority's analysis "compar[es] apples and oranges." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 224, 85 P.3d at p. 18.)
[21] Ironically, notwithstanding its criticism of my analysis, the majority adopts a construction of Penal Code section 2625 without citing a single supporting decision and, in so doing, disapproves two published Court of Appeal decisions because they adopted a "contrary" construction "without examining [relevant] legislative history." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 233, fn. 12, 85 P.3d at p. 25, fn. 12.) Steven W. considered no legislative history. Kiana's dicta regarding subdivision (a) of section 7612 considered no legislative history, contained virtually no analysis, and depended principally on a decision that involved a different provision.
[22] (Doe v. Doe (2002) 99 Hawai'i 1, 52 P.3d 255, 262; Witso v. Overby (Minn.2001) 627 N.W.2d 63, 66; N.A.H. v. S.L.S., supra, 9 P.3d at p. 360; Love v. Love (1998) 114 Nev. 572, 959 P.2d 523, 526-527.)
[23] For the same reason, the majority is incorrect in stating that these non-California decisions, which construed a statute significantly different from either California's UPA or the 1973 Act, "addressed the issue" now before us under California's UPA or even were rendered in a "UPA state." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 220, 85 P.3d at p. 15.)
[24] The majority incorrectly suggests that I would make biology determinative only"within the first two years of life." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 227, 85 P.3d at p. 21.) However, as my analysis makes clear, I would hold that biology is determinative at least during the first two years. Because Jesusa was less than two years old when Heriberto sought to establish his paternity, it is unnecessary here to decide whether biology is determinative as to older children. Thus, my focus on children under two years of age is simply an exercise in judicial restraint, not, as the majority asserts, a "logical flaw[ ]." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 227, 85 P.3d at p. 21.) Nor is the majority correct that my construction is "inconsistent with" our decision in Dawn D. v. Superior Court (1998) 17 Cal.4th 932, 72 Cal.Rptr.2d 871, 952 P.2d 1139 (Dawn D.). (Maj. opn., ante, 10 Cal.Rptr.3d at p. 227, fn. 10, 85 P.3d at p. 21, fn. 10.) Contrary to the majority's assertion, my conclusion that biological paternity by a man who qualifies as a presumed father under section 7611 necessarily rebuts another man's presumption has no bearing on Dawn D.'s holding that a man who is "not a presumed father" lacks standing to challenge another man's presumption. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 227, fn. 10, 85 P.3d at p. 21, fn. 10, italics added.)
[25] Black's Law Dictionary defines "paternity" as "[t]he state or condition of being a father, esp. a biological one; fatherhood." (Black's Law Dict., supra, at p. 1148, col. 2.) It defines "paternity suit" or "parentage action" as "[a] court proceeding to determine whether a person is the father of a child." (Ibid., italics added.)
[26] Thus, the majority is incorrect in asserting that I have not cited anything to support my conclusion that the juvenile court's ruling "render[s] Heriberto a legal stranger to" Jesusa. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 221, 85 P.3d at p. 16.)
[27] The parties have taken a consistent position in this court. The brief filed on Jesusa's behalf asserts that "once the juvenile court found that Paul ... was the presumed father, Heriberto was no longer considered a legal parent" and "no longer maintained his legal status as Jesusa's parent." At oral argument, DCFS stated that a determination of who is the presumed father is a determination of who is the legal father, and that the court's finding that Paul is the presumed father thus is the same as a paternity determination and resolved Heriberto's formal request that the court enter a judgment of paternity. DCFS also argued that the finding that Paul is the presumed father means that Paul is Jesusa's legal father and that he has the rights and responsibilities of being a father.
[28] Even were the majority correct that any of these provisions applies, only in the most technical sense could it be said that Heriberto retains any parental rights. At best, the majority's reliance on the meager rights Heriberto purportedly retains under these provisions elevates form over substance.
[29] Moreover, that other witnesses may have been able to testify on this issue (maj. opn., ante, 10 Cal.Rptr.3d at p. 214, 85 P.3d at p. 9) does not justify the majority's conclusion. Given the juvenile court's statement that it would not consider such evidence, it is unlikely the court would have allowed Heriberto to call other witnesses on the issue. Nor, in light of the juvenile court's statement, did Heriberto have any reason to offer such evidence. Finally, the other potential witnesses could only testify regarding their personal knowledge of Heriberto's action; they could not testify about any of his actions of which they were unaware.
[30] Under the majority's analysis, even a married man who lives with his wife and biological child for two years and fulfills all of his responsibilities as a father apparently does not qualify for constitutional protection unless he takes additional steps to formalize his paternal relationship. Thus, little is left of Kelsey under the majority's view.
[31] The majority's analysis also depends on an obvious nonsequitur. After noting that Heriberto is in prison, the majority states: "Heriberto thus effectively seeks the rights of fatherhood without any of its responsibilities." (Maj. opn., ante, 10 Cal.Rptr.3d at p. 222, fn. 7, 85 P.3d at p. 17, fn. 7, italics added.) However, the conclusion that Heriberto does not seek any of the responsibilities of fatherhood does not logically follow from his imprisonment. Moreover, the record affirmatively refutes the majority's statement; in his formal request that the court enter a judgment establishing his paternity, Heriberto acknowledged that, if the judgment is entered, he "will have the obligation to support the child until the child reaches," at minimum, "the age of 18."
[32] See http://www.cdc.gov/nchs/data/nvsr/nvsr52/nvsr52  10.pdf (as of Mar. 1, 2004).
[33] According to the majority's own analysis, only one class of biological fathers  those "who are married to and cohabit with the mother" at the time of the child's conception  do not need the mother's cooperation after the child's birth to be protected. (Maj. opn., ante, 10 Cal.Rptr.3d at p. 223, 85 P.3d at p. 17.) Even this proposition is arguable. Section 7612, subdivision (b), without qualification, provides for the weighing of all presumptions that "arise under Section 7611," and section 7611 expressly incorporates the presumption under "[s]ection 7540." Thus, where the husband is the biological father, even though his section 7540 presumption cannot be rebutted under subdivision (a) of section 7612, under subdivision (b) of that section, it is arguably subject to weighing against another man's presumption.
[34] I also agree with the majority's conclusion that the juvenile court's error in this regard was harmless. However, because the court's error in determining paternity affected its disposition, I would reverse the dispositional order.
[35] The same analysis would apply if this were a proceeding to terminate parental rights "brought under Part 4 (commencing with Section 7800) of Division 12 of the Family Code, and Section 366.26 of the Welfare and Institutions Code...." (Pen.Code, § 2625, subd. (b).)
[36] The majority's analysis is suspect for another reason. It proceeds as if the juvenile court did not order Heriberto's production and the question is whether this failure was an abuse of discretion. However, the juvenile court did order Heriberto's production at the July 17 hearing, and the issue is whether it had discretion to proceed despite noncompliance with its order. Contrary to the majority's statement (maj. opn., ante, 10 Cal.Rptr.3d at p. 212, 85 P.3d at p. 8), this question was not answered in In re Barry W. (1993) 21 Cal.App.4th 358, 26 Cal.Rptr.2d 161. That decision considered whether the juvenile court, on the facts of that case, had discretion to decline to issue a production order and whether it had abused its discretion in refusing to issue such an order. (Id. at pp. 363-371, 26 Cal.Rptr.2d 161.) That a court has discretion to decline to issue an order does not answer the separate question of whether a court has discretion to proceed where it has issued a production order and the order has not been obeyed.